IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: PACKAGED ICE ANTITRUST LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br>ALL INDIRECT PURCHASER ACTIONS | Civil Action No.: 2:08-MD-1952-PDB<br><br>AMENDED CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Lawrence J. Acker, Brian W. Buttars, Linda Desmond, James Feeney, Ainello Mancusi, Ron Miastkowski, Perry Peka, Patrick Simasko and Wayne Stanford bring this action for damages, injunctive relief and costs of suit including reasonable attorneys' fees for injuries to themselves and members of the proposed class they represent. The allegations set forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding each plaintiff.

## NATURE OF THE ACTION

1.      This action arises from a long-standing agreement among defendants – producers of packaged ice in the United States and Canada, which have a combined market share of nearly 70 percent -- not to compete with each other. In furtherance of their cartel, defendants agreed to, and did in fact, fix and inflate prices, allocate territories and customers, acquire competitors, refuse to compete and otherwise commit a variety of unlawful and anticompetitive acts. The purpose and effect of the cartel has been to fix, raise, maintain and stabilize the prices paid for ice sold in plastic bags or large blocks ("packaged ice") throughout the United States. Evidence of the existence of the conspiracy includes but is not limited to admissions made by participants in the conspiracy, a guilty plea by one of the defendants to a violation of Section 1 of the

Sherman Act, defendants' suspension of officers who they believe may have participated in the cartel, defendants' attempts to intimidate and bribe a whistleblower and economic behavior that would have been inconsistent with each defendant's self-interest or implausible in the absence of the conspiracy.

JURISDICTION AND VENUE

2.      Plaintiffs' claims arise under § 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust and consumer protection statutes and common law of 47 states and the District of Columbia.  This Court has exclusive original jurisdiction over the federal claim pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) as well original jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the class exceeds $5 million exclusive of interest and costs.  In addition, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts of the federal claim asserted in this action.

3.      Venue is proper in the Eastern District of Michigan pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because defendants transact business, may be found, and a substantial part of the events and occurrences giving rise to the claims took place, in this District.

INTERSTATE TRADE AND COMMERCE

4.      During the class period, defendants produced, manufactured, distributed and sold packaged ice in interstate commerce in a continuous and uninterrupted flow to customers located in each and every state in the continental United States and District of Columbia.

5.     Defendants' activities at issue in this action were within the flow of and substantially affected interstate trade and commerce, including commerce in each and every state in the continental United States and District of Columbia.

PLAINTIFFS

6.     Plaintiffs Lawrence J. Acker, Patrick Simasko and Wayne Stanford are citizens of the State of Michigan.

7.     Plaintiff Brian W. Buttars is a citizen of the State of New York.

8.     Plaintiff Linda Desmond is a citizen of the State of California.

9.     Plaintiff James Feeney is a citizen of the State of California.

10.     Plaintiff Ainello Mancusi is a permanent resident alien.

11.     Plaintiff Ron Miastkowski is a citizen of the State of Florida.

12.     Plaintiff Perry Peka is a citizen of the State of Indiana.

13.     Between January 1, 2001 and March 6, 2008, plaintiffs purchased packaged ice indirectly from one or more of the defendants, for their own use and not for resale, at retail establishments throughout the United States, including but not limited to their home states.

DEFENDANTS

14.     Defendant Reddy Ice Holdings, Inc. ("Reddy Ice Holdings") is a corporation organized under the laws of the State of Delaware with its principal place of business at 8750 North Central Expressway, Suite 1800, Dallas, Texas 75231.  Reddy Ice Holdings is the parent of its wholly-owned subsidiary, defendant Reddy Ice Corporation ("Reddy Ice").  Reddy Ice is a Delaware corporation with its principal place of business at 8750 North Central Expressway, Suite 1800, Dallas, Texas 75231.  Hereafter Reddy Ice Holdings and Reddy Ice will be referred to collectively as "Reddy Ice."  Reddy Ice is the largest manufacturer and distributor of packaged

3

ice in the United States.  Reddy Ice's products are primarily sold throughout the southern United States.  Within its territories, Reddy Ice is and has been the leading manufacturer and distributor of packaged ice.  Reddy Ice has had over 80% of its packaged ice sales in territories where it is the leading manufacturer.

15.    The "Arctic Glacier" defendants are related companies consisting of: Defendant Arctic Glacier Income Fund ("Arctic Fund"),  a mutual fund trust organized under the laws of Alberta, Canada, with its principal place of business at 625 Henry Avenue, Winnipeg, Manitoba, Canada; defendant  Arctic Glacier, Inc. ("Arctic Inc."), a wholly-owned subsidiary of Arctic Fund, organized under the laws of Alberta, Canada,  with its principal place of business at 625 Henry Avenue, Winnipeg, Manitoba, Canada; and defendant Arctic Glacier International, Inc., a wholly-owned subsidiary of Arctic Glacier, Inc. that serves as its operating and holding subsidiary in the United States, and which is a Delaware corporation with its principal place of business located at 1654 Marthaler Lane, West St. Paul, Minnesota.  Artic Glacier is in the business of manufacturing and distributing packaged ice in the United States, primarily in parts of the midwest, northeast, and California.  Arctic Glacier is the second largest manufacturer of packaged ice sold in the United States.  Arctic Glacier is and has been the leading manufacturer and distributor of packaged ice in the territories in which it operates.

16.    Defendant Home City Ice Company ("Home City") is an Ohio corporation with its principal place of business at 6045 Bridgetown Road, Cincinnati, Ohio 45248.  Home City manufactures, distributes, and sells packaged ice principally in parts of the midwest.  Home City is the third largest manufacturer and distributor of packaged ice in the United States with sales that have grown to more than $80 million per year.

## AGENTS

17.    The acts alleged to have been done by the defendants were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of the defendants' business affairs.

## CLASS ALLEGATIONS

18.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.  The "class" is defined as:

> All persons or other legal entities (excluding governmental entities, defendants, their officers, directors, subsidiaries or affiliates), who purchased packaged ice indirectly in the continental United States (except for the State of Ohio) and the District of Columbia between January 1, 2001 through March 6, 2008.

19.    The members of the class are so numerous that joinder of all of them would be impracticable.  The exact number of class members is unknown by plaintiffs at this time, but plaintiffs believe them to number in the millions.

20.    Plaintiffs' claims are typical of the class members.  Plaintiffs and all class members were impacted and damaged in the same manner by defendants' wrongful conduct. Plaintiffs and the class members purchased packaged ice at artificially inflated prices because of defendants' wrongful conduct.

21.    Plaintiffs will fairly and adequately protect the interest of the class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.  Plaintiffs also have retained counsel who have experience in the litigation of complex antitrust class actions including of the type of claims alleged herein.

22.    Questions of law and fact common to the class members predominate over questions that may affect only individual class members.  Defendants have acted on grounds generally applicable to the entire class.  Common questions of law and fact include, but are not

limited to:

(a)    Whether defendants engaged in a contract, combination or conspiracy to allocate the market and customers for packaged ice in the United States, and to raise, fix, maintain or stabilize the price of packaged ice sold in the United States;

(b)    The duration and extent of the contract, combination or conspiracy alleged herein;

(c)    Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

(d)    Whether defendants violated the state statutes alleged in Count Two;

(e)    Whether defendants took steps to conceal the contract, combination or conspiracy;

(f)    Whether defendants' conduct caused the price of packaged ice sold in the United States to be artificially high and non-competitive;

(g)    Whether plaintiffs and members of the class were injured by defendants' conduct; and

(h)    Whether plaintiffs and the class are entitled to equitable and injunctive relief and the nature of such relief.

23.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all class members is impractical.  The damages suffered by the individual class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for class members to redress the

wrongs done to them. Even if the class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

STRUCTURAL CHARACTERISTICS OF THE INDUSTRY

24.    Packaged ice is sold at retail establishments such as supermarkets, mass merchants and convenience stores. It is used to keep food and beverages at sufficiently cold or comfortable temperatures particularly when refrigeration is not available.

25.    Packaged ice is sold throughout the United States. Excluding in-house manufacturing, the packaged ice industry in the United States has been estimated as having sales of about $900 million in 2006. The retail ice distribution market accounts for an estimated 90% of packaged ice sales.

26.    Defendants dominate the packaged ice industry, and the market share and financial resources of non-defendant firms that manufacture and distribute packaged ice is small. Through acquisitions, defendants have increased their market power and reduced the ability of other packaged ice companies to compete for customers served by defendants. According to Reddy Ice's estimation, by early 2007 Reddy Ice, Arctic Glacier and Home City controlled 66.6% of the packaged ice industry. By this time, there remained only small third party ice manufacturers, the majority of whom had less than $1 million a year in revenue.

27.    Turnover of major ice customers is infrequent. Each defendant typically is the sole source supplier of packaged ice to its customers. There is usually one packaged ice option

per retail location. So each defendant does not experience any competition for its packaged ice within stores.

28.    Defendants' pricing is not constrained by threat of entry into the manufacture and sale of packaged ice. There are substantial barriers to entry to be able to compete effectively with the defendants. In order to serve major customers, a new entrant into the business would have to incur multimillion dollar costs, including a manufacturing plant and equipment, energy, transportation, and distribution infrastructure. Because of these high costs, new or small distributors are not able to meet the needs of large customers with geographically dispersed retail locations and cannot compete successfully for such customers.

29.    Consumers of packaged ice do not have any alternative products that they find reasonably interchangeable with packaged ice. They will not substitute packaged ice for another product in response to a small price increase.

30.    Demand for packaged ice is inelastic and stable. Because of its low cost, consumers are not sensitive to price, as they will not reduce the quantity of packaged ice that they demand in response to a small increase in price. Although such a price increase would amount to pennies for the retail price of packaged ice, it would reap defendants substantial additional profits. Thus, an increase in price will not produce a sufficient reduction in the quantity of packaged ice sold so as to render a price increase unprofitable.

31.    Packaged ice is a fungible commodity product as it is simply frozen water. As a result, direct customers have no need to stock any particular brand of packaged ice.

32.    Packaged ice manufacturers are able to monitor the sales activity of each other including the territories in which they sell and the approximate prices charged.

33.    Direct customers of packaged ice, particularly retailers such as supermarkets, mass merchants and convenience stores, are in a fiercely competitive industry.  They operate on slim margins.  They have the ability to change prices to their customers frequently and cheaply.  They cannot afford to absorb price increases and remain profitable.  As a result, they typically pass on entire price increases to their customers such as plaintiffs and the class rapidly after they receive them from the manufacturers.

## THE CRIMINAL ANTITRUST INVESTIGATION

A.    Home City's Conviction

34.    On June 7, 2008, Thomas E. Sedler, President and Chief Executive Officer of Home City, on behalf of Home City, pleaded guilty to violating Section 1 of the Sherman Act.  Before the Honorable Herman J. Weber, United States District Judge of the United States District Court for the Southern District of Ohio (Western Division) and on behalf of Home City, Sedler swore that the averments in Home City's plea agreement were true.  Sedler confirmed under oath that "since 2001, [defendant] participated in a conspiracy among packaged ice producers, the primary purpose of which was to allocate customers and territories of packaged ice sold in southeastern Michigan and the Detroit, Michigan metropolitan area.  In furtherance of the conspiratorial activity, the defendant, through its officers and employees, primarily through its deceased vice president of sales and marketing, engaged in discussions and attended meetings with representatives of other packaged ice producers.  During these discussions and meetings, agreements were reached to allocate customers and territories of packaged ice to be sold in southeastern Michigan and the Detroit, Michigan metropolitan area."  The Court then accepted and entered Home City's guilty plea pursuant to the plea agreement.

B.  Search Warrant Executed at Reddy Ice's Headquarters and Its Suspension of Key Officer.

35.    On or about March 4, 2008, a United States Magistrate Judge of the United States District Court for the Northern District of Texas issued a warrant authorizing the Federal Bureau of Investigation to search Reddy Ice's headquarters in Dallas, Texas.  Before issuing the search warrant, the magistrate judge determined -- based upon a sworn government application – that it was more likely than not that Reddy Ice violated Section 1 of the Sherman Act and that evidence of that criminal activity will be found at its corporate headquarters.

36.    On September 15, 2008, Reddy Ice announced that it had suspended Ben D. Key, the Company's Executive Vice President – Sales & Marketing, because the Special Committee of the Company's Board had "found that Mr. Key has likely violated Company policies and is associated with matters that are under investigation."  Key had originally been an executive with Suiza Food's Reddy Ice, and was on Reddy Ice's Executive Committee.  To replace Key, a team of senior executives were to direct Reddy Ice's sales and marketing efforts.

C.  Arctic Glacier's Suspension of Officers

37.    Arctic Glacier also commenced an internal investigation into allegations of its involvement in the antitrust conspiracy.  As a result, Arctic Glacier suspended Frank Larson, Arctic Glacier's Executive Vice President, Operations, and Carl Cooley, Arctic Glacier's Vice President, Sales.

DEFENDANTS' EFFORTS TO SILENCE THE WHISTLEBLOWER

38.    In August, 2008, Martin G. McNulty filed an action against his former employer, Arctic Glacier, claiming he was fired because he had refused to participate in a packaged ice industry antitrust conspiracy.  McNulty, who had been Vice President of Sales at Party Time Ice, which was acquired by Arctic Glacier in late 2004, has stated that:

10

o  while employed by Party Time he heard that Party Time and other packaged ice manufacturers were conspiring to allocate markets and rig bids.

o  his boss at Arctic Glacier - Keith Corbin - told him Arctic Glacier was conspiring with Home City Ice.

o  Corbin told him in January 2005 that Arctic Glacier, Home City and Reddy Ice had a market allocation agreement.

o  Corbin told him that Corbin had flown to Cincinnati for a conspiracy meeting in late 2004 or early 2005, and provided an example of recent collusion with Reddy Ice.

o  a former colleague - Geoff Lewandowski - told McNulty that he had spoken to an Arctic Glacier executive and Lewandowski said Arctic Glacier would rehire McNulty if he stopped cooperating with authorities.

o  Joseph Riley - President of Tropic Ice (which was later acquired by Arctic Glacier) - told him that Arctic Glacier, Home City, and Reddy Ice had agreed that none of them would hire him.

39.  In 2004, Steve Knowlton called McNulty on behalf of his father Charles Knowlton (owner of Party Ice who later became Director of Franchise Operations for Arctic Glacier) and told him a Home City executive had told Knowlton that a current Party Time customer in Michigan had approached Home City about supplying it. Home City declined and told Party Time to take steps so that the customer would not look for another ice supplier. Steve Knowlton told McNulty that Party Time and Home City had agreed not to compete for customers in certain areas. Party Time would not service certain stores because they were being serviced by Home City, and Home City and Party Time agreed in advance on who would submit the lower bid to potential customers, including providing false certifications that the bid was not collusive.

40.  After Arctic Glacier acquired Party Time and McNulty went to work for Arctic Glacier, Corbin, an Arctic Glacier Vice President of Sales, told McNulty that Arctic Glacier had

a market allocation agreement with Home City. Corbin told McNulty the geographic locations of one customer – Speedway Super America – that Arctic Glacier and Home City had agreed Arctic Glacier could service.

41.    Corbin also told McNulty that Arctic Glacier had an agreement with Reddy Ice and Home City to geographically divide the United States market for packaged ice. Corbin said the Arctic Glacier – Reddy Ice conspiracy was nationwide, an example of which was Arctic Glacier backing away from buying an ice company in Nevada so as to avoid competition with Reddy Ice, and that Arctic Glacier had agreed not to enter the south and southeast markets to enable Reddy Ice to increase packaged ice prices. Also as part of the conspiracy, Arctic Glacier and Reddy Ice agreed that Reddy Ice would stay out of Canada and the United States mid-west to allow Arctic Glacier to increase its prices.

42.    Following his termination from Arctic Glacier, Mr. McNulty informed the federal government of collusion in the packaged ice industry and began working with both the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI").

43.    When in 2005 Mr. McNulty began searching for employment with manufacturers and distributors of packaged ice, he was informed by Joseph Riley, the president of Tropic Ice Company, and Geoff Lewandowski, a former colleague from Party Time who had also been terminated by Artic Glacier, that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed to "blackball" Mr. McNulty so that no one in the packaged ice industry would hire him.

DEFENDANTS' ACQUISITIONS ARE FURTHER EVIDENCE OF THE CONSPIRACY

44.    Over the last several years, Reddy Ice, Arctic Glacier and Home City have executed a strategy of acquiring competitors. Each defendant knew that the other defendants

were implementing a strategy of growth by acquisition in the United States.  As a result of their identical strategies, defendants understood that the biggest threat to success was competition from each other.

45.    In 1997, Arctic Glacier initially entered some of Reddy Ice's and Home City's territories as it had no operations in the United States.  This entry induced Reddy Ice and Home City to enter into an agreement with Arctic Glacier in which they allocated territories and customers.  As a result, defendants have very little overlap in the territories in which they sell packaged ice.

46.    Defendants' activities in California offer an example of how the conspiracy operated.  Reddy Ice and Arctic Glacier agreed that Arctic Glacier could have California, and that Arctic Glacier would not compete with Reddy Ice in Arizona and Nevada.

47.    As a result of its acquisitions, in 1998 Reddy Ice had a significant presence in California with 5 facilities.  In 1997, about 10% of Reddy Ice's revenue was from California. Indeed, in 1998 Reddy Ice stated that California was a significant market for it.  In 2001, however, despite what Reddy Ice described as an increased presence in the state, it stopped selling packaged ice in California.  Since 2001, Reddy Ice has not attempted to compete in one of the largest and most attractive packaged ice territories in the United States.

48.    Reddy Ice's withdrawal from the California market allowed Artic Glacier to expand its control over that state.  For example, in 2006, Arctic Glacier acquired 6 companies in California for $188.5 million and in 2007 Arctic Glacier acquired Union-Pacific L.P. of Los Angeles, the leading packaged ice manufacturer in the area.

49.    Another example of the effect of the conspiracy is what occurred in New Mexico and Oklahoma.  In or about 1997 or 1998, Arctic Glacier acquired Plainview Ice & Cold Storage,

Inc., which had locations in Amarillo, Lubbock, Midland and San Angelo, Texas, and Roswell, New Mexico, Lakeview Ice Co., Inc. in Comanche, Texas and other small companies in San Angelo and Oklahoma.  Notwithstanding its presence in Oklahoma and New Mexico, by 2002 Arctic Glacier stopped competing in these two states, even though it retained production and distribution facilities in the bordering states of Kansas and Texas.

50.    In the absence of a conspiracy, one would expect that defendants would have competing facilities and overlapping sales territories.  Yet, today defendants do not sell packaged ice in overlapping territories (with few insignificant exceptions).  The lack of such competition is only economically rational behavior to profit-maximizing firms if they have agreed not to compete throughout the country.

<u>UNJUSTIFIED PRICE INCREASES</u>

51.    Beginning in about January 1, 2001, the prices that direct customers have paid defendants for packaged ice have increased each year at a rate that cannot be explained by the costs of manufacturing or distribution.

52.    During this same period, Reddy Ice has admitted that its EBITDA (earnings before interest, taxes, depreciation and amortization) has grown "substantially faster than revenue."

53.    During the class period, defendants obtained significant excess capacity.  In the face of stable demand and excess capacity, defendants were able to increase prices at a rate greater than any increase in marginal costs.  It is economically implausible that such price increases would have stuck in the absence of a conspiracy.

<u>OPPORTUNITIES TO CONSPIRE</u>

54.    Defendants are members of several trade associations relating to the packaged ice industry.  Defendants' respective executives have served on the boards of directors and various standing committees of these organizations.  These trade associations hold regular meetings of their boards, committees, and members, which defendants' representatives have attended, and which provide the opportunity for defendants to meet and communicate with each other concerning the markets, customers, and prices of packaged ice.

55.    Defendants are members of the International Packaged Ice Association ("IPIA"), headquartered in Tampa, Florida.  Ben Key, Reddy Ice's now-suspended Executive Vice President of Sales and Marketing, recently served as the Chairman of the IPIA executive committee.  The Board of Directors for IPIA includes the Director of Marketing for Reddy Ice, and the President and CEO of Arctic Glacier.  IPIA's Marketing Committee has been comprised of these same individuals, along with Home City's Thomas Sedler, who recently pled guilty on behalf of Home City to antitrust violations.  The IPIA Board of Directors, along with its committees, holds regular meetings throughout the year in addition to its annual meeting. Defendants are also members of regional trade associations and their representatives regularly attend meeting within these regional trade associations.

<u>INJURY TO PLAINTIFFS AND THE CLASS</u>

56.    Defendants' conduct has had the following effects:

     a.    price competition has been restrained, suppressed, or eliminated with respect to packaged ice in each and every state in the continental United States and District of Columbia;

     b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels in each and every state in the continental United States and District of Columbia; and

      c.     indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice in each and every state in the continental United States and District of Columbia.

57.    As a result of the contract, combination or conspiracy, plaintiffs and class members have sustained injury. They have paid more for packaged ice than they would have in the absence of the conspiracy.

## AFFIRMATIVE CONCEALMENT

58.    Defendants' conspiracy by its nature was inherently self-concealing. Plaintiffs had no knowledge of defendants' unlawful combination or conspiracy. Defendants also undertook affirmative acts of concealment of their combination or conspiracy, including their attendance at secret meetings, and engaging in secret conversations concerning the allocation of markets and customers and price increases for packaged ice. They issued or caused to be issued public statements, which falsely attributed price increases for packaged ice to factors other than defendants' illegal scheme and unlawful conduct. These false and misleading statements were directed and made to consumers (including plaintiffs and the class) in each and every state in the continental United States and District of Columbia.

59.    Although plaintiffs exercised due diligence throughout the class period, they did not and could not have discovered defendants' unlawful combination or conspiracy any earlier than March 5, 2008 when news of the search of Reddy Ice's headquarters was first reported.

## COUNT ONE

(Section 1 of the Sherman Act)

(For Injunctive Relief Only)

60.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

61.     Beginning at least as early as January 1, 2001 and continuing until at least March 5, 2008, the exact dates being currently unknown to plaintiffs, defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

62.     Plaintiffs and the class have no adequate remedy at law and will suffer irreparable harm unless defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions they created in the packaged ice industry in furtherance of their conspiracy.  Otherwise, plaintiffs and the class will continue pay more for packaged ice than they would have in the absence of the conspiracy

<u>COUNT TWO</u>

(Violations of State Statutes)

63.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

64.     Defendants secretly agreed to allocate customers in each and every state in the continental United States and District of Columbia with the purpose and effect of raising prices that consumers paid for packaged ice in these states and District of Columbia.  Consumers in these states and the District of Columbia were targets of defendants' conspiracy.

65.     Defendants' conduct was malicious, flagrant and intended to harm plaintiffs and the class or undertaken with a reckless disregard for their rights.

66.     Defendants have violated:

    a.  Arizona (Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1402);

    b.  Arizona (Consumer Protection Act, Ariz. Rev. Stat. Ann. § 44-1522);

    c.  Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107(a));

d.  Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-108);

e.  California (Cartwright Act, Cal. Bus. & Prof. Code §§ 16722 & 16726);

f.  District of Columbia (Antitrust Act, D.C. Code Ann. § 28-4502);

g.  District of Columbia (Consumer Protection and Procedures Act, D.C. Code Ann. § 28-3904);

h.  Florida (Deceptive & Unlawful Trade Practices Act, Fla. Stat. § 501.204);

i.  Idaho (Consumer Protection Act, Idaho Code § 48-603);

j.  Iowa (Competition Law, § 553.4);

k.  Kansas (Restraint of Trade Act, Kan. Stat. Ann. § 50-112);

l.  Kansas (Unfair Trade and Consumer Protection Act, Kan. Stat. Ann. § 50-626);

m.  Maine (ME Rev. Stat. Ann., Tit. 10, § 1101);

n.  Maine (Unfair Trade Practices Act, ME Rev. Stat. Ann., Tit. 5, § 207);

o.  Michigan (Antitrust Reform Act, Section 2, Mich. Comp. Laws Ann. § 445.772);

p.  Michigan (Consumer Protection Act, Section 11, Mich. Comp. Laws Ann. § 445.911);

q.  Minnesota (Antitrust Law, Minn. Stat. § 325D.51);

r.  Mississippi (Miss. Code Ann. § 75-21-1);

s.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-205);

t.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-103);

u.  Nebraska (Junkin Act, Neb. Rev. Stat. § 59-801);

v.  Nebraska (Consumer Protection Act, Neb. Rev. Stat. § 59-1602 & 1603);

w.  Nevada (Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.06);

x.  New Hampshire (N.H. Rev. Stat. Ann. § 356:2);

y.  New Hampshire (N.H. Rev. Stat. Ann. § 358-A:2);

z.  New Jersey (Consumer Fraud Act, N.J.S.A. 56:8-2);

aa. New Mexico (Antitrust Reform Act, N.M. Stat. Ann. § 57-1-1);

bb. New Mexico (Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-3);

cc. New York (Donnelly Act, N.Y. Gen. Bus. Law § 340(1));

dd. New York (Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349(a));

ee. North Carolina (N.C. Gen. Stat. § 75-1);

ff.  North Carolina (Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1);

gg. North Dakota  (Uniform State Antitrust Act, N.D. Cent. Code, § 51.08.1-02);

hh. North Dakota (N.D. Cent. Code § 51-15-02);

ii.  Pennsylvania (Unfair Trade Practices and Consumer Protection Law, 73 Stat. Ann. § 201-3);

jj.  Rhode Island (Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-2);

kk.   South Dakota (Antitrust Law, S.D. Codified Laws Ann. § 37-1-3.1);

ll.    South Dakota (Unfair Practices and Consumer Protection Law, S.D. Codified Laws Ann. § 37-24-6);

mm.  Tennessee (Trade Practices Act, Tenn. Code Ann. § 47-25-102);

nn. Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-4);

oo. Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-5);

pp. Vermont (Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2453);

qq. West Virginia (Antitrust Act, W.Va. Code § 47-18-3);

rr. Wisconsin (Antitrust Act, Wis. Stat. Ann. § 133.03);

ss. Wyoming (Wyo. Stat. Ann. § 40-4-1).

67.    By reason of defendants' conspiracy in restraint of trade and unfair and deceptive trade practices, plaintiffs and each member of the class paid more for packaged ice than they would have paid in the absence of such conduct.  As a result, plaintiffs and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT THREE</u>

(UNJUST ENRICHMENT)

68.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

69.    Through paying more for packaged ice than they would have in the absence of defendants' wrongful conduct, plaintiffs and the class have conferred a benefit on defendants.

70.    As a result of defendants' wrongful conduct, defendants were able to charge more for packaged ice which overpayments were made by plaintiffs and the class.

71.    Defendants have been unjustly enriched by overpayments made by plaintiffs and the class.  Equity demands that defendants be required to make restitution and return the overpayments to plaintiffs and the class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that the Court enter judgment as follows:

a.       Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b.       Enjoining defendants from continuing to implement their unlawful agreement and ordering defendants to take such actions as necessary to remediate the market conditions that defendants created which would allow them to maintain, or continue to increase, prices above competitive levels;

c.       Awarding plaintiffs and the relevant class members compensatory damages under the state statutes in an amount to be proven at trial, trebled according to law against defendants, jointly and severally;

d.       Awarding plaintiffs and the relevant class members punitive, exemplary, statutory, and full consideration damages under the state laws that permit such recoveries;

e.       Ordering defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to plaintiffs and the class;

f.       Awarding plaintiffs and the class pre-judgment and post-judgment interest;

g.       Awarding plaintiffs and the class their costs of suit, including reasonable attorneys' fees; and

h.       Granting plaintiffs and the class such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure of all issues so triable in this case.

Dated: September 15, 2009                          s/ Matthew S. Wild

                                                   Matthew S. Wild
                                                   Richard Levitt
                                                   LEVITT & KAIZER
                                                   40 Fulton Street, 23rd Floor
                                                   New York, N.Y. 10038
                                                   (212) 480-4000 (phone)
                                                   (212) 480-4444 (fax)
                                                   mwild@landklaw.com

                                                   John M. Perrin
                                                   THE PERRIN LAW FIRM
                                                   27735 Jefferson Avenue
                                                   Saint Clair Shores, MI 48081-1309
                                                   (586) 773-9500 (phone)
                                                   (586) 773-3475 (fax)
                                                   johnmperrin@sbcglobal.net

                                                   Max Wild
                                                   LAW OFFICES OF MAX WILD
                                                   98 Distillery Road
                                                   Warwick, New York 10990
                                                   (845) 986-6931 (phone)
                                                   mhw311@optonline.net

                                                   Attorneys for Plaintiffs