UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE PACKAGED ICE ANTITRUST
LITIGATION                                             Case No. 08-MD-01952

                                                       Paul D. Borman
                                                       United States District Judge

DIRECT PURCHASERS ACTION

_____/


OPINION AND ORDER
DENYING DEFENDANTS' MOTIONS TO DISMISS (DKT. NOS. 202, 203)

        This matter is before the Court on (1) Defendants Reddy Ice Holdings, Inc. and Reddy Ice

Corporation's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 202), and (2)

Defendants Arctic Glacier Income Fund, Arctic Glacier Inc. and Arctic Glacier International's

Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(2) (Dkt. No. 203).

Plaintiffs filed a Consolidated Response to both motions (Dkt. No. 212).  Both Defendants have filed

replies.  (Dkt. Nos. 225, 226.)  The Court heard oral argument on June 24, 2010.  For the reasons

that follow, the Court DENIES Defendants' motions.

I.      BACKGROUND

        This action is the lead case in the consolidated class action *In Re Packaged Ice Antitrust

Litig.*, No. 08-MD-01952.  In this multidistrict litigation involving 68 consolidated actions, Plaintiffs

are both direct purchasers (retail stores and gas stations who purchased from Defendants) and

indirect purchasers (individuals who purchased from retail stores and gas stations) of Packaged Ice

from Defendants in the United States.  In this Opinion and Order, the Court addresses Defendants'

1

motions to dismiss the Direct Purchasers' Consolidated Amended Class Action Complaint ("CAC").

The Direct Purchasers allege that Defendant Reddy Ice Holdings, Inc. and its wholly owned subsidiary Reddy Ice Corporation (the "Reddy Ice Defendants"), Defendant Arctic Glacier Income Fund ("AGIF"), its wholly owned subsidiary Arctic Glacier, Inc. ("AG") and AG's wholly owned subsidiary Arctic Glacier International, Inc. ("AGI") (collectively the "Arctic Glacier Defendants") and Defendant Home City Ice Company ("Home City") conspired to allocate customers and markets throughout the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Reddy Ice and Arctic Glacier Defendants now move to dismiss Plaintiffs' CAC under Federal Rule of Civil Procedure 12(b)(6). Arctic Glacier Income Fund and Arctic Glacier Inc. additionally move for dismissal under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Defendant Home City and Direct Purchaser Plaintiffs have reached a proposed settlement.[1]

## A.   PROCEDURAL BACKGROUND - THE MULTIDISTRICT LITIGATION

In 2008, the Department of Justice ("DOJ") went public with an investigation into the packaged ice industry in the United States. Multiple civil antitrust actions were subsequently filed against the Reddy Defendants, the Arctic Glacier Defendants and Home City. On June 5, 2008,

---

[1] On November 13, 2009, the Direct Purchaser Plaintiffs filed a motion for preliminary approval of a $13.5 million dollar settlement with the Defendant Home City. (Dkt. No. 206.) On November 30, 2009, the Reddy Ice and Arctic Glacier Defendants filed a motion to stay consideration of the motion for preliminary approval, objecting that Plaintiffs have not demonstrated that the proposed class meets the requirements of Federal Rule of Civil Procedure 23. (Dkt. No. 211.) Both Plaintiffs and Home City filed responses to the motion to stay consideration of the motion for preliminary approval of the settlement, arguing that preliminary approval did not prejudice the non-settling Defendants' rights to contest class certification at a later time. (Dkt. Nos. 214, 218.) Both Plaintiffs and Home City filed replies to the non-settling Defendants' responses to Plaintiffs' motion to stay consideration of the motion for preliminary approval. (Dkt. Nos. 219, 221.) The motion to stay consideration of the motion for preliminary approval of the settlement is scheduled for hearing on July 21, 2010.

Pursuant to 28 U.S.C. § 1407, the United States Judicial Panel on Multidistrict Litigation ("MDL") transferred all pending and subsequent related civil actions to this District, and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings. (Transfer Order, Dkt. No. 1.) A total of 68 cases have been transferred and consolidated in accordance with the MDL Order. (Transfer Order, Conditional Transfer Orders 1-4, Dkt. Nos. 1, 9, 47, 70, 85.)

On June 1, 2009, this Court appointed Kohn, Swift & Graft, P.C. as interim lead counsel and Gurewitz & Raben, PLLC as liaison counsel for the proposed Direct Purchaser class. (Dkt. No. 175.) On July 17, 2009, the Court entered Case Management Order No. 1, directing the Direct Purchaser Plaintiffs (hereinafter "Plaintiffs") to file a Consolidated Amended Complaint and setting forth deadlines for answering, moving or otherwise responding to the Consolidated Amended Complaint and for responding to any motions filed. (Dkt. No. 185.) On September 15, 2009, Plaintiffs filed their Consolidated Amended Class Action Complaint ("CAC"). (Dkt. No. 198.) On October 30, 2009, the Reddy Defendants and the Arctic Glacier Defendants filed their motions to dismiss the CAC. (Dkt. Nos. 202, 203.) On November 30, 2009, Plaintiffs filed their combined response in opposition to the motions to dismiss. (Dkt. No. 212.) On December 30, 2009, Reddy Ice and Arctic Glacier filed their replies. (Dkt. Nos. 225, 226.)

## B.     FACTUAL ALLEGATIONS

Taking the well-pled allegations of Plaintiffs' CAC as true for purposes of this motion to dismiss, the following factual matters are established.[2] Reddy Ice, Arctic Glacier and Home City

_____

[2] In analyzing the allegations of Plaintiffs' CAC for purposes of this motion to dismiss, the Court takes judicial notice of, and at times refers to, allegations made in the Complaints filed in this Court in two related actions: *McNulty v. Reddy Ice Holdings, Inc.*, No. 08-13178 (a whistleblower complaint) and *Chamberlain v. Reddy Ice Holdings, Inc., et al.*, No. 08-13451 (a securities class action complaint). *See Hinds County, Mississippi v. Wachovia Bank, et al.*, __ F. Supp. 2d ___,

are among the three largest companies in the United States that manufacture and distribute Packaged Ice, with a combined market share of nearly 70%. (CAC ¶ 1.) "Packaged Ice" refers to ice that is made by the Defendants packaged in bags and sold as ice in blocks. (CAC ¶ 1.) The Direct Purchasers, whose CAC is challenged in this motion to dismiss, are retail stores and gas stations that purchased Packaged Ice directly from the Defendants. (CAC ¶¶ 5-10.)

### 1.    Allegations of Conspiracy

Martin McNulty is a former vice president of Party Time Ice who became a salesman for Arctic Glacier after it acquired Party Time in 2004. McNulty states that Reddy Ice, Arctic Glacier, Home City, and smaller packaged ice manufacturers such as Party Time, conspired to allocate territories and customers throughout the United States. (CAC ¶ 23.) Specifically, McNulty alleges that Keith Corbin, Arctic Glacier's Vice President of Sales at the time it acquired Party Time, informed McNulty that Arctic Glacier did not and would not compete with Home City, and further informed McNulty that Home City and Reddy Ice had agreed to geographically divide the United States market for the sale and delivery of Packaged Ice. (CAC ¶ 25.) Corbin also informed McNulty that representatives of Arctic Glacier and Home City met in Cincinnati as part of the monitoring of the ongoing conspiracy to address specific customer allocations and to reinforce their

---

2010 WL 1244765 at * 11 (S.D.N.Y. March 25, 2010) (court in lead action in multidistrict antitrust litigation taking judicial notice of first amended complaint filed in a related action, recognizing the court's inherent power to rely on matters of public record in deciding a motion to dismiss, citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) and *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)). *See also Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (taking judicial notice of the facts alleged in a related state-court action "[b]ecause this court sits to decide real cases, not abstract questions of law, and because an adequate understanding of [the] case is essential to our decision.") Plaintiffs reiterate or paraphrase multiple allegations contained in the *McNulty* complaint and Arctic Glacier urges the Court to take judicial notice of the entirety of that related complaint. The Court will do the same with respect to the *Chamberlain* complaint, to which Plaintiffs also refer.

agreement to allocate customers and territories.[3]  (CAC ¶ 26.)

An example of the agreement to geographically divide customers and markets was the arrangement under which Reddy Ice, which formerly had a significant presence in the state of California, with five facilities generating 10% of its revenue, curtailed selling its Packaged Ice in California, thereby allowing Arctic Glacier to sell in the California market free of competition from Reddy Ice.  As part of this agreement, Arctic Glacier agreed not to compete in Arizona.[4]  (CAC ¶¶ 28-29.)  Similarly, as part of the agreement between Arctic Glacier and Reddy Ice, Arctic Glacier withdrew from competing in Oklahoma and New Mexico, while maintaining production and distribution facilities in the neighboring states of Kansas and Texas, allowing Reddy Ice to establish a presence in Oklahoma and New Mexico, free of competition from Arctic Glacier.  (CAC ¶ 30.)

On November 5, 2007, the DOJ filed a criminal information against Home City in the Southern District of Ohio, alleging a conspiracy to restrain trade during the period January 1, 2001 to July 17, 2007.  (CAC ¶ 31.)  On June 17, 2008, Thomas Sedler, President and CEO of Home City, agreed to prosecution by the criminal information and on October 18, 2007 pled guilty to violating Section 1 of the Sherman Act by participating in a conspiracy to restrain trade in the Packaged Ice

---

[3] This allegation is reiterated in the *McNulty* Complaint:  "In January, 2005 . . . Mr. Corbin further explained to [Mr. McNulty] that he had recently flown to Cincinnati to meet with Home City executives to discuss a dispute regarding which competitor would control customer stores located in a specific geography."  (*McNulty, supra* No. 08-13178, Compl. ¶ 35.)

[4] In *Chamberlain*, the companion securities fraud case filed in this Court, based upon the same facts and circumstances as the antitrust cases, these allegations are reiterated with even greater particularity.  (*See Chamberlain, supra* No. 08-13451, Amended Compl. ¶¶ 48-57.)  According to the allegations of the *Chamberlain* complaint, which are based upon the anticipated testimony of four percipient confidential witnesses, Reddy Ice agreed to sell its California manufacturing operations to a consortium of California companies which would subsequently be acquired by Arctic Glacier.

industry.  (CAC ¶¶ 32-33.)  On October 18, 2007, Home City pled guilty to participating in a conspiracy to restrain trade by "agreeing with other packaged ice manufacturers to allocate customers and territories in southeastern Michigan and the Detroit, Michigan metropolitan area, beginning at least as early as January 1, 2001 until July 17, 2007, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."  (Plea Agreement, ¶ 2.)[5]

On March 5, 2008, the DOJ Antitrust Division executed a search warrant at Reddy Ice's Dallas, Texas headquarters.  (CAC ¶ 33.)  Reddy Ice does not sell ice in Michigan.  (Pls.'s Resp. 2.) Following the DOJ search, Reddy Ice formed a special Committee of its Board of Directors to conduct an internal investigation into Reddy Ice's conduct within the Packaged Ice industry and, on September 15, 2008, Reddy Ice announced that it had suspended Ben D. Key, the company's Executive Vice President of Sales and Marketing finding that Mr. Key had "likely violated Company policies and is associated with matters under investigation."  (CAC ¶¶ 33-35.)

On or about October 5, 2009, Arctic Glacier International pled guilty in the Southern District of Ohio to participating in a "conspiracy to suppress and eliminate competition by agreeing with one or more packaged ice manufacturers to allocate customers in southeastern Michigan and the Detroit,

---

[5] Plaintiffs refer to the Home City Plea Agreement in their CAC and the Court takes judicial notice of the details of that Plea, which is available on the DOJ website at http://www.justice.gov/atr/cases/f234200/234211.htm.  Currently pending before this Court is the Plaintiffs' motion to have the Court approve a proposed $13.5 million dollar class action settlement between Plaintiffs and Home City, benefitting a class consisting of "all purchasers of Packaged Ice *in the United States* who purchased directly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at anytime during the period January 1, 2001 to March 6, 2008."  (Motion for Preliminary Approval of Settlement with Home City Ice, Dkt. No. 206, Ex. A, Proposed Settlement Agreement, ¶ 9) (emphasis added).  As part of the Proposed Settlement Agreement, Home City agrees to cooperate with Plaintiffs in their further prosecution of their nationwide antitrust conspiracy claim against the remaining Defendants, Arctic Glacier and Reddy Ice.  (*Id.* ¶ 28.)

Michigan metropolitan area, beginning January 1, 2001, and continuing until at least July 17, 2007, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." (Arctic Glacier Plea Agreement, ¶ 2.) On or about that same date, Keith Corbin (then Vice President, Sales and Marketing, Arctic Glacier International Inc.), Frank Larson (then Executive Vice President, Operations, Arctic Glacier International Inc.) and Gary Cooley (then Vice President, Sales and Marketing, Arctic Glacier International, Inc.) all pled guilty in the Southern District of Ohio to participating in a conspiracy to suppress and eliminate competition by agreeing with other packaged ice manufacturers to allocate customers in southeastern Michigan and the Detroit, Michigan metropolitan area, beginning at least as early as January 1, 2001 in the case of Arctic Glacier and Home City, at least as early as March 1, 2005 for Messrs. Larson and Corbin and at least as early as June 1, 2006 in the case of Mr. Cooley, and continuing for all defendants until at least July 17, 2007, in violation of the Sherman Antitrust Act 15 U.S.C. § 1.[6] Arctic Glacier has also commenced an internal investigation into allegations that it was involved in an antitrust conspiracy and, as a result of its investigation, has suspended Frank Larson, its Executive Vice President of Operations and Gary Cooley, Vice President of Sales. (CAC ¶¶ 36-37.)[7]

---

[6] In its motion to dismiss, Arctic Glacier refers the Court to the Arctic Glacier plea agreement (Arctic Glacier Mot. 10 n. 2) and the Court takes judicial notice of the details of that agreement, as well as the related agreements of the Arctic Glacier executives, which are available on the DOJ website. The Arctic Glacier plea agreement is available at www.justice.gov/atr/cases/f251200/251299.htm. Mr. Corbin's plea agreement is available at http://www.justice.gov/atr/cases/f250900/250963.htm; Mr. Larson's plea agreement is available at http://www.justice.gov/atr/cases/f250900/250967.htm; Mr. Cooley's plea agreement is available at http://www.justice.gov/atr/cases/f250900/250959.htm.

[7] The Court also notes that, according to the allegations in the related securities case, *Chamberlain*, several state attorneys general are also investigating anticompetitive behavior in the Packaged Ice industry. "Reddy Ice has disclosed that the Attorney Generals of 19 states, including Michigan, Arizona and Florida, are investigating agreements in restraint of trade and/or price fixing with

Defendant manufacturers are members of the International Packaged Ice Association ("IPIA"), a trade association headquartered in Tampa, Florida.  Ben Key, Reddy Ice's now-suspended Executive Vice President of Sales and Marketing, recently served as the Chairman of the IPIA executive committee.  The Board of Directors of the IPIA includes the Director of Marketing for Reddy Ice, and the President and CEO of Arctic Glacier.  These same individuals, along with Home City's Tom Sedler who recently pled guilty on behalf on Home City to antitrust violations, serve or have served on IPIA's Marketing Committee.  (CAC ¶ 53.)  The IPIA Board of Directors, along with its committee, hold regular meetings throughout the year in addition to its annual meeting.  (CAC ¶ 54.)  In addition to IPIA, there are a number of regional trade associations on which Defendants' executives have served as board members and/or on various committees.  (CAC ¶ 55.) Plaintiffs allege that membership in and service on these various trade association committees and boards have provided Defendants with the opportunity to meet and communicate with each other concerning the Packaged Ice markets, customers and pricing.  (CAC ¶ 52.)

### 2.    Allegations of Fraudulent Concealment

Plaintiffs allege that Defendants affirmatively concealed their anticompetitive conduct from Plaintiffs and other Class members, thereby tolling the statute of limitations through at least March 6, 2008 when it first became public that the DOJ had executed search warrants.  (CAC ¶ 58.) "Before March, 2008, Defendants represented publicly, both to customers and otherwise, that their pricing activities were unilateral, rather than collusive, and based upon legitimate business purposes, such as increased costs.  In making those false public representations, Defendants misled Plaintiffs

---

respect to the pricing or market allocation of packaged ice." (*Chamberlain*, *supra* No. 08-13451, Amended Compl. ¶ 18.)

and members of the Class as to the true, collusive and coordinated nature of their territorial and customer allocation and other illegal anticompetitive activities."[8]  (CAC ¶59.)  Plaintiffs could not have discovered Defendants' unlawful conduct at any time prior to March 6, 2008 because it was carried out in a manner designed to avoid detection and had the effect of raising, fixing maintaining or stabilizing prices at artificially high levels, and was by its very nature self-concealing.  (CAC ¶ 60-62.)

### 3.      Plaintiffs' Allegations Concerning the Structure of the Packaged Ice Industry

Packaged Ice, used primarily to cool beverages and food, is commonly sold in supermarkets, convenience stores, beverage stores, drug stores, gas stations and other retail outlets.  (CAC ¶ 38.) Packaged Ice is a commodity product, made of frozen water and retail customers have little preference as to brands.  There are no reasonable economic substitutes for Packaged Ice and the demand is stable and inelastic.  (CAC ¶¶ 38-40.)

The CAC alleges that the current market structure differs from the historical pattern, in which Packaged Ice was produced and distributed by local and regional firms.  The market now is dominated by the Defendants who control approximately two-thirds of the sales of Packaged Ice in the United States, with combined sales annually of more than $600 million dollars.  (CAC ¶¶ 41-42.) The CAC alleges that Defendants "aggressively expanded" through acquisition of smaller local and

---

[8] In the *Chamberlain* securities fraud case, these allegations are reiterated, including extensive quotes from the Reddy Ice 2005 Form 10-K, which indicates that the Company abides by its own internal Code of Business Conduct and Ethics, which specifically states that the Company complies with the Antitrust Laws: "Some of the most serious antitrust offenses occur between competitors, such as agreements to fix prices or to divide customers, territories or markets. Accordingly, it is important to avoid discussions with our competitors regarding pricing, terms and conditions, costs, marketing plans, customers and any other proprietary or confidential information." *Chamberlain*, *supra*, No. 08-13451, Amended Compl. ¶ 87.)

regional competitors.  As a result of the Defendants' allocation of territories, "there is little or no overlap among the areas in which Reddy Ice, Arctic Glacier and Home City compete."  (CAC ¶ 43.)

Reddy Ice is the largest manufacturer and distributor of Packaged Ice in the United States, "with sales in 31 states and the District of Columbia to over 80,000 accounts," employing over 2,000 workers.  "It sells approximately 1.9 million tons of ice per year, primarily packaged in seven and ten pound bags, sold principally to convenience stores and supermarkets.  Reddy Ice had sales of $339 million in 2007 and holds the dominant position in the United States."  (CAC ¶ 44.)

Arctic Glacier operates 37 manufacturing plants and distribution facilities, principally in the northeast, central and western United States, serving more than 70,000 retail accounts.  Arctic Glacier is the second largest producer and distributor of Packaged Ice in the United States, with total revenues of $249 million in 2007.  Arctic Glacier dominates the eastern seaboard cities such as New York and Philadelphia, as well as New England, California, and the Midwest.  (CAC ¶ 45.)

Home City sells ice in Ohio, Indiana, Illinois, Kentucky and West Virginia as well as parts of Michigan, Pennsylvania, Tennessee, New York, and Maryland.  Home City has 28 manufacturing plants, with 36 distribution centers and manufactures over 4,400 tons of ice per day.  (CAC ¶ 47.)

As to the existence of barriers to entry, the CAC alleges: "There are substantial barriers that preclude or reduce the ability of competitors to enter into the production and distribution of Packaged Ice.  An ice plant, equipment, and trucks needed to manufacture and deliver large quantities of Packaged Ice require millions of dollars in investment.  Further, Defendants typically install refrigeration units at their customers' locations for dispensing ice to retail consumers.  This creates an "installed base;" changing suppliers entails removing and replacing these units."  (CAC ¶ 47.)  Arctic Glacier has stated that while it services markets adjacent to markets served by the

other Defendants, in general it does not compete directly with these companies.[9]  (CAC ¶ 49.)

The CAC alleges that: "Based upon publicly available data, beginning in or about January 1, 2001, the prices that customers have paid Defendants for Packaged Ice have increased at a rate that cannot be explained by the costs of manufacturing and distributing Packaged Ice to customers." (CAC ¶ 50.)

### 4.    Allegations of Injury to the Class

The CAC alleges that Defendants' anticompetitive conduct has (1) restrained, suppressed or eliminated price competition with respect to Packaged Ice, (2) raised, fixed, maintained or stabilized the price of Packaged Ice at supra-competitive levels, and (3) has deprived direct purchasers of free and open competition in the Packaged Ice market.  (CAC ¶ 56.)  The Direct Purchaser Plaintiffs allege that they have been charged anticompetitive prices for Packaged Ice, resulting in damage to their business or property.  (CAC ¶ 57.)

## II.    STANDARDS OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487

---

[9] Similar statements are alleged to have been made by Reddy Ice in its public filings.  "In the United States, the traditional packaged ice industry is led by us and three smaller, regional, multi-facility suppliers. Although these suppliers generally do not serve customers in our primary markets, we do compete with numerous smaller local and regional companies of varying sizes and competitive resources."  (*Chamberlain*, *supra*, Dkt. No. 37, Amended Compl. ¶ 83, quoting Reddy Ice's Annual Report for the fiscal year 2005, filed with the Securities Exchange Commission on Form 10-K .)

F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id*. at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id*. at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id*. at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

## B.    Federal Rule of Civil Procedure 12(b)(2)

Plaintiffs bear the burden of establishing that personal jurisdiction exists. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  The Court has discretion to make a determination as to the existence of personal jurisdiction without an evidentiary hearing but plaintiff must, by affidavit, set forth specific facts demonstrating that the court has jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458-1459 (6th Cir. 1991).   A court must consider the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff. *Id.* at 1458.  Where there has been no evidentiary hearing, the plaintiff need only present a *prima facie* case in support of jurisdiction. *Id.* at 1458.

## III.   ANALYSIS

Plaintiffs claim that Defendants have violated Section 1 of the Sherman Act, which prohibits "any contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."   15 U.S.C. § 1.   Specifically, Plaintiffs claim that Defendants conspired among themselves to allocate markets and customers and agreed not to compete with each other, the effect

of which has been to fix, raise, maintain or stabilize prices paid by direct purchasers of Packaged Ice. (CAC ¶ 1.) As evidence of unlawful conspiracy, Plaintiffs proffer evidence of the following: guilty pleas by some of the Defendants to criminal antitrust violations occurring in southeastern Michigan and suspension of key executives for violating corporate policy regarding antitrust compliance; DOJ Antitrust Division raids on corporate headquarters (of a non-Michigan Defendant) related to claimed anticompetitive conduct; allegations of nationwide collusion based upon insider admissions; investigations by state attorneys general into claims of anticompetitive conduct in the packaged ice industry; actions on the part of Defendants against economic self-interest; price increases not explained by increased costs; a market structure conducive to collusion; and opportunities to meet, facilitating conspiratorial conduct.

Defendants respond that Plaintiffs have not provided the Court with enough "factual content" to make an inference of conspiracy plausible, arguing that Plaintiffs have failed to identify the "who, what, where and when" of their claims and have alleged nothing more than legal conclusions and a "formulaic recitation" of the elements of a Sherman Act claim. Defendants argue that the allegedly illegal conduct is equally consistent with lawful activity and that an admitted conspiracy by certain Defendants to violate the antitrust laws in one area of the country is not sufficient, in and of itself, to suggest a nationwide conspiracy. Finally, Arctic Glacier argues that certain of Plaintiffs' claims, i.e. those involving conduct that occurred before March, 2004, are barred by the statute of limitations and that the Court cannot exercise personal jurisdiction over certain of the Arctic Glacier Canadian Defendants.[10]

_____

[10] While Arctic Glacier and Reddy Ice have filed separate motions to dismiss, Plaintiffs responded to the motions jointly and the Court will analyze Defendants' arguments, which are largely similar and rely on substantially the same legal authority, collectively. Where Defendants' arguments

**A.      The Plausibility Analysis Under *Twombly***

The Supreme Court, in *Twombly*, specifically addressed the pleading requirements on a motion to dismiss in the context of a section 1 Sherman Act claim.  To survive a motion to dismiss, the complaint must contain enough factual matter to "plausibly suggest" an agreement:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556.  "[A] district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'"  550 U.S. at 563 n. 8 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Plaintiffs in *Twombly* alleged that the defendants conspired not to compete with one another in the local markets for high speed telephone and Internet services.  Plaintiffs claimed that the local exchange carriers' decisions not to enter each other's markets was inconsistent with their individual economic self interest and therefore suggested a mutual agreement not to compete.   The SupremeCourt found, however, that the incumbent local exchange carriers, "ILECs" or "Baby Bells" (previously government-sanctioned regional service monopolies), who had been forced by the Telecommunications Act of 1966 to share their local networks with competitive long distance carriers ("CLECs"), had tremendous independent economic incentive to resist "sharing" and to forego entering one another's markets at the pain of being forced to subsidize a competing long distance carrier by sharing equipment.   550 U.S. at 566.   "[T]here was no need for joint

---

diverge, or where otherwise necessary, the Court will so specify.

encouragement to resist the 1966 Act . . . each ILEC has reason to want to avoid dealing with CLECs and each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs."  The Supreme Court concluded that, without more, this independent economically self-motivated behavior was not enough to sustain a conspiracy claim.  "The former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing."  550 U.S. at 568.

Apart from these allegations of parallel conduct, which were equally consistent with lawful behavior, plaintiffs' complaint contained no additional facts to suggest an illegal agreement.  It was not simply the lawful explanation alone that defeated plaintiffs' claims in *Twombly*, but the absence of "any independent allegation of actual agreement among the ILECs."  550 U.S. at 564.  The "nub" of the complaint was parallel conduct and the suggestions raised by this behavior alone when "viewed in light of common economic experience."  *Id.*  There was nothing more to place the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  550 U.S. at 557.  Thus, even if this Court were to conclude that Defendants' conduct was equally consistent with independent lawful activity, the Court must still inquire whether there are additional factual allegations which nonetheless "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible."  550 U.S. at 570.  If the Court can discern some "factual enhancement" pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion to dismiss must be denied.  550 U.S. at 556-557.

In the instant case, the Court concludes that Plaintiffs have alleged that something more. Although Defendants dismiss each of the pieces of evidence offered as either "conclusory hearsay" or lacking the "who, what, when and where," *Twombly* does not require the latter nor does Plaintiffs'

16

CAC contain only the former.  Plaintiffs have offered sufficient factual content to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Even if ultimate proof of the facts may seem improbable to a "savvy judge," *Twombly* did not purport to place on a plaintiff alleging an antitrust conspiracy claim a summary judgment standard at the pleading stage.[11]  *See In re Flat Panel Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) ("Contrary to defendants' suggestion, neither *Twombly* nor the Court's prior order requires elaborate fact pleading.")

> 1.    ***Twombly* does not require specific allegations of time, place or person.**

Defendants argue that Plaintiffs' CAC must fail at the pleading stage because it lacks the "who, what, when and where" allegedly required by *Twombly.*  (Reddy Ice Mot. 1, Br. 9-11; Arctic Glacier Mot. 14.)  *Twombly* imposed no such requirement.  The "time, place or person" language in *Twombly* appears in dicta, in a footnote, in the context of the Court's comment that, but for the complaint's allegations of parallel conduct, references to an agreement among the ILECs might not have given the notice required by Rule 8 because the complaint did not give the "specific time, place or person" involved in the alleged conspiracy.  550 U.S. 564 n. 10.  The Court noted that if parallel conduct among all the ILECs had not been generally alleged, there would have been "no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and

---

[11] The Court notes that two weeks after issuing its opinion in *Twombly*, the Supreme Court issued another opinion discussing *Twombly* and the 12(b)(6) standards, and reaffirmed the significance of the time-worn notice pleading standard set forth in *Conley v. Gibson*, 355 U.S. 41, 47 (1957), a case which the Court was forced to distance itself from in *Twombly* in rejecting *Conley's* "no set of facts" language.  550 U.S. at 562-563.  *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (reversing the court of appeals' decision affirming the district court's grant of a motion to dismiss, citing *Twombly* and *Conley* and stating that plaintiff need not provide "specific facts" at the pleading stage and must only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests").

where the illicit agreement took place." *Id*. In such an instance, the Court hypothesized, "a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin." *Id*. In fact, the Court in *Twombly* expressly stated that it did "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. Stated differently, the Court's "concern [was] not that the allegations in the complaint were insufficiently 'particular[ized];' rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." *Id*. at 569 n. 14 (internal citation omitted) (emphasis in original).

In *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008), the court discussed the impact of *Twombly* on the pleading requirements in an antitrust conspiracy case and concluded that specifics as to who, what, when and where were not mandated by that decision:

> These complaints, while not answering all specific questions about "who, what, when and where," do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist. While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants, i.e., that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act.
>
> *                *                *
>
> The complaints adequately state facts which address the questions of who, what, when, and where and give the Defendants seeking to respond to the allegations an idea where to begin. Although somewhat weak on allegations related to "when", the complaints plead sufficient facts to allow defendants to respond.

555 F. Supp. 2d at 943-944. *See also Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting defendants' argument that *Twombly* imposed an obligation to identify specifically the time, place and person as to each allegation of conspiracy); *In re Graphics*

*Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011, 1024 (N.D. Cal 2007) (confirming that plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made.").

The court in *Southeastern Milk* also expressly rejected defendants' attempts to read the allegations of the complaint in isolation, finding defendants' "attempt to parse and dismember the complaints, contrary to the Supreme Court's admonition that '[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'" *Id.* (quoting *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)). *See also In re Pressure Sensitive Lablestock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) (noting that nothing in *Twombly* "contemplates [a] 'dismemberment' approach to assessing the sufficiency of a complaint.  Rather, a district court must consider the complaint in its entirety without isolating each allegation for individualized review.") *See also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy-is contrary to the Supreme Court's admonition that '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *Continental Ore, supra*).

Defendants cite to a string of cases (*see* Reddy Ice Br. 8) that they allege support their contention that *Twombly* requires a plaintiff to plead the specifics of time, place and person.  The Court finds these cases distinguishable in that none involved the level of factual content proffered in this case, i.e. government and internal investigations of the very corporate entities and individual executives involved on the same claims of conspiracy as well as guilty pleas by the Defendants and

their executives to the same anticompetitive conduct in a significant market.  For example, in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008),  plaintiffs sued defendant credit card companies and banks alleging a conspiracy to set fees charged to merchants for credit card sales.  The district court had previously dismissed plaintiffs' complaint and granted plaintiffs leave to conduct discovery and file an amended complaint, which plaintiffs did.  *Id*. at 1046.  Plaintiffs chose not to depose any representatives of the banks.  *Id*. at 1046 n.4.  In its discussion of the allegations against the banks, the court noted, citing *Twombly*, that plaintiffs had utterly failed, even having been given a chance to conduct discovery, to answer the basic question of who did what to whom and where.  *Id*. at 1048.  The court found that plaintiffs offered no evidentiary facts as to the banks individually beyond the collective legal conclusion that the "banks" knowingly participated in the alleged scheme.  *Id*. at 1048.  Without more factual content the "banks," which were large institutions with hundreds of employees, entering into contracts and agreements daily, would have no idea how to begin to respond to the allegations of a conspiracy.  *Id.* at 1047.  The court concluded that such allegations of parallel pricing behavior and "naked" assertions of conspiracy, stopped short of crossing the line between possibility and plausibility.

Similarly, in *In re Late Fee and Over-Limit Fee Litig*., 528 F. Supp. 2d 953 (N.D. Calif. 2007), a case that involved allegations by credit card holders that defendants (who were most of the large credit card issuers in the United States) charged excessive late-fees, the complaint referred to the defendants only in collective terms.  *Id*. at 956.  The court held that stray statements, attributed to no one in particular, without any suggestion as to content or circumstances, failed to satisfy the *Twombly* plausibility requirement.  *Id*. at 962.  The court held that plaintiffs failed to place their allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel

conduct that could just as well be independent action." *Id*. at 963 (quoting *Twombly*, *supra* at 1966).

Defendants continue to reiterate, and offer a host of cases in support of, the notion that "[i]n the wake of *Twombly*, allegations of parallel conduct and bare assertions of conspiracy no longer supply an adequate foundation to support a plausible § 1 claim." *In re Travel Agent Commission Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009). The Court accepts this standard but notes that this is not a parallel conduct/bare assertion of conspiracy case. In the instant case, viewing the CAC in its entirety, there is sufficient factual content alleged to put the Plaintiffs' allegations in a context suggestive of a plausible conspiracy. Plaintiffs' allegations certainly put Defendants on notice, sufficient to form the basis for a response, as to who (the corporate players are clearly identified along with the names of several of their key high-level executives), what (agreements to stay out of each others territories, the details of which are alleged to be known by specific named individuals as well as by certain sufficiently identified confidential witnesses, and which are the subject of several ongoing government investigations and criminal guilty pleas), where (Cincinnati, Southeastern Michigan and other specifically referenced locations) and when (the time frames are identified in the CAC and are well known based on the plea agreements and the various ongoing criminal investigations). This additional factual content was lacking in *Twombly*. If the facts alleged give adequate notice to the parties of the claims and raise a reasonable expectation that discovery may lead to evidence of an illegal agreement, more specific allegations as to person, place and time are not necessary.[12]

---

[12] Reddy Ice argues that the Sixth Circuit's opinion in *In re Travel Agent, supra,* also requires Plaintiffs to allege specific time, person and place in their conspiracy claim. *See* Reddy Ice, Mot. 1, ¶ 2. *In re Travel Agent* imposes no such requirement. Indeed, the portion of the Sixth Circuit's opinion quoted by Reddy Ice, which refers to footnote 10 of the *Twombly* opinion, and the potential Rule 8 deficiencies of that complaint, is discussing the separate dismissals against four parties, two

**2.      The facts as alleged raise a reasonable expectation that discovery will reveal evidence of illegal agreement and therefore satisfy the *Twombly* pleading standard.**

Defendants continue to sound the who, what, when and where refrain throughout their briefs and specifically challenge the sufficiency of the allegations of the CAC, claiming that the CAC does not give rise to a plausible suggestion of conspiracy because; (a) the Court cannot plausibly infer a conspiracy based upon government investigations, guilty pleas relating to conduct in southeastern Michigan, or the terminations and/or suspensions of key executives; (b) the proposed testimony of ex-employees does not support the plausibility of an illegal agreement; and (c) the market structure of the Packaged Ice industry supports their contention that the challenged conduct is equally as consistent with lawful activity as it is with an illegal agreement and that mere opportunities to conspire cannot sustain a Sherman Act § 1 claim.

**a.      The government investigations and guilty pleas of the various Defendants and their corporate executives support the plausibility of a nationwide conspiracy.**

Arctic Glacier asserts, and Reddy Ice echoes the argument, that the guilty pleas of Arctic Glacier International, Home City, Keith Corbin, Gary Cooley, and Frank Larson to allocating

---

of whom were not even mentioned in the complaint and the other two mentioned only as having engaged in parallel conduct.  583 F.3d at 905.  It was these ancillary defendants, whom plaintiffs attempted to capture with generalized claims as to "defendants" or "defendants' executives," not Continental and American, that the Sixth Circuit suggested would have "no clue" how to respond to the allegations of the complaint.  There is no apt comparison to be made here, where the precise parties and their executives are implicated by name.  *In re Travel Agent,* like *Twombly*, is a parallel conduct case, with only bare, collective assertions of conspiracy and nothing more.  Unlike the instant case, there was no "setting" provided suggesting an agreement.  Additionally, *In re Travel Agent* was an opt-out suit and the class litigation had already been decided in favor of defendants.  The Sixth Circuit acknowledged in its opinion that "[o]nly the gravest of reasons should lead [a] court in [an] opt-out suit to come to a conclusion that departs from that in the class suit."  583 F.3d at 909 n.8 (internal quotation marks and citation omitted).  Despite the emphasis placed on this recent Sixth Circuit case by Defendants, the Court finds the case easily distinguished by the presence in the instant case of significant additional factual content, as discussed herein.

customers and territories in southeastern Michigan and the Detroit, Michigan metropolitan area and the DOJ investigation of Reddy Ice and the suspension of its executive vice-president Ben Key, do not lend plausibility to Plaintiffs' claim of a nationwide conspiracy.  (Arctic Glacier Br. 10-13; Reddy Ice Br. 16-17.)[13]  Defendants rely in part on *In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 444 (S.D.N.Y. 2008) for the proposition that a "mere investigation" does not make an antitrust conspiracy plausible.  However, *In re Digital Music* was vacated and remanded in *Starr, supra,* the Second Circuit expressly indicating that the fact that defendants' price fixing scheme was the subject of a pending investigation by the New York State Attorney General, and two pending investigations by the DOJ, were factors which plausibly suggested an illegal agreement.  592 F.3d at 324.

Defendants also rely on *Hinds County v. Wachovia Bank N.A.,* 620 F. Supp. 2d 499 (S.D.N.Y. 2009), which held that the averments in the plaintiffs' complaint relating to various government investigations into the municipal derivatives industry, "though suggestive, [were] too general to make an antitrust claim plausible as to any specific Defendant other than BoA."  620 F. Supp. 2d at 514.  The court in *Hinds County*, however, ultimately permitted plaintiffs to amend their complaint and, on a subsequent motion to dismiss which the court denied, the court specifically held that the pending government investigations could be used to enhance the plausibility of plaintiffs'

---

[13] Reddy Ice argues additionally that the fact that the plea agreements do not involve Reddy Ice at all undercuts Plaintiffs' argument that Reddy Ice was part of a national conspiracy.  (Reddy Ice Br. 16-17.)  As acknowledged by Reddy Ice, it does not do business or sell Packaged Ice in the territories that are the subject of the guilty pleas.  However, the very fact that Reddy Ice does not do business in Michigan, and that its executive vice-president Ben Key was suspended on the Company's own finding that "Mr. Key has likely violated Company policies and is associated with matters that are under investigation," certainly enhances the plausibility of the inference of illegal conduct beyond Southeastern Michigan.  (Def.'s Ex. 1, June 24, 2010 Hearing, Reddy Ice Press Release.)

claims:

> In its plausibility analysis, the Court will also consider the SCAC in light of recent developments in state and federal investigations into the municipal derivatives industry. Although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims. *See Starr*, 592 F.3d at 324-25 (finding that investigations by New York State Attorney General and DOJ Antitrust into defendants' price-fixing support plausibility of § 1 claim); *see also Hyland v. Homeservices of America, Inc.*, No. 3:05-CV-612-R, 2007 WL 2407233, at *3 (W.D. Ky. Aug.17, 2007) (finding that DOJ enforcement actions supported § 1 price-fixing allegations); *In re Tableware Antitrust Litig*., 363 F.Supp.2d 1203, 1205 (N.D. Cal.2005) ("A plaintiff may surely rely on governmental investigations, but must also ... undertake his own reasonable inquiry and frame his complaint with allegations of his own design.").

*Hinds County, Mississippi v. Wachovia Bank N.A.*, __ F. Supp. 2d __, MDL No. 08-1950, 2010 WL 1244765 at * 10 (S.D.N.Y. March 25, 2010). *But see In re Graphics, supra,* 527 F. Supp. 2d at 1024 (holding that subpoenas served on defendants and grand jury investigation carry no weight in pleading antitrust conspiracy where it is unknown whether investigation will result in indictments or nothing at all, also noting that a decision not to prosecute would not be binding on plaintiffs, and granting leave to amend).  This Court finds that the government investigations surrounding the Packaged Ice industry, along with Reddy Ice's suspension of Ben Key, to which Plaintiffs' refer in the CAC, while not determinative standing alone as to the plausibility of Plaintiffs' claims of conspiracy, do bolster the plausibility analysis and heighten the Court's expectation that "discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.

Defendants also contend that the guilty pleas of Arctic Glacier and Home City, and the guilty pleas of several high-level Arctic Glacier executives, Gary Cooley, Frank Larson and Keith Corbin, to a conspiracy to allocate customers and territories in southeastern Michigan, do not lend plausibility to Plaintiffs' claims of a nationwide conspiracy.  This Court disagrees.  In two cases

involving the market for electronic memory (specifically the markets for Dynamic Random Access Memory ("DRAM") and the market for Static Random Access Memory ("SRAM")), *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) and *In re Static Random Access Memory (SRAM) Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008), courts held that evidence of guilty pleas in markets not directly involved in the claims before them supported a reasonable inference of conspiratorial behavior in the markets in the cases before them.  Recognizing the general principle that "evidence concerning a prior conspiracy may be relevant and admissible to show the background and development of a current conspiracy" the court in *Flash Memory* stated:

> Defendants ignore the above authority, and instead, focus on the fact that the employees who pleaded guilty to price fixing in the DRAM investigation worked for only two of the Defendant companies.  While that may be so, the Court notes that the two companies involved, Samsung and Hynix, collectively controlled the majority of the flash memory market and together paid fines approaching half a billion dollars. In addition, at least seven of the employees involved are alleged to have had responsibility for NAND flash memory pricing, sales, marketing and operations in the United States. Given these employees' overlapping involvement in controlling DRAM and flash memory pricing, coupled with the significant market power wielded by their employers, it is reasonable to infer that their involvement in the DRAM conspiracy had at least some connection to the alleged conspiracy in this case.

643 F. Supp. 2d at 1149 (citations to the record omitted).  Similarly, the court in *SRAM* held that guilty pleas in the *DRAM* litigation supported an inference of conspiracy in the SRAM industry: "Plaintiffs allege that the same actors associated with certain Defendants were responsible for marketing both SRAM and DRAM.  Although the allegations are not sufficient to support Plaintiffs' claims standing on their own, they do support an inference of a conspiracy in the SRAM industry."  580 F. Supp. 2d 903.  *See also In re Air Cargo Shipping Services Antitrust Litig.*, MDL No. 1775, 2009 WL 3443405 at * 1 (E.D.N.Y. Aug. 21, 2009) (reversing the magistrate judge's opinion (which Arctic Glacier relied on in its brief at p. 12) and holding that "admissions of price-fixing by so many

of the defendants certainly 'are suggestive enough to render a § 1 conspiracy claim plausible.'") (quoting *Twombly*, *supra* at 556).

The Court finds the cases cited by Defendants distinguishable.  In *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2nd Cir. 2007), the court found that plaintiffs had offered "an insufficient factual basis" for inferring a worldwide conspiracy based upon apparent (not proven) misconduct in Europe.  502 F.3d at 52.  The court found that there was no evidence linking the conduct alleged to have occurred in Europe to the United States, in particular no indication that the two markets were even responsive to one another on price and "no allegations of the actual pricing of elevators or maintenance services in the United States or changes therein attributable to defendants' alleged misconduct."  *Id.*  The court did not hold that such a theory could never be viable, only that it hadn't been sufficiently alleged: "Without adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not "nudge [their] claims across the line from conceivable to plausible."  *Id.* (quoting *Twombly*, *supra*.)  Plaintiffs in the instant case are not reaching across the ocean to unproven allegations in an unknown market – they are pointing to an admitted conspiracy in a nieghboring state.  *See also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-577 (M.D. Pa. 2009) (distinguishing *In re Elevator* and holding that "Defendants' alleged [anticompetitive] conduct in Canada enhances the plausibility of the alleged U.S. price-fixing conspiracy.").

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 492 (D. Conn. 2008), also cited by Arctic Glacier, is distinguished by the fact that plaintiffs attempted to introduce evidence of guilty pleas as to a conspiracy to unlawfully raise prices (on a different trade route) as proof of a conspiracy to unlawfully lower prices, i.e. predatory pricing.  The court found that the

suggested inference did not, therefore, tend to enhance the plausibility of plaintiffs' claim: "in the context of a predatory pricing claim, 'a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another.'"  541 F. Supp. 2d at 492 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*, 475 U.S. 574, 596 (1986)).  This is not a predatory pricing case and Plaintiffs are not attempting cross-fertilize by utilizing guilty pleas as to one type of prohibited conduct as proof of a different type of unlawful behavior.

Finally, the Court distinguishes *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250 (W.D. Wash. 2009), where the court rejected plaintiffs' proffer of guilty pleas relating to conduct on an entirely different trade route by certain individuals, only one of whom was involved in the litigation before the court.  Declining plaintiffs' suggestion that the case before the court was analogous to the *SRAM* litigation discussed above, the court stated: "The cases on which plaintiffs primarily rely do not support a different view because those cases involved defendants with overlapping involvement in different markets, a factual scenario that plaintiffs in this case have not pleaded."  647 F. Supp. 2d at 1259

Thus, under certain circumstances, the "if there, then here" argument certainly can have merit.  Particularly where, as here, there is a significant overlap in identity of interest of the alleged co-conspirators in both markets (the corporate actors are the same and all of the individual defendants who pled guilty to anticompetitive conduct in southeastern Michigan are high-level key executives with nationwide, not local, corporate responsibilities) and where the claims are based upon the same anticompetitive conduct, i.e. customer and market allocation, the guilty pleas in one market are suggestive of the plausibility of a conspiracy to commit the same illegal acts in another market.  As with the related government investigations, standing alone the guilty pleas relating to

27

conduct in southeastern Michigan might not enhance the plausibility analysis.  But taken as part of the larger picture, and considering the parallel internal investigations that have resulted in the suspension of key executives, these guilty pleas do enhance the expectation that discovery might lead to evidence of a nationwide illegal agreement among these same actors, one of whom is under active government investigation and admittedly does not sell product in southeastern Michigan.[14]

Nor can this civil litigation be circumscribed or defined by the boundaries of the criminal investigations or plea agreements.  In *Starr*, *supra* the Second Circuit rejected defendants' argument that inferring a conspiracy based upon the DOJ investigations was unreasonable because the DOJ allegedly had closed its inquiry and publicly announced that it had uncovered no evidence of competitive harm.  592 F.3d at 325.  The Court noted that even if it could consider this evidence on a motion to dismiss, there was no case cited "to support the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the Department of Justice found no evidence of conspiracy."  *Id.*  Furthermore, the court noted, defendants' argument neglected the fact that the DOJ had launched two new investigations into whether defendants engaged in anticompetitive conduct and whether they misled the DOJ.  *Id.  See also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-665 (7th Cir. 2002) (refusing to infer lack of a civil conspiracy from the government's decision not to move against certain defendants,

---

[14] The Court also notes that Home City, in its proposed settlement agreement with Plaintiffs in the instant case, agrees to settlement with Plaintiffs who "consist of a class of direct purchasers of Packaged Ice throughout the United States," and further agrees to assist Plaintiffs in the prosecution of its *nationwide* conspiracy claim. Additionally, Plaintiffs allege that Keith Corbin of Arctic Glacier admitted to Mr. McNulty "that Arctic Glacier had agreed with both Home City and Reddy Ice to geographically divide the United States market for the sale and delivery of Packaged Ice, in order to keep prices high in their respective territories." (CAC ¶ 25).  Evidence of this larger, nationwide conspiracy is also alleged, in the *Chamberlain* Complaint, to have been perceived by numerous confidential witnesses.  (*Chamberlain*, *supra*, No. 08-13451, Amended Compl. ¶¶ 55-60.)

acknowledging that the DOJ may decide to limit the scope of an investigation for numerous reasons, including differing standards of proof in a criminal case and the knowledge that the private bar "had both the desire and the resources to prosecute [the] suit"); *In re Vitamins Litig.* No. 99-misc-197, 2000 WL 1475705 at * 11 (D.D.C. May 9, 2000) (rejecting the "notion that the guilty pleas and cooperation agreements and the class settlement foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 620 (N.D. Ga. 1997) ("[T]he court is aware of no authority that requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment. To the contrary, several cases flatly reject that theory.")

As this Court noted in its prior Order Accepting Submissions of Southern District of Ohio Transcript Excerpts of February 11 and March 2, 2010 from Parallel Criminal Proceedings (Dkt. No. 250), the DOJ investigation in this case has not closed and the Court gives no weight to the government's statements regarding evidence that may or may not have yet been discovered on the issue of a nationwide conspiracy in their criminal investigation. As the government stated in the March hearing, they "take no position as to whatever evidence exists in the civil case . . . the issue is just this case and the scope of the conspiracy that has been set forth in the pre-sentence investigation." (Resp. to Mot. for Leave to File Excerpts of Hr'g, Dkt. No. 245, Ex. 2, Tr. of March 2, 2010 Hr'g p. 3-4.) The Court accepts that there are a multitude of reasons why the government in a criminal investigation may limit or curtail its investigation, including the possibility that civil enforcement will step in where it decides, or is compelled, to conclude. In the instant case, the DOJ criminal investigation is continuing.

b.   **The alleged expected testimony of Defendants' former employees supports the plausibility of a nationwide agreement to allocate customers and markets**.

Plaintiffs allege in paragraph 25 of the CAC that Keith Corbin, an Arctic Glacier executive who has pled guilty to violating the antitrust laws, told Mr. McNulty "that Arctic Glacier had agreed with both Home City and Reddy ice to geographically divide the United States market for the sale and delivery of Packaged Ice, in order to keep prices high in their respective territories."[15]   Mr. McNulty's testimony is supported in great detail by the alleged expected testimony of several confidential witnesses, identified by the positions they held in the Defendant companies, in the complaint filed in the related securities fraud case, *Chamberlain*, *supra*, No. 08-13451, (Dkt No.37, Amended Compl. ¶¶ 45-57). For example, the *Chamberlain* complaint alleges that:

> Confidential Witness 1 ("CW1") is a former Reddy Ice employee who held the position of National Purchasing and Contracts Manager for Reddy Ice from mid-1997 through late-2004. CW1 was based out of the Company's Dallas, Texas headquarters. During CW1's tenure at Reddy Ice, CW1 became aware of the unlawful market allocation agreement between Reddy Ice and Arctic Glacier. According to CW1, the Agreement was entered into during CW1's employment at Reddy Ice. CW1 further stated that it was discussed in the presence of CW1 and other employees at Reddy Ice's Dallas headquarters that Reddy Ice had agreed to not compete against Arctic Glacier in California, and that Arctic Glacier in exchange had [sic] for the exclusive right to service California had agreed to "stay out" of Arizona.

And further in the *Chamberlain* complaint:

> During the execution of CW2's duties, CW2 learned of an unlawful agreement between Reddy Ice and Arctic Glacier to allocate territories and markets for packaged ice for exclusive distribution and sales of packaged ice. CW2 stated that this collusive agreement was often discussed in CW2's presence among Reddy Ice employees at the corporate office and at the various plants that CW2 visited while conducting audits. In addition, CW2 was personally told of the unlawful agreement

---

[15] The Court rejects Defendants' attempt to attach significance to the fact that some of the allegations in CAC are based on alleged hearsay.  This Court must accept all factual allegations in the CAC as true.  "Whether the allegations in the complaint are based on hearsay is not relevant to a motion under Rule 12(b)(6) or 12(c)."   *Polar Molecular Corp. v. Amway Corp.*, No. 07-460, 2007 WL 34373112 at *4 (W.D. Mich. Nov. 14, 2007).

by defendant Weaver.

According to CW2, defendant Brick had a connection at Arctic Glacier and had used this connection to approach the CEO of Arctic Glacier. As told to CW2 by other Reddy Ice employees with whom CW2 came into contact during the course of internal audits, defendant Brick entered into the on-going unlawful agreement with Arctic Glacier to allocate territories and markets for packaged ice whereby Reddy Ice agreed to stay out of California and Arctic Glacier agreed to stay out of Arizona.

Additionally, it was also regularly discussed amongst various Reddy Ice employees that Home City was a party to the unlawful agreement, according to CW2. CW2 stated that Reddy Ice employees mentioned that Home City was represented at the meeting during which defendant Brick and Arctic Glacier's Chief Executive Officer met to divvy up the California and Arizona markets. With respect to Home City, CW2 was told by other Reddy Ice employees that Reddy Ice and Arctic Glacier had agreed to stay out of certain Mid-West states where Home City had a presence. During the course of CW2's employment, CW2 also gained first-hand knowledge that defendants Weaver and Janusek knew of the unlawful allocation agreement with Home City.

*Chamberlain*, *supra*, Amended Compl. ¶¶ 48, 49, 52.

Mr. McNulty, and the confidential witnesses referred to in the *Chamberlain* complaint, are sufficiently identified that this Court must take their averments as true, and must "accept[] that the Confidential Witness would possess the information alleged for the purposes of this motion to dismiss." *Hinds County, supra,* __ F. Supp. 2d __, 2010 WL 1244765 at * 22 n.5. "Plaintiffs are not required to plead exact job titles, describe the sources' responsibilities and duties in detail or allege access to specific company documents." *In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004). *See also In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, MDL 1957, 2009 WL 3754041 at * 3 (N.D. Ill. Nov. 5, 2009) (distinguishing *Twombly* based upon the allegations of eyewitness accounts of price fixing discussions).

The Court concludes that the anticipated testimony of Mr. McNulty, Mr. Corbin and of the numerous confidential witnesses identified in the *Chamberlain* complaint, taken as true, supports

the plausibility of a nationwide conspiracy among the Defendants to allocate markets in violation of the Sherman Act. This is all that is required at the pleading stage and satisfies all that is mandated by *Twombly.*

> **c.    The Packaged Ice Industry market structure plausibly suggests collusive behavior and Defendants' conduct, even if accepted as consistent with independent, lawful market behavior, must be viewed in the context of the multiple additional factual allegations of Plaintiffs' Complaint which, when viewed as a whole, plausibly suggest an illegal conspiracy to allocate customers nationwide.**

Allegations that a market is characterized by economic factors that courts and antitrust experts and economists have found are conducive to collusive behavior, support an inference of plausibility. *Standard Iron Works*, *supra* 639 F. Supp. 2d at 883. *See also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D. Pa. 2009) ("For example, a plaintiff may aver that the relevant market is ripe for collusion due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products."); *Aftermarket Filters*, *supra*, 2009 WL 3754041 at * 3 (finding that allegations of market concentration, market maturity, fungibility of products, lack of brand loyalty and the importance of price buttressed the plausibility of a conspiracy theory).

According to the allegations of the CAC, Reddy Ice is the largest manufacturer and distributor of Packaged Ice in the United States with sales in 31 states and the District of Columbia. (CAC ¶ 44.) Arctic Glacier operates 37 manufacturing plants and distribution facilities principally in the northeast, central and western United States. (CAC ¶ 45.) Arctic Glacier dominates the major eastern seaboard cities like New York and Philadelphia and operates also in New England, California and the Midwest. (*Id.*) Home City sells Packaged Ice across Ohio, Indiana, Illinois, Kentucky and West Virginia, as well as parts of Michigan and Pennsylvania. (CAC ¶ 46.) The

Defendants together control approximately two-thirds of the sales of Packaged Ice in the United States.  (CAC ¶ 42.)

Plaintiffs allege in the CAC that Packaged Ice is a commodity product, there are no reasonable economic substitutes for Packaged Ice, the demand is stable and inelastic and customers have little preference as to brands.  (CAC ¶¶ 39-40.)  Plaintiffs further allege that the Packaged Ice industry is characterized by "substantial barriers [to entry] that preclude or reduce the ability of competitors to enter into the production and distribution of Packaged Ice."  (CAC ¶ 47.)  Millions of dollars of investment are required to establish an ice plant, purchase equipment and trucks needed to manufacture and distribute large quantities of ice.  Additionally, producers typically install refrigeration units at their customers' locations for storing and dispensing ice to retail consumers, creating an "installed base" which further inhibits the customers' ability and desire to change suppliers.  (*Id.*)

Plaintiffs allege that Packaged Ice historically "was produced and distributed by local and regional firms" and that "Defendants' have fundamentally changed the nature of that market" by "reducing the ability of other Packaged Ice companies to compete for customers serviced by Defendants."  (CAC ¶ 41.)  Plaintiffs allege that Defendants have increased and maintained their market power by aggressively expanding and acquiring numerous smaller local and regional manufacturers but allocating territories and agreeing to stay out of each others' way so that there is little or no overlap in the areas which they serve.  (CAC ¶ 43.)[16]

Defendants argue that Plaintiffs' allegations regarding the nature of the Packaged Ice industry describe conduct on the part of the Defendants that is completely consistent with lawful

---

[16] These allegations are buttressed by similar, and more specific allegations, in the related *Chamberlain* complaint, No. 08-13451, at ¶¶ 58-60.

business conduct. (Arctic Glacier Br. 7-9; Reddy Ice Br. 11-15.) Both Defendants argue that, under *Twombly*, a complaint that contains allegations of conspiracy that are equally consistent with lawful independent conduct fails to properly plead antitrust conspiracy and must be dismissed. Both Arctic Glacier and Reddy Ice also rely on *United States v. Colgate*, 250 U.S. 300, 307 (1919), for the proposition that a manufacturer has the right to choose to deal, or refuse to deal, with whomever it likes, as long as it does so independently.

Defendants argue that the barriers to entry and installed base facts pled by Plaintiffs explain why a Packaged Ice manufacturer could legitimately decide not to enter its competitor's territory and to operate instead within its own geographic footprint for lawful reasons based solely on economic self-interest. Thus, Arctic Glacier concludes, the fact "that Defendants are not present in the same geographic areas, without some non-conclusory allegation that their lack of overlap is due to an agreement, does not withstand *Twombly*. (Arctic Glacier Br. 9.) Similarly, Reddy Ice concludes that "Plaintiffs' own allegations concerning the packaged ice industry, taken as true, suggest that the Defendants are simply acting lawfully and in their own economic self-interest in refraining from aggressively expanding outside their respective geographic footprints." (Reddy Ice Br. 12.) Reddy Ice further argues that because a manufacturer can only cost-effectively deliver ice only within a 50 to 100 mile radius of its distribution site, it would be cost prohibitive for Reddy, with most of its plants in the south, to try to sell Packaged Ice from these plants to customers in the Northeast, where Arctic Glacier has a strong presence. Reddy Ice argues that therefore its decision to withdraw from certain markets that were then served by one of the other Defendants is not evidence of antitrust conspiracy but is explained by independent business decision making. (Reddy Ice Br. 14.) Reddy Ice concludes that because of the necessity of proximity to one's manufacturing

base, markets for Packaged Ice are regional, not national and that "a unilateral decision by Reddy to grow within its footprint rather than aggressively expand its footprint makes economic sense." (Reddy Ice Br. 15.)

Plaintiffs respond that Defendants' argument that their conduct is equally consistent with lawful conduct ignores the critical fact that "an admitted participant in a packaged ice antitrust conspiracy says that all three Defendants agreed not to compete with each other nationwide, which, in light of the fact that they could have, but did not, certainly renders a national conspiracy plausible." (Pls.' Resp. 12.) Plaintiffs are correct that, as *Twombly* instructed, the allegations which Defendants claim are entirely consistent with independent action must be placed in context, and if that context suggests a preceding agreement, a lawful explanation alone will not defeat the claim of conspiracy on a motion to dismiss. *Twombly*, 550 U.S. at 557 ( the challenged conduct "must be placed in the context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.") In *Twombly* there were no additional facts to support the context suggesting a preceding agreement. Here, as discussed extensively above in section IIIA1, 2, such allegations have been made.

Additionally, Plaintiffs argue that several of the actions undertaken by Defendants to exit certain areas which they previously served and to allow another co-conspirator unfettered access to that region, free of competition, are against economic self-interest and cannot be explained other than by the existence of an illegal agreement to allocate territories. Plaintiffs argue that these rival companies have historically grown through acquisition of small, local companies with existing facilities and reject Defendants' argument that staying within their respective geographic made good business sense based on the nature of the product and the industry. Where plaintiffs allege "behavior

that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals,'" a § 1 claim is stated under *Twombly*. *Starr, supra* at 327 (citing 7 Areeda & Hovenkamp §1415a (2d ed. 2003)). *See also Standard Iron Works*, *supra* 639 F. Supp. 2d at 896 ("Defendant's actions against self-interest constitute "widely recognized plus factor[ ]" suggestive of concerted action.") (internal quotation marks and citation omitted).

For example, Plaintiffs allege, Reddy had a significant presence in California, which it stated publicly was a significant and lucrative market. (CAC ¶ 29.) Arctic Glacier had no presence in California but moved into and began to dominate the California market after Reddy Ice's unexplained decision to leave that market. (CAC ¶ 45.) *See also Chamberlain*, Compl. ¶¶ 55-60, detailing the background of Reddy Ice's departure from the California market and Arctic Glacier's entry into that same market. Plaintiffs claim that in the absence of an agreement of quid pro quo, Reddy Ice's decision to leave California, where it already had plants, trucks and distribution facilities, was against its economic self interest. (Arctic Glacier Br. 14.) Plaintiffs also argue, as an example of behavior against economic self interest, that Arctic Glacier's decision to withdraw from competing in Oklahoma and New Mexico, even though it had manufacturing facilities in neighboring states, allowing Reddy Ice to sell in those states free of competition, would have contravened its self-interest in the absence of similar accommodating behavior by Reddy Ice. (CAC ¶ 30.) Plaintiffs further point out that Reddy Ice's argument that it was cost-prohibitive to service markets in the northeast when they were heavily invested the South ignores the fact that nothing prevented Reddy Ice from purchasing an existing company outside their geographic footprint, given that growth by acquisition was their business modus operandi, and servicing an area from that established base. (Pls.'s Resp. 13.)

It is not Plaintiffs' burden at the pleading stage to "rule out the possibility that the defendants were acting independently" but only to allege "enough factual matter (taken as true) to suggest that an agreement was made." *Starr, supra* 592 F.3d at 321 (citing *Twombly* 550 U.S. at 554, 556.) As the court noted in *Standard Iron Works, supra*, 639 F. Supp. 2d at 895, "[w]hile more innocent inferences can be drawn from [Defendants' conduct] it is not Plaintiffs' burden to allege facts that cannot be squared with the possibility of unilateral action. *Fructose* 295 F.3d at 663." Whether Defendants' actions were "benign unilateral business decisions made by the individual Defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which [this Court] cannot decide on the pleadings and which require discovery prior to resolution." *Standard Iron Works, supra*, 639 F. Supp. 2d at 902.  This Court concludes that Plaintiffs have plausibly alleged, in non-conclusory terms, that the "lack of market overlap" is due to an illegal agreement and have placed the allegations of conspiratorial behavior in a context that undermines Defendants' claims of lawful independent action, thereby stating a claim under *Twombly.*

      **d.**      **Allegations of opportunities to collude bolster the plausibility analysis.**

Defendants correctly argue that "mere opportunity" to conspire, without more, cannot form the basis of a claim of conspiracy.  *In re Graphics, supra* 527 F. Supp. 2d at 1023; *In re Travel Agent*, *supra* 583 F.3d at 911.  This Court is cognizant of the fact that membership in IPIA, the dominant Packaged Ice trade association, and the fact that several of Defendants' key executives who have pled guilty to antitrust violations served as board and committee members in that organization, standing alone, do not suffice to support a claim of conspiracy.  However, these allegations do not stand alone and must be viewed not in isolation but in the context of the entirety of Plaintiffs' allegations.  *See Standard Iron Works, supra,*639 F. Supp. 2d at 897 ("Proof of

Defendants' opportunity to conspire does not alone suggest that there was an agreement to curtail production. But Plaintiffs' allegations go further than pointing to opportunity alone.") (citation omitted).   When viewed in the context of the allegations of the CAC as a whole, these "opportunities" bolster the plausibility of a conspiracy and "attendance at said meetings should be easily ascertained through discovery such that there is a reasonable expectation that discovery may reveal evidence of the alleged illegal conspiracy." *In re Flat Glass Antitrust Litig. II*, No. 08-mc-180, MDL 1942, 2009 WL 331361 at * 3 (W.D. Pa. Feb. 11, 2009).

Plaintiffs' CAC contains enough factual content to plausibly suggest that these Defendants participated in a nationwide conspiracy to allocate customers and territories and raises a reasonable expectation that discovery will reveal evidence of illegal agreement.  The CAC provides Defendants with fair notice of Plaintiffs' claims and the grounds on which they are based, such that these Defendants will know how to respond.  "The present complaint succeeds where *Twombly's* failed because the complaint alleges specific facts sufficient to plausibly suggest that the parallel conduct alleged was the result of an agreement among the defendants."  *Starr, supra* 592 F.3d at 323. Whether Plaintiffs will ultimately prevail on their claims is a question reserved for a later day. Because Plaintiffs have "nudge[d] their claims across the line from conceivable to plausible," Defendants' motions to dismiss for failure to state a claim are denied.

## B.      Fraudulent Concealment/Statute of Limitations.

Plaintiffs purport to represent a class whose members purchased Packaged Ice between January 1, 2001 through March 6, 2008.  Arctic Glacier argues that Plaintiffs' claims are barred in part by the Sherman Act four-year statute of limitations.  *See* 15 U.S.C. §15(b).  Defendants state

that the CAC was filed in March 2008 and that any violations that allegedly occurred before March 2004 are not actionable.  Plaintiffs respond that Arctic Glacier and Home City pled guilty to a conspiracy that began in January, 2001 and that Plaintiffs should be able to assert claims covering that same period.  Plaintiffs argue that the four-year statute of limitations should be tolled, and the class allegations permitted to reach back to conduct in 2001, because the Defendants affirmatively concealed their anticompetitive conduct.

"In order to establish equitable tolling by the doctrine of fraudulent concealment, the plaintiffs must allege and establish that: 1) defendants concealed the conduct that constitutes the cause of action; 2) defendants' concealment prevented plaintiffs from discovering the cause of action within the limitations period; and 3) until discovery, plaintiffs exercised due diligence in trying to find out about the cause of action."  *Egerer v. Woodland Realty, Inc*., 556 F.3d 415, 422 (6th Cir. 2009) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp*., 838 F.2d 1445, 1465 (6th Cir. 1988)).  The doctrine of fraudulent concealment, as developed in the Sixth Circuit, requires proof of affirmative acts of concealment.  "Mere silence, or one's unwillingness to divulge one's allegedly wrongful activities, is not sufficient."  *Pinney, supra* at 1472.[17]

Plaintiffs' allegations of fraudulent concealment are not extensive.  They claim that "Defendants affirmatively concealed their anti-competitive conduct from Plaintiffs . . . represented publicly, both to customers and otherwise, that their pricing activities were unilateral, rather than collusive, and based upon legitimate business purposes, such as increased costs.  In making those

---

[17] The Court agrees with Defendants that Plaintiffs' reliance on *In re Scrap Metal Antitrust Litig*., 527 F.3d 517 (6th Cir. 2008) is overemphasized.  The Sixth Circuit did not rule that instructing the jury that "conspiracy, by its nature, is self-concealing" is appropriate in a fraudulent concealment claim in a conspiracy case.  Rather, as Defendants point out, the court merely held that on the facts of that case, the instruction was harmless error.  *Id*. at 538.

false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their territorial and customer allocation and other illegal anticompetitive activities. . . Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection." (CAC ¶¶ 58-61.) Plaintiffs further allege that they "did not and could not have discovered Defendants' unlawful contract, combination or conspiracy at any earlier date. Defendants undertook affirmative acts of concealment of their contract, combination or conspiracy, including their attendance at secret meetings, and engaging in secret conversations concerning the allocation of markets and customers for Packaged Ice." (CAC ¶ 62.)

At first blush, this rather conclusory allegation appears to run afoul of the *Pinney* prohibition against a finding of fraudulent concealment based upon defendants' failure to "divulge [their] allegedly wrongful activities." However, it is also true that "where there is a dispute as to the issue of fraudulent concealment, the question is one for the jury." *Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.*, 841 F. Supp. 212, 216 (E.D. Mich. 1993). There may be merit to Plaintiffs' generalized allegation that Defendants "represented publicly, both to customers and otherwise, that their pricing activities were unilateral, rather than collusive, and based upon legitimate business purposes, such as increased costs." For example, in the related securities fraud case, *Chamberlain*, *supra*, plaintiffs allege numerous public disclosures by Reddy Ice affirmatively representing that they comply with company's code of business ethics and specifically that they comply with the federal antitrust laws. (*Chamberlain*, No. 08-13451, Dkt. No. 37, Amended Compl. ¶ 87.) Given the scope of the conspiracy to which Home City and Arctic Glacier have pled in the criminal case (clearly embracing the entire period from 2001-2007), taking as true the allegations

in the CAC relating to affirmative acts of public disclosure on the part of at least some of the Defendants of compliance with the very laws they have now admitted to violating, and the fact that fraudulent concealment is a question best left to the jury if there is any question, the Court finds that under the pleading standard set forth in *Twombly*, Plaintiffs' claims of fraudulent concealment plausibly allege affirmative acts of concealment which satisfy the *Twombly, Iqbal* requirements.

**C.    The Court Will Defer Decision on Arctic Glacier's Motion to Dismiss the Canadian Entities for Lack of Personal Jurisdiction**

Plaintiffs bear the burden of establishing that personal jurisdiction exists. *Neogen Corp. v. Neo Gen Screening, Inc*., 282 F.3d 883, 887 (6th Cir. 2002). However, "a plaintiff is only required to meet this burden when challenged by a motion under Rule 12(b)(2), which the moving defendant supports by attaching affidavits." *Hagen v. U-Haul Co.*, 613 F. Supp. 2d 986, 1001 (W.D. Tenn. 2009) (citing *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929-30 (6th Cir.1974)). "The Court has discretion to make a determination as to the existence of personal jurisdiction without an evidentiary hearing." *Theunissen v. Matthews*, 935 F.2d 1454, 1458-1459 (6th Cir. 1991). Where there has been no evidentiary hearing, the plaintiff need only present a *prima facie* case in support of jurisdiction. *Id.* at 1458.

In the instant case, Arctic Glacier has not submitted any facts, by way of affidavit, which challenge Plaintiffs' factual allegations. Therefore, the Court can properly rely on Plaintiffs' pleadings to resolve the 12(b)(2) motion. *See Hagen, supra*, 613 F. Supp. 2d at 1002 ("[W]hen the defendant fails to attach supporting affidavits, as in this case, a Rule 12(b)(2) motion cannot be sustained because the Court will have been presented with no evidence contradicting the plaintiff's assertion of jurisdiction over the defendant."). Plaintiffs allege that the Canadian Arctic Glacier Defendants have extensive United States business operations and the Court notes that "the

ownership of a subsidiary that does business in the forum is a factor to be considered in determining

minimum contacts." *General Motors Corp.*, 948 F. Supp. 656, 665 (E.D. Mich. 1966) (citing *Third*

*Nat'l Bank v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1090 n.1 (6th Cir. 1989).

At the hearing on June 24, 2010, counsel for Arctic Glacier indicated to the Court that Arctic

Glacier was agreeable to the Court's deferring decision on the issue of personal jurisdiction, as it

did in the *McNulty* case (Dkt. No. 84, 5/29/09, Opinion and Order Granting in Part and Denying in

Part Defendants' Motion to Dismiss, 7-8), until Plaintiffs have had an opportunity to conduct

jurisdictional discovery.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions to dismiss (Dkt. Nos. 202

and 203).

IT IS SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 1, 2010




CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July
1, 2010.

S/Denise Goodine
Case Manager