IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: PACKAGED ICE ANTITRUST LITIGATION | Civil Action No.: 2:08-MD-1952-PDB |
| THIS DOCUMENT RELATES TO: ALL INDIRECT PURCHASER ACTIONS | SECOND AMENDED CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |

Plaintiffs bring this action for damages, injunctive relief and costs of suit including reasonable attorneys' fees for injuries to themselves and members of the proposed class they represent. The allegations set forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding each plaintiff.

NATURE OF THE ACTION

1.    This action arises from a long-standing agreement among defendants — producers of packaged ice in the United States and Canada, which have a combined United States market share of nearly 70 percent — not to compete with each other. In furtherance of their cartel, defendants agreed to, and did in fact, fix and inflate prices, allocate territories and customers, acquire competitors, refuse to compete and otherwise commit a variety of unlawful and anticompetitive acts. The purpose and effect of the cartel has been to fix, raise, maintain and stabilize the prices paid for ice sold in plastic bags or large blocks ("packaged ice") throughout the United States. Evidence of the existence of the conspiracy includes, but is not limited to, admissions made by participants in the conspiracy, guilty pleas by two of the defendants to a violation of Section 1 of the Sherman Act, defendants' suspension of officers who they believe may have participated in the cartel, defendants' attempts to intimidate and bribe a whistleblower

and economic behavior that would have been inconsistent with each defendant's self-interest or implausible in the absence of the conspiracy.

## JURISDICTION AND VENUE

2.      Plaintiffs' claims arise under § 1 of the Sherman Act (15 U.S.C. § 1) and the statutes of 14 states.  This Court has exclusive original jurisdiction over the federal claim pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) as well original jurisdiction pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the class exceeds $5 million exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts of the federal claim asserted in this action.

3.      Venue is proper in the Eastern District of Michigan pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because defendants transact business, may be found, and a substantial part of the events and occurrences giving rise to the claims took place, in this District.

## INTERSTATE TRADE AND COMMERCE

4.      During the class period, defendants produced, manufactured, distributed and sold packaged ice in interstate commerce in a continuous and uninterrupted flow to customers located in each and every state in the continental United States and District of Columbia.

5.      Defendants' activities at issue in this action were within the flow of and substantially affected interstate trade and commerce, including commerce in each and every state in the continental United States and District of Columbia.

PLAINTIFFS

6.    Plaintiff Lawrence J. Acker is a citizen of the State of Michigan.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier and Reddy Ice, for his own use and not for resale, at one or more retail establishments in Michigan.

7.    Plaintiff Patrick Simasko is a citizen of the State of Michigan.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier, for his own use and not for resale, at one or more retail establishments in Michigan.

8.    Plaintiff Wayne Stanford is citizen of the State of Michigan.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier, for his own use and not for resale, at retail establishments in Michigan and Wisconsin.

9.    Plaintiff Brian W. Buttars is a citizen of the State of New York.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier and Reddy Ice, for his own use and not for resale, at retail establishments in Florida, Maine and New York.

10.    Plaintiff James Feeney is a citizen of the State of California.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier, for his own use and not for resale, at retail establishments in California, Maine and Nevada.

11.    Plaintiff Ainello Mancusi is a permanent resident alien.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier, for his own use and not for resale, at one or more retail establishments in New York.

12.    Plaintiff Ron Miastkowski is a citizen of the State of Florida.   Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Reddy Ice, for his own use and not for resale, at one or more retail establishments in Florida.

13. Plaintiff Brandi Palombella is a citizen of the Commonwealth of Massachusetts. Between January 1, 2001 and March 6, 2008, she purchased packaged ice indirectly from Arctic Glacier and Reddy Ice, for her own use and not for resale, at retail establishments in New York and Tennessee.

14. Plaintiff Lehoma Goode is a citizen of the State of North Carolina. Between January 1, 2001 and March 6, 2008, she purchased packaged ice indirectly from Reddy Ice, for her own use and not for resale, at one or more retail establishments in North Carolina.

15. Plaintiff Beverly Herron is a citizen of the State of Minnesota. Between January 1, 2001 and March 6, 2008, she purchased packaged ice indirectly from Arctic Glacier, for her own use and not for resale, at one or more retail establishments in Minnesota.

16. Plaintiff Robert DeLoss is a citizen of the State of Iowa. Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Reddy Ice, for his own use and not for resale, at one or more retail establishments in Iowa.

17. Plaintiff Karen Prentice is a citizen of the State of Arizona. Between January 1, 2001 and March 6, 2008, she purchased packaged ice indirectly from Reddy Ice, for her own use and not for resale, at one or more retail establishments in Arizona.

18. Plaintiff Ian Groves is a citizen of the State of New Mexico. Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Reddy Ice, for his own use and not for resale, at one or more retail establishments in New Mexico.

19. Plaintiff Lynn Strauss is a citizen of the State of New Mexico. Between January 1, 2001 and March 6, 2008, she purchased packaged ice indirectly from Arctic Glacier, for her own use and not for resale, at one or more retail establishments in New Mexico.

20.     Plaintiff Nathan Croom is a citizen of the State of Nebraska.  Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier, for his own use and not for resale, at one or more retail establishments in Nebraska.

21.     Plaintiff Joe Sweeney is a citizen of the Commonwealth of Massachusetts. Between January 1, 2001 and March 6, 2008, he purchased packaged ice indirectly from Arctic Glacier, for his own use and not for resale, at one or more retail establishments in Massachusetts.

<u>DEFENDANTS</u>

22.     Defendant Reddy Ice Holdings, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 8750 North Central Expressway, Suite 1800, Dallas, Texas 75231. Reddy Ice Holdings, Inc is the parent of its wholly-owned subsidiary, defendant Reddy Ice Corporation.  Reddy Ice Corporation is a Delaware corporation with its principal place of business at 8750 North Central Expressway, Suite 1800, Dallas, Texas 75231.  Hereafter Reddy Ice Holdings Inc. and Reddy Ice Corporation will be referred to collectively as "Reddy Ice."  Reddy Ice is the largest manufacturer and distributor of packaged ice in the United States.  Reddy Ice's products are primarily sold throughout the southern United States.   Within its territories, Reddy Ice is, and has been, the leading manufacturer and distributor of packaged ice.  Reddy Ice has had over 80% of its packaged ice sales in territories where it is the leading manufacturer.  Reddy Ice also uses other packaged ice producers as agents to serve its customers under its customer contracts referring to them at times as "co-packers" or "franchisees."

23.     The "Arctic Glacier" defendants are related companies consisting of: Defendant Arctic Glacier Income Fund ("Arctic Fund"), a mutual fund trust organized under the laws of Alberta, Canada, with its principal place of business at 625 Henry Avenue, Winnipeg, Manitoba,

Canada; defendant Arctic Glacier Inc., a wholly-owned subsidiary of Arctic Fund, organized under the laws of Alberta, Canada, with its principal place of business at 625 Henry Avenue, Winnipeg, Manitoba, Canada; and defendant Arctic Glacier International Inc., a wholly-owned subsidiary of Arctic Glacier Inc., which is a Delaware corporation with its principal place of business located at 1654 Marthaler Lane, West St. Paul, Minnesota.  Artic Glacier is in the business of manufacturing and distributing packaged ice in the United States, primarily in parts of the midwest, northeast, and California.  Arctic Glacier is the second largest manufacturer of packaged ice sold in the United States.  Arctic Glacier is, and has been, the leading manufacturer and distributor of packaged ice in the territories in which it operates.  Arctic Glacier also sells packaged ice through its many wholly-owned subsidiaries and uses other packaged ice producers as agents to serve its customers under its customer contracts referring to them at times as "co-packers," "franchisees" or "licensees."

24.     Defendant Home City Ice Company ("Home City") is an Ohio corporation with its principal place of business at 6045 Bridgetown Road, Cincinnati, Ohio 45248.  Home City manufactures, distributes, and sells packaged ice principally in parts of the midwest.  Home City is the third largest manufacturer and distributor of packaged ice in the United States with sales that have grown to more than $80 million per year.  Home City also uses other packaged ice producers as agents to serve its customers under its customer contracts referring to them at times as "co-packers" or "franchisees."

<u>AGENTS</u>

25.     The acts alleged to have been done by the defendants were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of the defendants' business affairs.

## CLASS ALLEGATIONS

26.     Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.  The "class" is defined as:

> All persons or other legal entities (excluding governmental entities, defendants, their officers, directors, subsidiaries or affiliates), who purchased packaged ice indirectly in the continental United States (except Ohio) and District of Columbia between January 1, 2001 until such time as the effect of the conspiracy ceases.

27.     The members of the class are so numerous that joinder of all of them would be impracticable.  The exact number of class members is unknown by plaintiffs at this time, but plaintiffs believe them to number in the millions.

28.     Plaintiffs' claims are typical of the class members.  Plaintiffs and all class members were impacted and damaged in the same manner by defendants' wrongful conduct. Plaintiffs and the class members purchased packaged ice at artificially inflated prices because of defendants' wrongful conduct.

29.     Plaintiffs will fairly and adequately protect the interest of the class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.  Plaintiffs also have retained counsel, who have experience in the litigation of complex antitrust class actions including of the type of claims alleged herein.

30.     Questions of law and fact common to the class members predominate over questions that may affect only individual class members.  Defendants have acted on grounds generally applicable to the entire class.  Common questions of law and fact include, but are not limited to:

(a)     Whether defendants engaged in a contract, combination or conspiracy to allocate the market and customers for packaged ice in the United States, and to raise, fix, maintain or stabilize the price of packaged ice sold in the United States;

(b)     The duration and extent of the contract, combination or conspiracy alleged herein;

(c)     Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

(d)     Whether defendants violated the state statutes alleged herein;

(e)     Whether defendants took steps to conceal the contract, combination or conspiracy;

(f)     Whether defendants' conduct caused the price of packaged ice to be artificially high and non-competitive in the states in which they bought it;

(g)     Whether plaintiffs and members of the class were injured by defendants' conduct; and

(h)     Whether plaintiffs and the class are entitled to equitable and injunctive relief and the nature of such relief.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all class members is impractical.  The damages suffered by the individual class members are small, particularly given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for class members to redress the wrongs done to them.  Even if the class members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case management difficulties

and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

<u>STRUCTURAL CHARACTERISTICS OF THE INDUSTRY</u>

32.     Packaged ice is sold at retail establishments such as supermarkets, mass merchants and convenience stores.  Suitable for human consumption, it is used to keep food and beverages at sufficiently cold or comfortable temperatures particularly when refrigeration is not available.

33.     Packaged ice is sold throughout the United States.  Excluding in-house manufacturing, the packaged ice industry in the United States has been estimated as having sales of about $900 million in 2006.  The retail ice distribution market accounts for an estimated 90% of packaged ice sales.

34.     Defendants dominate the packaged ice industry, and the market share and financial resources of non-defendant firms that manufacture and distribute packaged ice is small.  Through acquisitions, defendants have increased their market power and reduced the ability of other packaged ice companies to compete for customers served by defendants.  According to Reddy Ice's estimation, by early 2007 Reddy Ice, Arctic Glacier and Home City controlled 66.6% of the packaged ice industry.  By this time, there remained only small third party ice manufacturers, the majority of whom had less than $1 million a year in revenue.

35.     Turnover of major ice customers is infrequent.  Each defendant typically is the sole source supplier of packaged ice to its customers.  There is usually one packaged ice option per retail location.  Accordingly, each defendant does not experience any competition for its packaged ice within stores.

36.     Defendants' pricing is not constrained by threat of entry into the manufacture and sale of packaged ice.  There are substantial barriers to entry to be able to compete effectively with the defendants.  In order to serve major customers, a new entrant into the business would have to incur multimillion-dollar costs, including a manufacturing plant and equipment, energy, transportation, and distribution infrastructure.  Because of these high costs, new or small distributors are not able to meet the needs of large customers with geographically dispersed retail locations and cannot compete successfully for such customers.

37.     Consumers of packaged ice do not have any alternative products that they find reasonably interchangeable with packaged ice.  They will not substitute packaged ice for another product in response to a small price increase.

38.     Demand for packaged ice is inelastic and stable.  Because of its low cost, consumers are not sensitive to price, as they will not reduce the quantity of packaged ice that they demand in response to a small increase in price.  Although such a price increase would amount to pennies for the retail price of packaged ice, it would reap substantial additional profits to defendants.  Thus, an increase in price will not produce a sufficient reduction in the quantity of packaged ice sold so as to render a price increase unprofitable.

39.     Packaged ice is a fungible commodity product as it is simply frozen water.  As a result, direct customers have no need to stock any particular brand of packaged ice.

40.     Packaged ice manufacturers are able to monitor the sales activity of each other, including the territories in which they sell and the approximate prices charged.

41.     Direct customers of packaged ice, particularly retailers such as supermarkets, mass merchants and convenience stores, are in a fiercely competitive industry.  They operate on slim margins.  They have the ability to change prices charged to their customers frequently and

cheaply.  They cannot afford to absorb price increases and remain profitable.  As a result, they typically pass on entire price increases to their customers such as plaintiffs and the class rapidly after they receive them from the manufacturers.

THE CRIMINAL ANTITRUST INVESTIGATION

A.      Home City's Conviction

42.      On June 7, 2008, Thomas E. Sedler, President and Chief Executive Officer of Home City, on behalf of Home City, pleaded guilty to violating Section 1 of the Sherman Act. Before the Honorable Herman J. Weber, United States District Judge of the United States District Court for the Southern District of Ohio (Western Division) and on behalf of Home City, Sedler swore that the averments in Home City's plea agreement were true.  Sedler confirmed under oath that "since 2001, [defendant] participated in a conspiracy among packaged ice producers, the primary purpose of which was to allocate customers and territories of packaged ice sold in southeastern Michigan and the Detroit, Michigan metropolitan area.  In furtherance of the conspiratorial activity, the defendant, through its officers and employees, primarily through its deceased vice president of sales and marketing, engaged in discussions and attended meetings with representatives of other packaged ice producers.  During these discussions and meetings, agreements were reached to allocate customers and territories of packaged ice to be sold in southeastern Michigan and the Detroit, Michigan metropolitan area."  The Court then conditionally accepted Home City's guilty plea pursuant to the plea agreement.

43.      On March 2, 2010, the Court accepted Home City's guilty plea and imposed sentence.  The judgment of conviction and commitment order was entered on March 3, 2010.

B.      Search Warrant Executed at Reddy Ice's Headquarters, Its Suspension of Key Officer and State Attorneys General Investigations.

44.      On or about March 4, 2008, a United States Magistrate Judge of the United States

District Court for the Northern District of Texas issued a warrant authorizing the Federal Bureau of Investigation to search Reddy Ice's headquarters in Dallas, Texas.  Before issuing the search warrant, the magistrate judge determined — based upon a sworn government application — there was probable cause to believe evidence of criminal activity would be found at Reddy Ice's corporate headquarters.  The magistrate judge made this finding even though Reddy Ice does no business in Michigan.

45.     On September 15, 2008, Reddy Ice announced that it had suspended Ben D. Key, the Company's Executive Vice President – Sales & Marketing, because the Special Committee of the Company's Board had "found that Mr. Key has likely violated Company policies and is associated with matters that are under investigation."  Key had originally been an executive with Reddy Ice, and was on Reddy Ice's Executive Committee.  To replace Key, Reddy Ice assigned a team of senior executives to direct its sales and marketing efforts.  Key later resigned voluntarily.

46.     Reddy Ice has disclosed that it is the subject of investigations by numerous state attorneys general relating to pricing fixing or a customer market allocation.

C.      Arctic Glacier's Conviction, Its Officers' Convictions and State Attorneys General Investigations

47.     Arctic Glacier International Inc. and Keith Corbin, Frank Larson and Gary Cooley, three former executives of Arctic Glacier Inc., pleaded guilty to violating § 1 of the Sherman Act.  Although Corbin, Larson, and Cooley swore in their allocutions that they were employed by Arctic Glacier International Inc. when they committed their crimes, they have since admitted that they were employed by Arctic Glacier Inc. at that time.

48.     On November 10, 2009, Hugh A. Adams, Secretary and General Counsel of Arctic Glacier, Inc., pleaded guilty, on behalf of Arctic Glacier International Inc., to violating § 1 of the Sherman Act.  Before the Honorable Herman J. Weber, United States District Judge of the

United States District Court for the Southern District of Ohio (Western Division) and on behalf of Arctic Glacier, Adams swore that the averments in Arctic Glacier International Inc.'s plea agreement were true. Adams confirmed under oath that "[b]eginning January 1st, 2001, and continuing until at least July 17th, 2007, the exact dates being unknown to the United States, the defendant and co-conspirators entered into and engaged in a conspiracy to suppress and eliminate competition by allocating packaged-ice customers in southeastern Michigan and the Detroit, Michigan, metropolitan area."

49.    On February 11, 2010, the Court accepted Arctic Glacier International Inc.'s guilty plea and imposed sentence. The judgment of conviction and commitment order was entered on March 3, 2010.

50.    On October 13, 2009, Keith Corbin pleaded guilty to violating § 1 of the Sherman Act. Before the Honorable Herman J. Weber, United States District Judge of the United States District Court for the Southern District of Ohio (Western Division), Corbin swore that the averments in his plea agreement were true. Corbin confirmed under oath that beginning as early as March 1, 2005 and continuing until at least July 17, 2007, "he participated in a conspiracy to allocate customers of packaged ice sold in southeastern Michigan and the Detroit metropolitan area."

51.    On February 2, 2010, the Court accepted Corbin's guilty plea and imposed sentence. On February 3, 2010, the Court entered the judgment of conviction and commitment order.

52.    On October 13, 2009, Gary Cooley pleaded guilty to violating § 1 of the Sherman Act. Before the Honorable Herman J. Weber, United States District Judge of the United States District Court for the Southern District of Ohio (Western Division), Cooley swore that the

averments in his plea agreement were true. Cooley confirmed under oath that "[b]eginning at least as early as June 1st, 2006, and continuing until at least July 17th, 2007, . . ., the defendant and co-conspirators entered into and engaged in a conspiracy to suppress and eliminate competition by allocating packaged-ice customers in southeastern Michigan and the Detroit, Michigan, metropolitan area."

53.     On February 4, 2010, the Court accepted Cooley's guilty plea, imposed sentence and entered the judgment of conviction and commitment order.

54.     On October 13, 2009, Frank Larson pleaded guilty to violating § 1 of the Sherman Act. Before the Honorable Herman J. Weber, United States District Judge of the United States District Court for the Southern District of Ohio (Western Division), Larson swore that the averments in his plea agreement were true. Larson confirmed under oath that "[b]eginning at least as early as March 1st, 2005, and continuing until at least July 17th, 2007, ... the defendant and co-conspirators entered into and engaged in a conspiracy to suppress and eliminate competition by allocating packaged-ice customers in southeastern Michigan and the Detroit, Michigan metropolitan area."

55.     On February 3, 2010, the Court accepted Larson's guilty plea, imposed sentence and entered the judgment of conviction and commitment order.

56.     Arctic Glacier has disclosed that it is the subject of investigations by numerous state attorneys general relating to pricing fixing or a customer market allocation.

<u>DEFENDANTS' EFFORTS TO SILENCE THE WHISTLEBLOWER</u>

57.     In August 2008, Martin G. McNulty filed an action against his former employer, Arctic Glacier, claiming he was fired because he had refused to participate in a packaged ice industry antitrust conspiracy. McNulty, who had been Vice President of Sales at Party Time Ice,

which was acquired by Arctic Glacier in late 2004, has sworn, subject to penalties of perjury (*see*

*United States v. Arctic Glacier Int'l Inc.*, 09-cr-0147 (S.D. Oh.) (Dkt. #38 at 1-3)):

a. "Arctic Glacier executive Keith Corbin told me that Arctic Glacier's conspiracy with Reddy Ice extended throughout the United States. For instance, according to Mr. Corbin, Arctic Glacier had 'backed away' from buying an ice company in Nevada so that Arctic Glacier and Reddy Ice would not be in direct competition. Mr. Corbin explained to me that Arctic Glacier's agreement not to enter the South and Southwest (a geography dominated by Reddy Ice) enabled Reddy Ice to 'get their prices up,' and Reddy Ice's agreement to stay out of the Midwest and Canada enabled Arctic Glacier to do the same. Mr. Corbin described Reddy Ice as 'good competition.'"

b. "In January 2005, I traveled with Keith Corbin to Ohio to meet with one of my accounts, Speedway SuperAmerica LLC. Speedway was headquartered in Ohio and had stores in a number of different states, including Michigan. Prior to meeting with Speedway, Mr. Corbin instructed me as to the geographic locations of the Speedway stores that Arctic Glacier could service, and the locations that Arctic Glacier could not service – including locations in Ohio – because of Arctic Glacier's market allocation agreement with Home City."

c. "Charles Knowlton, the owner of Party Time Ice (which was acquired by Arctic Glacier) threatened that, because of the conspiracy between Arctic Glacier and Home City Ice, Mr. Knowlton would ensure that Home City Ice would not hire me if I did not participate in the market allocation conspiracy."

d. "Keith Corbin informed me that Arctic Glacier had the same conspiratorial relationship with Home City as Party Time. Mr. Corbin informed me that if I refused to participate in the conspiracy and left Arctic Glacier, he would ensure that I would not be hired by competing ice manufacturers, including Home City."

e. "After I was terminated by Arctic Glacier for refusing to participate in the unlawful market allocation conspiracy, I unsuccessfully applied for employment with Home City in Ohio. I was told by Geoff Lewandowski that he had spoken to Charles Knowlton, who was then working for Arctic Glacier, and that Mr. Knowlton had told Mr. Lewandowski that I would not be able to get a job with another packaged ice company if I continued cooperating with federal authorities in their investigation."

f. "After being terminated, I also spoke to Joseph Riley of Tropic Ice. He informed me that he spoke to Jim Forsberg of Arctic Glacier, who told Mr.

Riley that I was being boycotted from employment in the packaged ice industry by Arctic Glacier."

58.     McNulty also alleges in the lawsuit that Steve Knowlton called McNulty on behalf of his father Charles Knowlton (owner of Party Ice who later became Director of Franchise Operations for Arctic Glacier) and told him that a Home City executive had told Steve Knowlton that a current Party Time customer in Michigan had approached Home City about supplying it.  Home City declined, and told Party Time to take steps so that the customer would not look for another ice supplier.  Steve Knowlton told McNulty that Party Time and Home City had agreed not to compete for customers in certain areas.  Party Time would not service certain stores because they were being serviced by Home City, and Home City and Party Time agreed in advance on who would submit the lower bid to potential customers, including providing false certifications that the bid was not collusive.  (*McNulty v. Reddy Ice Holdings, Inc.*, 08-cv-13178 (E.D. Mich.) ("*McNulty*") (Dkt. #43 at 10-11).

59.     In *McNulty*, McNulty also alleged, "on March 28, 2005, Mr. McNulty received a phone call from a colleague of Mr. Knowlton [an Arctic Glacier officer] ..., who was calling at the behest of Mr. Knowlton. [The colleague] wanted to set up a meeting between himself, Mr. McNulty, and Mr. Knowlton to address terms upon which Arctic Glacier might rehire Mr. McNulty at a salary that 'would make him happy.'  [The colleague] stated that Arctic Glacier was willing to pay him an annual salary of more than twice his previous salary.  The offer was conditioned on Mr. McNulty's participation in the conspiracy and his not cooperating with the government.  Mr. McNulty refused the offer." (*Id.* at 14).

<u>ADMISSIONS BY THE CO-CONSPIRATORS</u>

60.     In a motion made in these proceedings (Dkt. #332 at 10-11), the Direct Purchaser

Plaintiffs offer information about 11 secretly recorded telephone conversation between Ted

Sedler of Home City and representatives of Arctic Glacier and Reddy Ice.  In particular, the

motion provides the following details of these recordings:

a.     "A recording on 9/25/07 between Keith Corbin of Arctic Glacier and Ted
Sedler of Home City in which, inter alia, they discussed settling issues
with Ben Key of Reddy Ice and discussed dividing territories with Reddy
Ice in Texas, Kansas or Oklahoma.5

b.     A recording on 8/17/07 in which Greg Cooley of Arctic Glacier said that
Arctic Glacier and Reddy Ice have worked together and co-existed in
Texas.

c.     A recording on 11/17/07 in which Greg Snyder of Arctic Glacier
explained that he and Ben Key had traded customers in Kansas and that
Arctic Glacier and Reddy had allocated territories after acquisition of
Shepards.

d.     A recording of 11/5/07 between Greg Geiser of Home City and Ray
Torteriesse in which they confirmed prior meetings with Lou McGuire;
indicated that Bob Nagy of Arctic Glacier had pricing conversations with
Kerry Chamberlin of Happy Ice; stated that Happy Ice had been causing
problems; and that Arctic worked with Holiday Ice to broker peace.

e.     A recording on 11/5/07 between Ben Key of Reddy Ice and Ted Sedler of
Home City regarding Roanoke, VA.

f.     A recording on 12/11/07 between Ted Sedler of Home City and Gary
Cooley of Arctic Glacier regarding Lubbock, TX, Carlisle, PA, and
Phoenix.

g.     Three recordings, on 2/20/08, 2/22/08 and 2/26/08 respectively, between
Ted Sedler of Home City and Ben Key of Reddy Ice regarding Tennessee
and Kentucky.

h.     A recording on 8/24/07 in which Gary Cooley of Arctic Glacier confirmed
past practices with Home City's Lou McGuire.

i.     A recording on 8/24/07 in which Frank Larson confirms that Arctic
Glacier wants to continue working with Home City."

61.     In an action entitled *Chamberlain v. Reddy Ice Holdings, Inc.*, 08-cv-13451,

pending in this Court, plaintiff alleged (Dkt. #37 at 17-19):

    a.     "Confidential Witness Number 2 ("CW2") is a former Reddy Ice employee that held several different positions at Reddy Ice during the Class Period and specifically from January 2006 through March 2008, including: (i) Internal Auditor, (ii) Area Controller, and (iii) Utilities Specialist. Through these positions at Reddy Ice, CW2 was privy to highly-sensitive financial information related to the Company's financial performance and business practices, such as compiling the financials for all of the manufacturing plants in CW2's assigned territory, including revenues, expenses and EBITDA, and comparing budgeted amounts to actual amounts. CW2 was based out of the Company's Dallas headquarters, and travelled regularly to numerous plants owned by the Company to conduct internal audits."

    b.     "During the execution of CW2's duties, CW2 learned of an unlawful agreement between Reddy Ice and Arctic Glacier to allocate territories and markets for packaged ice for exclusive distribution and sales of packaged ice. CW2 stated that this collusive agreement was often discussed in CW2's presence among Reddy Ice employees at the corporate office and at the various plants that CW2 visited while conducting audits. In addition, CW2 was personally told of the unlawful agreement by [former Reddy Ice Chief Executive Office] Weaver."

    c.     "According to CW2, [former Reddy Ice Chief Executive Officer] Brick had a connection at Arctic Glacier and had used this connection to approach the CEO of Arctic Glacier. As told to CW2 by other Reddy Ice employees with whom CW2 came into contact during the course of internal audits, defendant Brick entered into the on-going unlawful agreement with Arctic Glacier to allocate territories and markets for packaged ice whereby Reddy Ice agreed to stay out of California and Arctic Glacier agreed to stay out of Arizona. CW2 understood, based upon conversations with other Reddy Ice employees, that the unlawful agreement was entered into prior to the start of CW2's employment at Reddy Ice and at around the same time that Reddy Ice sold most of its California ice plants and Arctic Glacier shut down its Arizona plants."

    d.     "With respect to the structure of the unlawful allocation agreement, several Reddy Ice employees explained to CW2 that Reddy Ice agreed to sell its California manufacturing operations (except for a facility in Brawley, California that was near the border of Arizona) to a consortium of companies located in California. It was further explained to CW2 that, at the time of the Agreement, Arctic Glacier did not externally appear to

18

have a connection with the consortium of companies, but it was understood that Arctic Glacier would subsequently acquire this consortium of companies to have access to all of the packaged ice manufacturing facilities that had been acquired from Reddy Ice.

e.  "During CW2's employment at Reddy Ice, CW2 attended an annual plant managers' meeting held at a Dallas hotel during February 2006 or 2007. CW2 stated that during this annual meeting, defendant Weaver mentioned the unlawful agreement with Arctic Glacier in a presentation to CW2 and several other management attendees, including [former Reddy Ice Chief Financial Officer] Janusek.  CW2 further stated that the attendees (including the various plant managers) all expressed knowledge and an understanding of the terms of the on-going unlawful agreement during the meeting."

f.  "Additionally, it was also regularly discussed amongst various Reddy Ice employees that Home City was a party to the unlawful agreement, according to CW2.  CW2 stated that Reddy Ice employees mentioned that Home City was represented at the meeting during which defendant Brick and Arctic Glacier's Chief Executive Officer met to divvy up the California and Arizona markets. With respect to Home City, CW2 was told by other Reddy Ice employees that Reddy Ice and Arctic Glacier had agreed to stay out of certain Mid-West states where Home City had a presence. During the course of CW2's employment, CW2 also gained first-hand knowledge that [] Weaver and Janusek knew of the unlawful allocation agreement with Home City."

g.  "Further according to CW2, although it appeared to the public that Arctic Glacier did not have a connection to the 'consortium' at the time that Reddy Ice sold its manufacturing operations, [] Brick knew that the consortium of companies that acquired Reddy Ice's manufacturing and distribution facilities in California was in fact a straw man set up by agreement between Reddy Ice and Arctic Glacier through which Arctic Glacier would subsequently acquire the packaged ice facilities in California. CW2 stated that Reddy Ice wanted to keep the details of Arctic Glacier's involvement 'less obvious' since Reddy Ice was a public company."

<u>DEFENDANTS' ACQUISITIONS ARE FURTHER EVIDENCE OF THE CONSPIRACY</u>

62.     Over the last several years, Reddy Ice, Arctic Glacier and Home City have executed a strategy of acquiring competitors.  Each defendant knew that the other defendants were implementing a strategy of growth by acquisition in the United States.  As a result of their

identical strategies, defendants understood that the biggest threat to success was competition from each other.

63.    In 1997, Arctic Glacier initially entered some of Reddy Ice's and Home City's territories as it had no operations in the United States.  This entry induced Reddy Ice and Home City to enter into an agreement with Arctic Glacier in which they allocated territories and customers.  As a result, defendants have very little overlap in the territories in which they sell packaged ice.

64.    Defendants' activities in California offer an example of how the conspiracy operated.  Reddy Ice and Arctic Glacier agreed that Arctic Glacier could have California, and that Arctic Glacier would not compete with Reddy Ice in Arizona.

65.    As a result of its acquisitions, in 1998 Reddy Ice had a significant presence in California with 5 facilities.  In 1997, about 10% of Reddy Ice's revenue was from California.  Indeed, in 1998 Reddy Ice stated that California was a significant market for it.  In 2001, however, despite what Reddy Ice described as an increased presence in the state, it stopped selling packaged ice in California.  Since 2001, Reddy Ice has not attempted to compete in one of the largest and most attractive packaged ice territories in the United States.

66.    Reddy Ice's withdrawal from the California market allowed Artic Glacier to expand its control over that state.  For example, in 2006, Arctic Glacier acquired 6 companies in California for $188.5 million and in 2007 Arctic Glacier acquired Union-Pacific L.P. of Los Angeles, the leading packaged ice manufacturer in the area.

67.    In the absence of a conspiracy, one would expect that defendants would have competing facilities and overlapping sales territories.  Yet, today defendants do not sell packaged ice in overlapping territories (with few insignificant exceptions).  The lack of such competition is

only economically rational behavior to profit-maximizing firms if they have agreed not to compete throughout the country.

## UNJUSTIFIED PRICE INCREASES

68.     Beginning on about January 1, 2001, the prices that direct customers have paid defendants for packaged ice have increased each year at a rate that cannot be explained by the costs of manufacturing or distribution.

69.     During this same period, Reddy Ice has admitted that its EBITDA (earnings before interest, taxes, depreciation and amortization) has grown "substantially faster than revenue."

70.     During the class period, defendants obtained significant excess capacity.  In the face of stable demand and excess capacity, defendants were able to increase prices at a rate greater than any increase in marginal costs.  It is economically implausible that such price increases would have stuck in the absence of a conspiracy.

## OPPORTUNITIES TO CONSPIRE

71.     Defendants are members of several trade associations relating to the packaged ice industry.  Defendants' respective executives have served on the boards of directors and various standing committees of these organizations.  These trade associations hold regular meetings of their boards, committees, and members, which defendants' representatives have attended, and which provide the opportunity for defendants to meet and communicate with each other concerning the markets, customers, and prices of packaged ice.

72.     Defendants are members of the International Packaged Ice Association ("IPIA"), headquartered in Tampa, Florida.  Ben Key, Reddy Ice's former Executive Vice President of Sales and Marketing, recently served as the Chairman of the IPIA executive committee.  The

Board of Directors for IPIA includes the Director of Marketing for Reddy Ice, and the President and CEO of Arctic Glacier. IPIA's Marketing Committee has been comprised of these same individuals, along with Home City's Sedler, who recently pled guilty on behalf of Home City to antitrust violations. The IPIA Board of Directors, along with its committees, holds regular meetings throughout the year in addition to its annual meeting. Defendants are also members of regional trade associations and their representatives regularly attend meeting within these regional trade associations.

INJURY TO PLAINTIFFS AND THE CLASS

73. Defendants' conduct has had the following effects:

    a. price competition has been restrained, suppressed, or eliminated with respect to packaged ice in each and every state in the continental United States and District of Columbia;

    b. the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels in each and every state in the continental United States and District of Columbia; and

    c. indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice in each and every state in the continental United States and District of Columbia.

74. As a result of the contract, combination or conspiracy, plaintiffs and class members have sustained injury. They have paid more for packaged ice than they would have in the absence of the conspiracy.

AFFIRMATIVE CONCEALMENT

75. Defendants' conspiracy by its nature was inherently self-concealing. Plaintiffs had no knowledge of defendants' unlawful combination or conspiracy. Defendants also undertook affirmative acts of concealment of their combination or conspiracy, including their attendance at secret meetings, and engagement in secret conversations concerning the allocation

of markets and customers and price increases for packaged ice.  They issued or caused to be issued public statements, which falsely attributed price increases for packaged ice to factors other than defendants' illegal scheme and unlawful conduct.  These false and misleading statements were directed and made to indirect purchasers (including plaintiffs and the class) in each and every state in the continental United States and District of Columbia.

76.     Although plaintiffs exercised due diligence throughout the class period, they did not, and could not, have discovered defendants' unlawful combination or conspiracy any earlier than March 5, 2008 when news of the search of Reddy Ice's headquarters was first reported. They have still been unable to uncover the full extent of the conspiracy and the identity of all of the co-conspirators.

<u>COVER-UP OF ARCTIC GLACIER INC.'S ROLE IN THE CONSPIRACY</u>

77.     Through Hugh A. Adams, who holds the position of Secretary and General Counsel of Arctic Glacier Inc., Arctic Glacier International Inc. stated in its plea agreement, and subsequently confirmed under oath in its plea allocution, that "through certain of its executives and employees of its subsidiary corporations and its predecessor company acquired in December 2004, [it] participated in [the] conspiracy."

78.     Corbin stated in his plea agreement, and subsequently confirmed under oath in his plea allocution, that "he served as Vice President, Sales and Marketing of Arctic Glacier International Inc." when he participated in the conspiracy.

79.     Larson stated in his plea agreement, and subsequently confirmed under oath in his plea allocution, that he "was employed by Arctic Glacier International Inc." when he participated in the conspiracy.

80.     Cooley stated in his plea agreement, and subsequently confirmed under oath in his plea allocution, that he "was Vice President, Sales and Marketing of Arctic Glacier International Inc." when he participated in the conspiracy.

81.     Each of these statements was false.  In their opposition to the motion to disqualify Jones Day and Dykema Gossett (Dkt. #276) filed on August 16, 2010, Arctic Glacier, Corbin, Larson and Cooley revealed for the first time that Corbin, Larson and Cooley were in fact employed by Arctic Glacier Inc. when they participated in the conspiracy, and that each of these individuals' acts "were undertaken during the course of their employment with [Arctic Glacier Inc.]".

82.     Although plaintiffs exercised due diligence throughout the class period, plaintiffs could not have uncovered Arctic Glacier Inc.'s role in the conspiracy any earlier than August 16, 2010, when Arctic Glacier and Corbin, Larson and Cooley admitted that these individuals were employed by Arctic Glacier Inc. when they committed their crimes.  Plaintiffs still do not know the full extent of each Arctic Glacier entity's role in the conspiracy.

<u>COUNT ONE</u>

(ON BEHALF OF ALL PLAINTIFFS)

(VIOLATION OF 15 U.S.C. § 1)

(FOR INJUNCTIVE RELIEF ONLY)

83.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

84.     Beginning at least as early as January 1, 2001 and continuing until at least March 5, 2008, the exact dates being currently unknown to plaintiffs, defendants entered into and

engaged in a contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of 15 U.S.C. § 1.

85.     Plaintiffs and the class have no adequate remedy at law and will suffer irreparable harm unless defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions they created in the packaged ice industry in furtherance of their conspiracy.  Otherwise, plaintiffs and the class will continue to pay more for packaged ice than they would have in the absence of the conspiracy

<u>COUNT TWO</u>

(ON BEHALF OF PLAINTIFFS ACKER, SIMASKO AND STANFORD ONLY)

(VIOLATION OF MICH. COMP. LAWS ANN. § 445.772)

86.     Plaintiffs Acker, Simasko and Stanford repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

87.     Indirect purchasers in Michigan were targets of defendants' conspiracy.

88.     Defendants' conspiracy had each of the following intended effects in Michigan:

      a.     price competition has been restrained, suppressed, or eliminated;

      b.     the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by indirect purchasers; and

      c.     indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

89.     Defendants' conduct was malicious, flagrant and intended to harm plaintiffs and the class or undertaken with a reckless disregard for their rights.

90.     Defendants have violated Mich. Comp. Laws Ann. § 445.772.

91.     By reason of the foregoing, plaintiffs Acker, Simasko and Stanford and each member of the class paid more for packaged ice than they would have paid in the absence of

such conduct. As a result, plaintiffs Acker, Simasko and Stanford and each member of the class have been injured and damaged in an amount presently undetermined.

COUNT THREE

(ON BEHALF OF PLAINTIFF GOODE ONLY)

(VIOLATION OF N.C. GEN. STAT. § 75-1)

92.     Plaintiff Goode repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

93.     Indirect purchasers in North Carolina were targets of defendants' conspiracy.

94.     Defendants' conduct had each of the following intended effects in North Carolina:

      a.     price competition has been restrained, suppressed, or eliminated;

      b.     the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by indirect purchasers; and

      c.     indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

95.     Defendants' conduct was malicious, flagrant and intended to harm plaintiffs and the class or undertaken with a reckless disregard for their rights.

96.     Defendants have violated N.C. Gen. Stat. § 75-1.

97.     By reason of the foregoing, plaintiff Goode and each member of the class paid more for packaged ice in North Carolina than they would have paid in the absence of such conduct. As a result, plaintiff Goode and each member of the class have been injured and damaged in an amount presently undetermined.

## COUNT FOUR

### (ON BEHALF OF PLAINTIFF HERRON ONLY)

### (VIOLATION OF MINN. STAT. § 325D.51)

98.     Plaintiff Herron repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

99.     Indirect purchasers in Minnesota were targets of defendants' conspiracy.

100.    Defendants' conspiracy had each of the following intended effects in Minnesota:

      a.      price competition has been restrained, suppressed, or eliminated;

      b.      the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by indirect purchasers; and

      c.      indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

101.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Herron and the class or undertaken with a reckless disregard for their rights.

102.    Defendants have violated Minn. Stat. § 325D.51.

103.    By reason of the foregoing, plaintiff Herron and each member of the class paid more for packaged ice in Minnesota than they would have paid in the absence of such conduct. As a result, plaintiff Herron and each member of the class have been injured and damaged in an amount presently undetermined.

## COUNT FIVE

### (ON BEHALF OF PLAINTIFFS BUTTARS, MANCUSI AND PALOMBELLA ONLY)

### (VIOLATION OF N.Y. GEN. BUS. LAW § 340)

104.    Plaintiffs Buttars, Mancusi and Palombella repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

105.    Indirect purchasers in New York were targets of defendants' conspiracy.

106.    Defendants' conspiracy had each of following intended effects in New York:

      a.    price competition has been restrained, suppressed, or eliminated;

      b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by the indirect purchasers; and

      c.    indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

107.    Defendants' conduct was malicious, flagrant and intended to harm plaintiffs and the class or undertaken with a reckless disregard for their rights.

108.    Defendants have violated the N.Y. Gen. Bus. Law § 340.

109.    By reason of the foregoing, plaintiffs Buttars, Mancusi and Palombella and each member of the class paid more for packaged ice in New York than they would have paid in the absence of such conduct. As a result, plaintiffs Buttars, Mancusi and Palombella and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT SIX</u>

(ON BEHALF OF PLAINTIFF STANFORD ONLY)

(VIOLATION OF WIS. STAT. ANN. § 133.03)

110.    Plaintiff Stanford repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

111.    Indirect purchasers in Wisconsin were targets of defendants' conspiracy.

112.    Defendants' conspiracy had each of the following intended effects in Wisconsin:

      a.    price competition has been restrained, suppressed, or eliminated;

      b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by the indirect purchasers; and

      c.      indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

113.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Stanford and the class or undertaken with a reckless disregard for their rights.

114.    Defendants have violated Wis. Stat. Ann. § 133.03.

115.    By reason of the foregoing, plaintiff Stanford and each member of the class paid more for packaged ice in Wisconsin than they would have paid in the absence of such conduct. As a result, plaintiff Stanford and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT SEVEN</u>

(ON BEHALF OF PLAINTIFF FEENEY ONLY)

(VIOLATION OF CAL. BUS. & PROF. CODE §§ 16722 & 16726)

116.    Plaintiff Feeney repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

117.    Indirect purchasers in California were targets of defendants' conspiracy.

118.    Defendants' conspiracy had each of the following intended effects in California:

      a.      price competition has been restrained, suppressed, or eliminated;

      b.      the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by the indirect purchasers; and

      c.      indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

119.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Feeney and the class or undertaken with a reckless disregard for their rights.

120.    Defendants have violated Cal. Bus. & Prof. Code §§ 16722 & 16726.

121. By reason of the foregoing, plaintiff Feeney and each member of the class paid more for packaged ice in California than they would have paid in the absence of such conduct. As a result, plaintiff Feeney and each member of the class have been injured and damaged in an amount presently undetermined.

## COUNT EIGHT

### (ON BEHALF OF PLAINTIFF PALOMBELLA ONLY)

### (VIOLATION OF TENN. CODE ANN. § 47-25-102)

122. Plaintiff Palombella repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

123. Indirect purchasers in Tennessee were targets of defendants' conspiracy.

124. Defendants' conspiracy had each of the following intended effects in Tennessee:

    a.    price competition has been restrained, suppressed, or eliminated;

    b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by the indirect purchasers; and

    c.    indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

125. Defendants' conduct was malicious, flagrant and intended to harm plaintiff Palombella and the class or undertaken with a reckless disregard for their rights.

126. Defendants have violated Tenn. Code Ann. § 47-25-102.

127. By reason of the foregoing, plaintiff Palombella and each member of the class paid more for packaged ice in Tennessee than they would have paid in the absence of such conduct. As a result, plaintiff Palombella and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT NINE</u>

(ON BEHALF OF PLAINTIFF FEENEY ONLY)

(VIOLATION OF NEV. REV. STAT. § 598A.060)

128.    Plaintiff Feeney repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

129.    Indirect purchasers in Nevada were targets of defendants' conspiracy.

130.    Defendants' conspiracy had each of the following intended effects in Nevada:

      a.    price competition has been restrained, suppressed, or eliminated;

      b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels with such artificially inflated prices paid by the indirect purchasers; and

      c.    indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

131.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Feeney and the class or undertaken with a reckless disregard for their rights.

132.    Defendants have violated Nev. Rev. Stat. § 598A.060.

133.    By reason of the foregoing, plaintiff Feeney and each member of the class paid more for packaged ice in Nevada than they would have paid in the absence of such conduct.  As a result, plaintiff Feeney and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT TEN</u>

(ON BEHALF OF PLAINTIFFS BUTTARS AND FEENEY ONLY)

(VIOLATION OF ME REV. STAT. ANN., TIT. 10, § 1101);

134.    Plaintiffs Buttars and Feeney repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

135.    Indirect purchasers in Maine were targets of defendants' conspiracy.

136.    Defendants' conspiracy had each of the following intended effects in Maine:

     a.    price competition has been restrained, suppressed, or eliminated;

     b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

     c.    indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

137.    Defendants' conduct was malicious, flagrant and intended to harm plaintiffs and the class or undertaken with a reckless disregard for their rights.

138.    Defendants have violated ME Rev. Stat. Ann., Tit. 10, § 1101.

139.    By reason of the foregoing, plaintiff Buttars and Feeney and each member of the class paid more for packaged ice in Maine than they would have paid in the absence of such conduct.  As a result, plaintiff Buttars and Feeney and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT ELEVEN</u>

(ON BEHALF OF PLAINTIFF PRENTICE ONLY)

(VIOLATION OF ARIZ. REV. STAT. ANN. § 44-1402)

140.    Plaintiff Prentice repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

141.    Indirect purchasers in Arizona were targets of defendants' conspiracy.

142.    Defendants' conspiracy had each of the following intended effects in Arizona:

     a.    price competition has been restrained, suppressed, or eliminated;

     b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

     c.     indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

143.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Prentice and the class or undertaken with a reckless disregard for their rights.

144.    Defendants have violated Ariz. Rev. Stat. Ann. § 44-1402.

145.    By reason of the foregoing, plaintiff Prentice and each member of the class paid more for packaged ice in Arizona than they would have paid in the absence of such conduct.  As a result, plaintiff Prentice and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT TWELVE</u>

(ON BEHALF OF PLAINTIFFS GROVES AND STRAUSS ONLY)

(VIOLATION OF N.M. STAT. ANN. § 57-1-1)

146.    Plaintiffs Groves and Strauss repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

147.    Indirect purchasers in New Mexico were targets of defendants' conspiracy.

148.    Defendants' conspiracy had each of the following intended effects in New Mexico:

     a.     price competition has been restrained, suppressed, or eliminated;

     b.     the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

     c.     indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

149.    Defendants' conduct was malicious, flagrant and intended to harm plaintiffs Groves and Strauss and the class or undertaken with a reckless disregard for their rights.

150.    Defendants have violated N.M. Stat. Ann. § 57-1-1.

151.    By reason of the foregoing, plaintiffs Groves and Strauss and each member of the class paid more for packaged ice in New Mexico than they would have paid in the absence of such conduct.  As a result, plaintiffs Groves and Strauss and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT THIRTEEN</u>

(ON BEHALF OF PLAINTIFF DELOSS ONLY)

(VIOLATION OF IOWA COMPETITION LAW, § 553.4)

152.    Plaintiff DeLoss repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

153.    Indirect purchasers in Iowa were targets of defendants' conspiracy.

154.    Defendants' conspiracy had each of the following intended effects in Iowa:

a.      price competition has been restrained, suppressed, or eliminated;

b.      the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

155.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff DeLoss and the class or undertaken with a reckless disregard for their rights.

156.    Defendants have violated Iowa Competition Law, § 553.4.

157.    By reason of the foregoing, plaintiff DeLoss and each member of the class paid more for packaged ice in Iowa than they would have paid in the absence of such conduct.  As a result, plaintiff DeLoss and each member of the class have been injured and damaged in an amount presently undetermined.

## COUNT FOURTEEN

### (ON BEHALF OF PLAINTIFF CROOM ONLY)

### (VIOLATION OF NEB. REV. STAT. § 59-801)

158.    Plaintiff Croom repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

159.    Indirect purchasers in Nebraska were targets of defendants' conspiracy.

160.    Defendants' conspiracy had each of the following intended effects in Nebraska:

      a.    price competition has been restrained, suppressed, or eliminated;

      b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

      c.    indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

161.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Croom and the class or undertaken with a reckless disregard for their rights.

162.    Defendants have violated Neb. Rev. Stat. § 59-801.

163.    By reason of the foregoing, plaintiff Croom and each member of the class paid more for packaged ice in Nebraska than they would have paid in the absence of such conduct. As a result, plaintiff Croom and each member of the class have been injured and damaged in an amount presently undetermined.

## COUNT FIFTEEN

### (ON BEHALF OF PLAINTIFF CROOM ONLY)

### (VIOLATION OF NEB. REV. STAT. § 59-1603)

164.    Plaintiff Croom repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

165.    Indirect purchasers in Nebraska were targets of defendants' conspiracy.

166.    Defendants' conspiracy had each of the following intended effects in Nebraska:

      a.    price competition has been restrained, suppressed, or eliminated;

      b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

      c.    indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

167.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Croom and the class or undertaken with a reckless disregard for their rights.

168.    Defendants have violated Neb. Rev. Stat. § 59-1603.

169.    By reason of the foregoing, plaintiff Croom and each member of the class paid more for packaged ice in Nebraska than they would have paid in the absence of such conduct. As a result, plaintiff Croom and each member of the class have been injured and damaged in an amount presently undetermined.

<u>COUNT SIXTEEN</u>

(ON BEHALF OF PLAINTIFF SWEENEY ONLY)

(VIOLATION OF MASS. GEN. LAWS ANN. CH. 93A, § 2)

170.    Plaintiff Sweeney repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

171.    None of the defendants maintain a place of business in Massachusetts.  None of the defendants keep assets in Massachusetts.

172.     Indirect purchasers in Massachusetts were targets of defendants' conspiracy.

173.    Defendants' conspiracy had each of the following intended effects in Massachusetts:

d.      price competition has been restrained, suppressed, or eliminated;

e.      the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels; and

f.      indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice.

174.    Defendants' conduct was malicious, flagrant and intended to harm plaintiff Sweeney and the class or undertaken with a reckless disregard for their rights.

175.    Defendants have violated Mass. Gen. Laws Ann. Ch. 93a, § 2.

176.    By reason of the foregoing, plaintiff Sweeney and each member of the class paid more for packaged ice in Massachusetts than they would have paid in the absence of such conduct.  As a result, plaintiff Sweeney and each member of the class have been injured and damaged in an amount presently undetermined.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs respectfully pray that the Court enter judgment as follows:

a.      Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b.      Enjoining defendants from continuing to implement their unlawful agreement and ordering defendants to take such actions as necessary to remediate the market conditions that defendants created which would allow them to maintain, or continue to increase, prices above competitive levels;

c.      Awarding plaintiffs and the relevant class members compensatory damages under the state statutes in an amount to be proven at trial, trebled according to law against defendants, jointly and severally;

d.      Awarding plaintiffs and the relevant class members punitive, exemplary,

statutory, and full consideration damages under the state laws that permit such recoveries;

e.      Ordering defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to plaintiffs and the class under the state laws that permit such relief;

f.      Awarding plaintiffs and the class pre-judgment and post-judgment interest;

g.      Awarding plaintiffs and the class their costs of suit, including reasonable attorneys' fees; and

h.      Granting plaintiffs and the class such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable in this case.

Dated: April 26, 2011                    s/ Matthew S. Wild

WILD LAW GROUP PLLC
Matthew S. Wild (mwild@wildlawgroup.com)
Max Wild (max.wild@wildlawgroup.com)
178 Myrtle Boulevard, Suite 104
Larchmont, NY 10538
Tel. (914) 630-7500

John M. Perrin (jperrin@wildlawgroup.com)
27735 Jefferson Avenue
Saint Clair Shores, MI 48081
Tel. (586) 773-9500

INTERIM LEAD AND LIAISON COUNSEL FOR THE INDIRECT PURCHASER CLASS

REINHARDT WENDORF & BLANCHFIELD
Mark Reinhardt (m.reinhardt@rwblawfirm.com)
Mark Wendorf (m.wendorf@rwblawfirm.com
Garrett D. Blanchfield
(g.blanchfield@rwblawfirm.com)
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Tel. (651) 287-2100

GUSTAFSON GLUEK PLLC
Daniel E. Gustafson
(dgustafson@gustafsongluek.com)
Daniel C. Hedlund
(dhedlund@gustafsongluek.com)
Jason S. Kilene (jkilene@gustafsongluek.com)
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.  (612) 333-8844

LAW OFFICES OF ROBERT TAYLOR-
MANNING
Robert Taylor-Manning (rtm@taylor-manning.net)
4200 Two Union Square
Seattle, WA 98101
Tel. (206) 310-3333

ADDITIONAL COUNSEL FOR THE INDIRECT PURCHASER CLASS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2011, I electronically filed the within Second Amended Class Action Complaint with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

<u>s/ Matthew S. Wild</u>