UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE PACKAGED ICE ANTITRUST
LITIGATION

Case No. 08-MDL-01952

THIS ORDER RELATES TO:
DIRECT PURCHASERS ACTION

Paul D. Borman
United States District Judge

_____/

OPINION AND ORDER
(1) GRANTING DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF PROPOSED SETTLEMENT WITH ARCTIC GLACIER INCOME FUND, ARCTIC
GLACIER, INC., AND ARCTIC GLACIER INTERNATIONAL, INC. (DKT. NO. 394);
(2) GRANTING DIRECT PURCHASER PLAINTIFFS' MOTION FOR APPROVAL OF
PROPOSED PLAN OF DISTRIBUTION OF FUNDS RECEIVED IN SETTLEMENTS WITH
HOME CITY ICE COMPANY, ARCTIC GLACIER INCOME FUND, ARCTIC GLACIER,
INC., AND ARCTIC GLACIER INTERNATIONAL, INC. (DKT. NO. 395); and
(3) GRANTING IN PART DIRECT PURCHASER PLAINTIFFS' COUNSEL'S MOTION FOR
AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION COSTS
AND EXPENSES (DKT. NO. 396)

This matter is before the Court on Direct Purchaser Plaintiffs' Motion for Final Approval of

Proposed Settlement with Arctic Glacier Income Fund, Arctic Glacier, Inc., and Arctic Glacier

International, Inc. (Dkt. No. 394), Direct Purchaser Plaintiffs' Motion for Approval of Proposed Plan

of Distribution of Funds Received in Settlements with Home City Ice Company, Arctic Glacier

Income Fund, Arctic Glacier, Inc. and Arctic Glacier International, Inc. (Dkt. No. 395) and Direct

Purchaser Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of

Litigation Costs and Expenses (Dkt. No. 396). A Final Fairness Hearing was held on October 28,

2011. For the reasons that follow, the Court GRANTS the motion for final approval of the Arctic

Glacier settlement, GRANTS the motion for approval of the proposed plan of distribution of funds

1

received in the Home City and Arctic Glacier settlements and GRANTS IN PART the motion for an award of attorneys' fees and expenses.

**INTRODUCTION**

This action is the lead case in the consolidated class action *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-1952 (E.D. Mich. 2008). In this multidistrict litigation involving some 68 consolidated actions, Plaintiffs are both direct purchasers (retail stores and gas stations who purchased directly from Defendants) and indirect purchasers (individuals who purchased from retail stores and gas stations) of packaged ice from Defendants in the United States.

This Opinion and Order relates to the Direct Purchaser action, which alleges that Defendants Reddy Ice Holdings, Inc. and Reddy Ice Corporation (the "Reddy Ice Defendants"), Defendants Arctic Glacier Income Fund, Arctic Glacier, Inc. and Arctic Glacier International, Inc. (collectively the "Arctic Glacier Defendants") and Defendant Home City Ice Company ("Home City") conspired to allocate customers and markets throughout the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Direct Purchaser Plaintiffs now move for final approval of a settlement agreement with the Arctic Glacier Defendants, for authorization of a plan of distribution of the settlement funds from the settlement with Arctic Glacier and the prior settlement with Home City and for an award of attorneys' fees and reimbursement of expenses.[1] Direct Purchaser Plaintiffs' litigation against Reddy Ice continues. For the reasons that follow, the Court approves the settlement with Arctic Glacier, approves the plan of distribution and approves in part

---

[1] Direct Purchaser Plaintiffs Alvin's Enterprises, Inc. d/b/a Party King, Suzie's Investments, Inc. d/b/a Checker Drugs and Food, Arkansas Garden Center West, LLC, Arkansas Garden Center North, LLC, Chi-Mar Enterprises, Inc., Kingsway Enterprises, Polly's Food Service, Inc., Kenco, Inc. and Thomas Beverages Co., Inc. d/b/a Thomas Liquors have been appointed as the class representatives for the Proposed Settlement Class.

2

the requested legal fees and expenses.

## I.   BACKGROUND

### A.   The Multidistrict Packaged Ice Litigation

In 2008, the Department of Justice ("DOJ") executed a search warrant against Reddy Ice, thereby going public with an investigation into the packaged ice industry in the United States. Packaged ice is sold from freezers placed by manufacturers in retail stores. Multiple civil antitrust actions were subsequently filed against the Reddy Defendants, the Arctic Glacier Defendants and Home City. On June 5, 2008, Pursuant to 28 U.S.C. § 1407, the United States Judicial Panel on Multidistrict Litigation ("JPML") transferred all pending and subsequent related civil actions to this District, and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings. (Transfer Order, Dkt. No. 1.) A total of 68 cases have been transferred and consolidated in accordance with the MDL Order, the majority of the transferred cases being direct purchaser actions. (Transfer Order, Conditional Transfer Orders 1-6, Dkt. Nos. 1, 9, 47, 70, 85, 356, 384.)

On June 1, 2009, this Court appointed Kohn, Swift & Graf, P.C. as interim lead counsel and Gurewitz & Raben, PLLC as liaison counsel for the proposed Direct Purchaser class. (Dkt. No. 175.) On September 15, 2009, the Direct Purchaser Plaintiffs filed their Consolidated Amended Class Action Complaint ("CAC"). (Dkt. No. 198.) On October 30, 2009, the Reddy Ice Defendants and the Arctic Glacier Defendants filed motions to dismiss the CAC. (Dkt. Nos. 202, 203.) On July 1, 2010, this Court issued an Opinion and Order Denying Defendants Reddy Ice and Arctic Glacier's Motions to Dismiss, finding that the CAC stated a plausible claim for relief as to both Reddy Ice and Arctic Glacier under section 1 of the Sherman Antitrust Act. (Dkt. No. 260.)

3

On November 13, 2009, Direct Purchaser Plaintiffs filed a motion for preliminary approval of a settlement agreement dated October 30, 2009 between Direct Purchaser Plaintiffs and Defendant Home City ("the HC Settlement Agreement"). On August 26, 2010, the Court held a preliminary fairness hearing on the proposed HC Settlement Agreement. In an Opinion and Order dated September 2, 2010, the Court preliminarily approved the proposed HC Settlement Agreement, authorized Direct Purchaser Plaintiffs to disseminate notice, and set February 10, 2011 as the date for the Final Fairness Hearing on the proposed Settlement Agreement. (Dkt. No. 285.) The Court held a Final Fairness Hearing on February 10, 2011 and, in an Amended Opinion and Order dated February 22, 2011, the Court granted final approval of the HC Settlement Agreement and granted class counsel's request to use a portion of the HC Settlement funds for litigation expenses incurred in the continued prosecution of the action against the remaining non-settling Defendants. (Dkt. No. 329.)

On April 7, 2011, Direct Purchaser Plaintiffs filed a motion for preliminary approval of a settlement agreement dated March 30, 2011 between Direct Purchaser Plaintiffs and the Arctic Glacier Defendants ("the AG Settlement Agreement"). The motion sought preliminary approval of the AG Settlement Agreement and approval to disseminate notice to the proposed AG Settlement Class. (Dkt. No. 351.) On May 20, 2011, the Court held a preliminary fairness hearing on the proposed AG Settlement Agreement. On July 12 and July 19, 2011, the Court received revised proposed class notices, which better explained to class members the potential impact of the Most Favored Nation Clause in the Home City Settlement Agreement on the AG Settlement Agreement.

In an Opinion and Order dated July 20, 2011, the Court preliminarily approved the proposed AG Settlement Agreement, appointed Kohn, Swift & Graf, P.C. and Gurewitz & Raben, PLLC

4

("Class Counsel") as Class Counsel for the AG Settlement Class, authorized Direct Purchaser Plaintiffs to disseminate notice, and set October 28, 2011 as the date for the Final Fairness Hearing on the proposed AG Settlement Agreement. (Dkt. No. 285.)

**B.      The Terms of the Settlement Agreement with the Arctic Glacier Defendants**

The principal terms of the AG Settlement Agreement are as follows:

(1)      The Settlement Amount. The AG Settlement Agreement provides that Arctic Glacier will pay $12.5 million in two installments. (AG Settlement Agreement ¶ 19.) The first installment of $2.5 million was paid on August 4, 2011. In the original Settlement Agreement, the second installment was to be paid on the later of November 1, 2011 or 30 days after this Court entered its Final Order approving the AG Settlement Agreement. By an Amendment dated October 26, 2011, the Direct Purchaser Plaintiffs and Arctic Glacier agreed to modify the date on which the second installment payment would be due to "the later of April 2, 2012 or thirty (30) days after entry of the final judgment order" approving the AG Settlement. (Dkt. No. 400.) All other terms and conditions of the AG Settlement Agreement remain the same. Interest is to be paid on each installment, with interest accruing 30 days following the date on which the AG Settlement Agreement was executed. The Settlement Funds have been, and are to be, invested in United States Government Treasury securities or United States Treasury money market funds.

An issue remains regarding whether Home City will claim a refund from the amount that it paid in the HC Settlement Agreement, pursuant to a Most Favored Nation ("MFN") clause in the HC Settlement Agreement. Home City and the Direct Purchaser Plaintiffs continue to discuss whether the MFN clause has been triggered and, if so, how much of a refund Home City is due. If a refund is due, this amount will be withdrawn from the total Settlement Fund and the amount available to

the class reduced accordingly. The potential for this reduction in the Settlement Fund was fully disclosed to potential class members in both the Notice and Summary Notice of the AG Settlement.

In their efforts to analyze the reasonableness of the AG Settlement amount, the Direct Purchaser Plaintiffs reviewed Arctic Glacier's financial information and had discussions with Arctic Glacier and its counsel regarding Arctic Glacier's precarious financial condition, its significant debt load and the extensive control of its lenders over its financial affairs. Based on their review of Arctic Glacier's financial affairs, Direct Purchaser Plaintiffs have concluded that the amount that Arctic Glacier has agreed to pay in settlement represents the limit that Arctic Glacier could pay given its financial restraints.

(2)     Rights to Reduce the Settlement Amount or Withdraw From the Settlement. The Settlement Agreement provides that Arctic Glacier may reduce its settlement payment based on certain thresholds being crossed regarding the percentage of purchases of packaged ice from Arctic Glacier during the class period from customers that elected to be excluded from the Settlement Class. (AG Settlement Agreement ¶ 20.) If the dollar amount of purchases by Settlement Class members requesting exclusion exceeds a certain percentage of either Arctic Glacier's total sales, or the total sales of the other Defendants, during the class period, Arctic Glacier has a right to withdraw from the settlement altogether.

Only 15 potential class members, a minimal number, have exercised their right to be excluded from the Settlement. These opt-outs, according to counsel for the Direct Purchaser Plaintiffs, include a few larger entities but are predominantly "mom and pop entities." Three of the larger entities, the Koch companies, also opted out of the HC Settlement. A list of those entities who filed timely notices of their intent to opt-out of the AG Settlement is attached to this Order as Exhibit

6

A.  The percentage of sales represented by those members seeking exclusion has not triggered any of the provisions of paragraph 20 of the Settlement Agreement.

(3)   <u>Cooperation</u>.  In addition to paying the $12.5 million, Arctic Glacier agreed to cooperate with the Direct Purchaser Plaintiffs' Counsel in connection with the prosecution of claims against the remaining Defendant, Reddy Ice.  Arctic Glacier, per the terms of the AG Settlement Agreement, has already produced to the Direct Purchaser Plaintiffs the documents that it produced to the Department of Justice.  Arctic Glacier has also arranged a meeting between outside counsel for Arctic Glacier and Class Counsel.  Arctic Glacier will also provide declarations and testimony as necessary to establish the admissibility of its documents and to use its best and good faith efforts to make present and former officers available for interviews, depositions or trial testimony.

(4)   <u>Releases</u>.  Upon the occurrence of the Effective Date of the AG Settlement Agreement, as defined in paragraph 17 of the Settlement Agreement, the named Plaintiffs and the Settlement Class members (as defined in paragraph 7 of the Settlement Agreement) release all claims (as defined in paragraph 18 of the Settlement Agreement) against Arctic Glacier (and additional "releasees" as defined in paragraph 6 of the Settlement Agreement).  Specifically excluded from the category of "releasees" are the non-settling Reddy Ice Defendants.  (Settlement Agreement ¶ 6.)  Specifically excluded from the claims released are any claims made by indirect purchasers of Packaged Ice as to their indirect purchases, or any product defect or similar claim between the parties relating to Package Ice.  (Settlement Agreement ¶ 18.)

(5)   <u>Sales by Arctic Glacier Remain in the Case Against the Reddy Ice Defendants</u>.  The proposed AG Settlement Agreement will not affect the non-settling Defendant's joint and several liability for the alleged conspiracy.  Arctic Glacier sales will remain in the case as a basis for damage

7

claims and the non-settling Defendant remains jointly and severally liable for damages on those sales. (Settlement Agreement ¶ 34.)

      (6)    <u>Stipulation to Class Certification</u>.  The parties to the Settlement Agreement have stipulated that the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) have been satisfied and have stipulated to certification of the following Settlement Class, which is identical to the class certified by the Court for purposes of the HC Settlement, for purposes of settlement with Arctic Glacier:

> All purchasers of Packaged Ice who purchased Packaged Ice in the United States directly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at any time during the period from January 1, 2001 to March 6, 2008.  Excluded from the Settlement class are governmental entities and Defendants, including their parents, subsidiaries, predecessors or successors, and Defendants' co-conspirators.

**C.**    **Notice to the Class and Requests for Exclusion and/or Objections**

      The Direct Purchaser Plaintiffs, in compliance with the Notice provisions of this Court's July 20, 2011 Preliminary Approval Order, mailed 208,862 notices on August 3, 2011 to potential class members whose addresses were provided by Defendants. (Dkt. No. 393, Notice of Filing Affidavits of Mailing and Publication, Ex. A.)  The firm responsible for mailing the notices, Smith-Edwards-Dunlap Printing Company, also published a Summary Notice in the National Edition of the Wall Street Journal.  The Notice, Settlement Agreement and a copy of the Consolidated Class Action Complaint were also made available at www.kohnswift.com.  (Dkt. No. 393, Notice of Filing Affidavits of Mailing and Publication.)

      The Court finds that the method, form and content of the class notice by mail and publication approved by the Court on July 20, 2011 (Dkt. No. 285, Preliminary Approval Order), mailed to the Class Members by Smith Edwards-Dunlap Printing Company first class U.S. Mail on August 3, 2011

and published in the Wall Street Journal on August 11, 2011, satisfied Rule 23(e)(1) notice requirements. "The contents of a Rule 23(e) notice are sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing." 3 Newberg on Class Actions, § 8.32 (4th ed. 2010). Plaintiffs obtained the names and addresses of potential Class Members from customer lists provided by the Defendants, and the Notice explained the litigation and the terms of the Settlement Agreement in detail and also provided the Class Members access to the relevant documents, i.e. the Settlement Agreement and the Complaint, via the Kohn Swift website. The Notice explained in detail, and highlighted in bold print, the process for requesting exclusion and for filing objections with the Court and also informed Class Members of their right to attend the hearing upon proper notice to the Court. The Notice explains that the previously-approved HC Settlement amount of $13.5 million will be combined with the $12.5 million Arctic Glacier Settlement amount into a single Settlement Fund. The Notice also informed Class Members of the potential for the Settlement Amount to decrease in the event that the HC Settlement Agreement MFN provision is triggered. The Notice also explained the process for submitting Claims Forms in great detail, attaching easy-to-follow worksheets to facilitate the submission of claims.

The Court concludes that the notice was "reasonably calculated, under all the circumstances, to apprise [the Class Members] of the pendency of the action and afford them an opportunity to present their objections." *UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (citations omitted). The Court finds that the Notice fully complied in all respects with the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.

### D.     The Proposed Plan of Distribution

The Direct Purchaser Plaintiffs seek approval for distribution of the proceeds of the HC and the AG Settlement Agreements on a *pro rata* basis to those members of the Settlement Class who filed valid and timely claims. The deadline for filing claims was November 26, 2011. (Dkt. No. 394, Mot. for Final Approval, Ex. C, Notice and Claim Form.) In connection with the HC Settlement, the Notice that was sent to Class Members on November 2, 2010 did not explain the claims process, but explained to Class Members that if they remained in the HC Settlement Class, they would receive a second notice setting forth the process for submitting claims. (Dkt. No. 395, Mot. for Approval of Plan of Distribution, Ex. A, Home City Notice.)

In connection with the AG Settlement, the August 3, 2011 Notice that was sent to 208,862 Class Members (largely the same individuals that received the HC Settlement Agreement Notice) explained the claims process and attached an easy-to-follow claim form for listing all information that would be necessary to process a valid claim and obtain their share of the net settlement funds. On December 7, 2011, in response to a request from the Court, the Direct Purchaser Plaintiffs informed the Court that "there has been a positive and robust response to the Notice by the class member purchasers, and that claims have been submitted setting forth purchases of over $1.4 billion, constituting approximately 46% of the total packaged ice sales in the United States by Defendants during the seven year and two month settlement period." (Dkt. No. 404, Direct Purchaser Plaintiffs' Report Regarding the Claims Submission Process, 1.) "Claims have been received from purchasers across the board, from Fortune 100 companies and national chains, to "mom and pops" with claims of less than $100." *Id.* By way of example, Direct Purchaser Plaintiffs note that four claimants filed claims for purchases of $100 million or more; an additional 17 filed claims for purchases of $10

10

million or more, and an additional 93 filed claims for purchases greater than $1 million. At the other end of the spectrum, 166 claims are for less than $1,000 and the remaining 2,480 claims are for purchases between $1,000 and $1 million. *Id.* at 2. Direct Purchaser Plaintiffs state that collectively, the Defendants' relevant sales during the class period total approximately $3.1 billion (Home City's sales were $527 million, Arctic Glacier's were $563 million and Reddy Ice's were $2 billion) so the amount represented by the claims filed is approximately 46% of the Defendants' sales during the class period. The Direct Purchaser Plaintiffs further informed the Court that as of December 5, 2011, the claims administrator had received 2,760 timely filed claims with total claimed purchases of $1,431,127,786.40. *Id.* at 1-2. All of the claims are subject to further review by the claims administrator. Direct Purchaser Plaintiffs' counsel represents that from his "experience, the amount of purchases in the filed claims represents a significant percentage of the effected [sic] market participating in the claims process and proposed distribution." *Id.* at 2.

## II.    ANALYSIS

The Sixth Circuit and courts in this district have recognized that the law favors the settlement of class action lawsuits. *UAW*, 497 F.3d at 632 (noting "the federal policy favoring settlement of class actions"); *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006) (noting "the general federal policy favoring the settlement of class actions"). This policy applies with equal force whether the settlement is partial, involving only some of the defendants, or complete. *See In re Beef Ind. Antitrust Litig.*, 607 F.2d 167, 172 (5th Cir. 1979) (finding nothing in the cases or the commentaries to suggest that approval of a pre-certification settlement is dependent upon the settlement being complete as to all parties); *Newby v. Enron Corp.*, 394 F.3d 296 (5th Cir. 2004) (affirming approval of partial settlement where class certified for settlement purposes only).

11

"The evaluation and approval of a class settlement is committed to the sound discretion of the district court" and the district court "should approve a class settlement if, following a hearing, the court determines that the settlement 'is fair, reasonable, and adequate.'" *IUE-CWA*, 238 F.R.D. at 593, 594. "In exercising that discretion, the Court may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Int'l Union v. Ford Motor Co.*, No. 05-74730, 2006 WL 1984363, at *21 (E.D. Mich. July 13, 2006) (internal quotation marks and citations omitted). "Given that class settlements are favored, the role of the district court is limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement taken as a whole, is fair, reasonable and adequate to all concerned." *IUE-CWA*, 238 F.R.D. at 594 (internal quotation marks and citations omitted); *Sheick v. Automotive Component Carrier LLC.*, No. 09-14429, 2010 WL 4136958, at *14 (E.D. Mich. Oct. 18, 2010) ("In assessing a proposed settlement, the district court judge 'may not substitute his or her judgment for that of the litigants and their counsel' and 'should approve a class settlement if, following a hearing, the court determines that the settlement 'is fair, reasonable, and adequate.'") (quoting *IUE-CWA*, 238 F.R.D. at 593, 593). "Settlement embodies a bargained give and take between the litigants that is presumptively valid about which the Court should not substitute its judgment for that of the parties." *Ford*, 2006 WL 1984363, at *21 (internal quotation marks and citation omitted).

### A.   Final Certification of the AG Settlement Class

In its order preliminarily approving the AG Settlement Class, the Court conditionally certified the AG Settlement Class, as defined in the proposed AG Settlement Agreement, and identical to the

class finally approved by the Court for purposes of the HC Settlement, as follows:

> All purchasers of Packaged Ice who purchased Packaged Ice in the United States directly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at any time during the period from January 1, 2001 to March 6, 2008. Excluded from the Settlement Class are governmental entities and Defendants, including their parents, subsidiaries, predecessors or successors, and Defendants' co-conspirators.

Certification of a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and one of the subsections of Federal Rule of Civil Procedure 23(b). *Ford Motor*, 2006 WL 1984363, at *18 (citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)). The Court discussed each of the relevant factors in its prior Opinion and Order finally approving the HC Settlement Agreement, which approved the identical class for purposes of that settlement. *See In re Packaged Ice Antit. Litig.*, No. 08-MDL-1952, 2011 WL 717519, at *5-6 (E.D. Mich. Feb. 22, 2011). For the reasons that follow, which are many of the same reasons discussed with respect to approval of this same class for purposes of the HC Settlement, the Court finds that the AG Settlement Class likewise satisfies the Rule 23 requirements.

**1.   The AG Settlement Class satisfies the requirements of Rule 23(a).**

Federal Rule of Civil Procedure 23(a) provides that class members may represent a class if the following prerequisites are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four prerequisites are met here:

13

a.    **Rule 23(a)(1):**  The numerosity requirement of Rule 23(a)(1) is met because the Notice was mailed to 208,862 putative Class Members. *See Ford Motor*, 2006 WL 1984363, at *19 (holding that class of over 170,000 satisfied the numerosity requirement). The Settlement Class is too large for joinder to be practicable;

b.    **Rule 23(a)(2):**  "The requirement of commonality requires only a common question of law or fact." *Ford Motor*, 2006 WL 1984363, at *19 (citing *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997)). There exist common questions of law and fact to satisfy Rule 23(a)(2), i.e. whether Defendants conspired to allocate territories and customers and whether their unlawful conduct caused packaged ice prices to be higher than they would have been absent such illegal behavior and whether the conduct caused injury to the Class Members;

c.    **Rule 23(a)(3):**  The claims of the Class Representatives are typical of the Settlement Class in satisfaction of Rule 23(a)(3). "If there is a strong similarity of legal theories, the requirement [of typicality] is met, even if there are factual distinctions among named and absent class members." *Ford Motor*, 2006 WL 1984363, at *19. Because all Class Members' claims arise from the same course of conduct, i.e. a conspiracy to allocate markets in violation of the Sherman Act, their claims are based on the same legal theory and the typicality requirement, which is not onerous, is met.

d.    **Rule 23(a)(4):**  The named Plaintiffs will fairly and adequately represent the interests of the Settlement Class Members in satisfaction of Rule 23(a)(4). "The two criteria for determining whether class representatives are adequate are '(1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Ford Motor*, 2006 WL 1984363, at

14

*19 (quoting *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). Plaintiffs'

interests are aligned with the Class Members because they all possess the same interests and have

suffered the same type of injury and the class is represented by competent and experienced Class

Counsel. There is no indication that the named Plaintiffs' interests are unjustifiably advanced at the

expense of unnamed Class Members or that the named Plaintiffs' interests conflict in any way with

those of the Class Members. *Lessard v. Allen Park*, 372 F. Supp. 2d 1007, 1009 (E.D. Mich. 2005)

("In determining fairness, a court should consider whether the interests of counsel and the named

plaintiffs are 'unjustifiably advanced at the expense of unnamed class members.'") (quoting *Williams*

*v. Vukovich*, 720 F.2d 909, 921-923 (6th Cir. 1983)).  To date, there has been no request for an

incentive award for the named Plaintiffs and any such request would be subject to further notice and

an opportunity to object by the Class Members.

      **2.**      **The AG Settlement Class satisfies the requirements of Rule 23(b)(3).**

      Finally, the Court concludes that the Settlement Class satisfies the requirements of Fed. R.

Civ. P. 23(b)(3) because for purposes of this Settlement Agreement "questions of law or fact

common to the members of the class predominate over any questions affecting only individual

members, and . . . a class action is superior to other available methods for the fair and efficient

adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  "'Predominance is a test readily met in

certain cases alleging . . . violations of the antitrust laws, because proof of the conspiracy is a

common question that is thought to predominate over the other issues of the case.'"  *In re Scrap*

*Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (quoting *Amchem Prods, Inc. v. Windsor*,

521 U.S. 591,625 (1997)) (finding that allegations of price fixing and market allocation will not vary

among the class members).  The allegations of market and customer allocation will not vary among

the class members and issues regarding the amount of damages do not destroy predominance. *In re Scrap Metal*, 527 F.3d at 535-36. The evidence that will prove a violation as to one member will be sufficient to prove it as to all - the anticompetitive conduct is not dependent on the separate conduct of the individual Class Members. *Meijer Inc. v 3M*, No. 04-5871, 2006 WL 2382718, at *8 (E.D. Pa. Aug. 14, 2006). Class Counsel represents that the superiority requirement is met because no Class Members have exhibited an interest in individually pursuing separate actions. (Pls. Mot. for Final Approval, 19.)

The Court hereby certifies the proposed AG Settlement Class. The Court further concludes that the persons and entities identified on the schedule attached to this Opinion and Order as Exhibit A, and no others, have timely requested to be excluded from the AG Settlement Class and accordingly are not included in or bound by this Opinion and Order. As the Court noted in its Opinion and Order approving this identical class for purposes of the HC Settlement, the ability of the non-settling Defendant to contest certification of a litigation class will be unimpaired by the certification of an AG Settlement-only class. *In re Packaged Ice Antit. Litig.*, 2011 WL 717519, at *5-6. The Court's findings in this Final Approval Order will have no effect on the Court's ruling on any motion to certify any class in this litigation and no party may cite or refer to the Court's approval of the AG Settlement Class as persuasive or binding authority with respect to any motion to certify such a class.

### B.  The AG Settlement Agreement is Fair, Reasonable and Adequate

The Sixth Circuit has identified a number of factors that are relevant in determining whether a settlement is fair, reasonable and adequate: "(1) the likelihood of success on the merits weighed against the amount and form of relief in the settlement; (2) the complexity, expense and likely

16

duration of the litigation; (3) the opinions of class counsel and class representatives; (4) the amount of discovery engaged in by the parties; (5) the reaction of absent class members; (6) the risk of fraud or collusion; and (7) the public interest." *UAW*, 497 F.3d at 631. "The Court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." *Ford Motor*, 2006 WL 1984363, at *22.

Consideration of the factors most relevant to the instant case leads the Court to conclude that, given the complexity of the litigation, the multitude of factual and legal hurdles which remain in this case which is still at an early stage, and the financial struggles facing the Arctic Glacier Defendants, the AG Settlement Agreement falls within the range of reasonableness, fairness and adequacy required under Fed. R. Civ. P. 23.

### 1.    The likelihood of Plaintiffs' success on the merits weighed against the amount and form of relief offered in the settlement supports approval.

In determining whether the relief offered in a settlement outweighs the plaintiffs' chances of ultimate success on the merits, the Court "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs inherent in taking any litigation to completion." *IUE-CWA*, 238 F.R.D. at 594. The Court "is not to decide whether one side is right or even whether one side has a better of these arguments. . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual dispute." *UAW*, 497 F.3d at 632.

The Court concludes that the AG Settlement Agreement seeks to resolve a legitimate legal and factual dispute. Direct Purchaser Plaintiffs state that they remain optimistic about their ultimate chance of success but acknowledge that there is always a risk that Defendants could prevail with respect certain legal or factual issues. Plaintiffs point out, and the Court notes, that the Department

of Justice has closed its investigation of the Packaged Ice industry. *See In re Pressure Sensitive Labelstock Antit. Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) ("Risks of establishing liability and damages are substantial. . . . the criminal investigation that likely instigated this antitrust litigation was concluded without the issuance of any indictments. "); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) (finding that district court did not abuse its discretion in considering that "there were no government coattails for the class to ride"). Plaintiffs also note that their case alleges a nationwide conspiracy, while certain Defendants have pled guilty only to antitrust violations in Southeastern Michigan.

Weighing against these potential weaknesses is the immediate availability of a $12.5 million cash settlement, which represents approximately 2.2% of Arctic Glacier's United States sales of Packaged Ice during the proposed Settlement Class Period. Like the HC settlement amount, the AG Settlement Amount, as a percentage of sales allegedly affected by Arctic Glacier's conduct, is on par with other antitrust class action settlements that have been approved by other courts. *See, e.g. In re Labelstock Antit. Litig.*, 584 F. Supp. 2d at 702 ($8.25 million settlement equal to 1.5% of settling defendant's sales during the class period); *Meijer*, 2006 WL 2382718, at *20 ($28.9 million settlement represented 2% of settling defendant's sales to class members); *In re Linerboard Antit. Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) ($34 million and $92.5 million represented 2.0% and 1.62% of settling defendants' sales); *In re Automotive Refinishing Paint Antit. Litig.*, MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004) ($48 million settlement represented 2% of sales).

Also of significant value is the fact that the Settlement Agreement with Arctic Glacier can serve as a further source of cooperation against the non-settling Defendant as to the nationwide conspiracy allegations. *See In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d at 643 (finding that

18

the provision of such cooperation provides "a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement"); *In re Labelstock Antitrust Litig.*, 584 F. Supp. 2d at 702 ("the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to withstand a larger judgment."). "As is true in any case, the proposed Settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution." *Ford*, 2006 WL 1984363, at *23 (internal quotation marks and citation omitted). The Court concludes that consideration of this factor weighs in favor of final approval of the AG Settlement Agreement.

### 2.      The complexity, expense and likely duration of the litigation favor approval.

"[T]he prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery." *In Re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003). "Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *Id.* Although reluctant to disclose their analysis of the risks of litigation because of their pending action against the remaining non-settling Defendant, Plaintiffs concede that an antitrust litigation of this scope has undeniable inherent risks, such as whether the class will be certified and upheld on appeal, whether the conspiracy as alleged in the Complaint can be established, whether Plaintiffs will be able to demonstrate class wide antitrust impact and ultimately whether Plaintiffs will be able to prove damages. These risks are wholly eliminated with respect to a recovery from Arctic Glacier and the Settlement Agreement provides Plaintiffs with a sum certain recovery and cooperation against the non-settling Defendant which could bear substantial fruits.

Plaintiffs also point to the fact that there is a significant risk of the Settlement Class receiving

19

little or nothing if the litigation continues due to the financial health of all of the Arctic Glacier entities. Class counsel represents that they have had substantial discussions with Arctic Glacier and its counsel regarding the financial health of the Arctic Glacier entities and have concluded that the precarious financial future of these entities weighs heavily in favor of settlement at this point. Direct Purchaser Plaintiffs point out that the risk of the settlement class receiving little or nothing if the litigation continues against Arctic Glacier is an important consideration favoring settlement. Arctic Glacier remains debt laden and its share price is down to $.70 cdn as of September 27, 2011, down from $11.69 on March 6, 2008. (Pls.' Mot. 12 n. 5.)

The Court concludes that this factor weighs in favor of final approval, given the real possibility that Plaintiffs could ultimately be left with nothing at all in recovery from Arctic Glacier. *Sheick*, 2010 WL 4136958, at *18 (finding that the potential that a full blown trial might leave plaintiffs with "absolutely nothing" was a significant factor favoring final approval).

### 3.      The opinions of class counsel and class representatives.

The Court appointed Kohn, Swift & Graf, P.C. as Interim Lead counsel and Gurewitz & Raben, PLLC as interim liaison counsel after thorough review of their credentials and abilities which are discussed in greater detail in the Court's June 1, 2009 Opinion and Order Appointing Interim Class Counsel. (Dkt. No. 175.) Class Counsel's judgment that settlement is in the best interests of the class "is entitled to significant weight, and supports the fairness of the class settlement." *Sheick*, 2010 WL 4136958, at *18 (citation omitted). Class Counsel represents to the Court that they have negotiated this deal with Arctic Glacier at arm's length over many months, that they have met with Arctic Glacier's top executives to discuss the financial health of the Arctic Glacier entities and that Arctic Glacier rejected many offers before agreeing to the terms of the instant Settlement Agreement.

20

Class Counsel believes that the AG Settlement Agreement constitutes an excellent result. The Court concludes that this factor weighs in favor of final approval of the AG Settlement Agreement.

**4.      The amount of discovery conducted to date in the multi-district litigation.**

As did the HC Settlement Agreement, the Settlement Agreement with Arctic Glacier comes at what is still a relatively early stage of this multi-district antitrust litigation, before class certification and before the initiation of discovery in earnest. While the parties have proceeded with document discovery, written discovery and depositions were stayed by the Court pending class certification. (Dkt. No. 296, Case Management Order No. 2.) However, as the Court noted in its Opinion and Order preliminarily approving the HC Settlement, "the contours of this litigation are not a mystery and are informed by government investigations, internal corporate investigations that have been made public, state attorney general investigations, the related securities and whistleblower cases and importantly Plaintiffs' counsels' discussions with Home City's counsel in the course of their arms length negotiations." *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-1952, 2010 WL 3070161, at *6 (E.D. Mich. Aug. 2, 2010) (quoting *Newby v. Enron Corp.*, 394 F.3d 296, 306 (6th Cir. 2004) ("[T]he absence of formal discovery is not an obstacle [to settlement approval] so long as the parties and the Court have adequate information in order to evaluate the relative position of the parties.")). *See also Sheick*, 2010 WL 4136958, at *19 n.3 (noting that "courts do not require formal discovery so long as the parties have adequate information in order to evaluate the relative positions.") (quoting *Newby*, 394 F.3d at 306 ("Formal discovery [is not] a necessary ticket to the bargaining table")).

Plaintiffs' Counsel has been provided information by Arctic Glacier's attorneys, and has met with top executives at Arctic Glacier, in the process of negotiating the AG Settlement Agreement,

21

which lead counsel to conclude that this settlement is in the best interests of the settlement class. Particularly where, as here, there is the potential for a significant benefit to the class in the form of cooperation on the part of the settling Defendant, the absence of extensive discovery does not weigh against final approval of the AG Settlement Agreement.

**5.     The reaction of absent Class Members.**

Plaintiffs propose that the combined HC and AG Settlement Funds will be distributed among the Settlement Class Members pro-rata, based on the dollar amount of their purchases of Packaged Ice during the Settlement Class Period.  The Notice and Claim Forms that were sent to potential Class Members on August 3, 2011 request information detailing purchases made by Class Members who elect to file a claim for their portion of the Settlement Fund.  The reaction of the Settlement Class members weighs in favor of final approval.  Only 15 of the 208,862 AG Settlement Class Members who were sent Notice have  requested exclusion and, as with the HC Settlement, none of the AG Settlement Class Members has filed an objection.  According to Class Counsel, the opt-out percentage is "minuscule."  (Pls.' Mot. 14.)  "[U]nanimous approval of the proposed settlement [] by the class members is entitled to nearly dispositive weight in the court's evaluation of the proposed settlement."  *In re Linerboard*, 321 F. Supp. 2d at 629.

Further, the claims response rate, representing 46% of Defendants' total sales of packaged ice in the United States during the relevant class period, suggests good participation and is a positive indication as to the favorable reaction of absent class members.  Although the number of responses filed represents just under 1% of the total number of Notices mailed, this ratio is not dispositive and is frequently less than 5%.  *See Touhey v. United States*, No. EDCV 08-01418, 2011 WL 3179036, at *7-8 (C.D. Cal. July 25, 2011) (finding a 2% response rate acceptable - 38 responses out of 1,875

notices mailed - where there were no objections and the overall recovery was fair and reasonable); *In re Cardizem*, 218 F.R.D. at 526 (finding favorable class reactions in a 6.9% response rate (1800 proofs of claim out of 26,000 notices sent) and a 9% response rate (37,000 proofs of claim out of 400,000+ notices sent); *In re New Motor Vehicles Canadian Export Antit. Litig.*, MDL No. 1532, 2011 WL 1398485, at *3 (D. Maine April 13, 2011) (finding favorable class reaction in a 3.9% response rate (438,169 claims out of 11.3 million eligible claimants). As the court recognized in *In re Serzone Pdcts. Liability Action*, 231 F.R.D. 221 (S.D. W.Va. 2005), many factors affect response rates and this ratio should not be given great significance:

> Objectors also assert that because the settlement class could have potentially included millions of Class Members, and only 6,524 have "shown their hands" to be included in the class by filing an inventory form, the notice is inadequate. However, many factors contribute to the claims response rate. *See, e. g., Zimmer Paper Prod., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92-93 (3d Cir.1985) (holding that where defendant engaged in customary and court approved notice procedure, the response rate was not determinative of the adequacy of the class notice.); 3 Alba Conte & Herbert Newberg, Newberg on Class Actions § 8.45 (4th ed. 2002)("Claims response levels will tend to vary with the circumstances, types of class notices employed, and size of individual claims involved in each case."). . . . [T]he adequacy of notice is measured by whether notice reached Class Members and gave them an opportunity to participate, not by actual participation.

231 F.R.D. at 235-36. In this case, few class members have elected to be excluded, no objections have been filed and those claimants responding represent nearly 50% of the total relevant sales. These facts speak strongly to the positive reaction of affected class members. Consideration of this factor weighs in favor of approval of the AG Settlement.

### 6.     The risk of fraud or collusion.

"Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Ford*, 2006 WL 1984363, at

* 26.  There is no evidence in this case of any collusion and Kohn Swift on the one hand and Arctic

Glacier's counsel on the other can be presumed to have acted in good faith.  This factor weighs in

favor of final approval.

### 7.    The Settlement Agreement is consistent with the public interest.

"[T]here is a strong public interest in encouraging settlement of complex litigation and class

action suits because they are 'notoriously difficult and unpredictable' and settlement conserves

judicial resources." *In re Cardizem*, 218 F.R.D. at 530.  There do not appear to the Court to be any

countervailing public interests that would suggest that the Court should disapprove the AG

Settlement Agreement and, significantly, no one has come forward to suggest one to the Court.  This

factor weighs in favor of final approval.

In sum, having considered all of the relevant factors, each of which weighs in favor of final

approval, the Court concludes that the proposed AG Settlement Agreement is fair, reasonable and

adequate and merits Final Approval.

### C.    The Proposed Plan of Distribution is Reasonable

The Direct Purchaser Plaintiffs seek approval for distribution of the combined HC and AG

Settlement amounts, plus accrued interest and less notice and claims administration costs and any

amounts approved by the Court for attorneys' fees and reimbursement of expenses (the "Net

Settlement Fund") on a *pro rata* basis, each claimants share calculated based on the ratio that the

claimants' total purchases of Packaged Ice from any of the Defendants bears to the total purchases

of all Settlement Class Members' purchases during the Settlement Class period, to class members

who have submitted timely and valid claim forms. "'Approval of a plan of allocation of a settlement

fund in a class action is governed by the same standards of review applicable to approval of the

24

settlement as a whole; the distribution plan must be fair, reasonable and adequate.'" *Meijer*, 2006 WL 2382718, at *17 (quoting *In re Ikon Office Solutions Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)). "'Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.'" *Id.* (quoting *In re Aetna, Inc.*, No. Civ. A. MDL 1219, 2001 WL 20928, at *12 (E.D. Pa. Jan. 4, 2001)). *See also In re Cardizem*, 218 F.R.D. at 531 (approving a plan as fair and reasonable that adopted a *pro rata* method for calculating each class member's share of the settlement fund).

Direct Purchaser Plaintiffs submit that a *pro rata* distribution is fair and reasonable here because it is consistent with the allegations that Defendants' anticompetitive conduct enabled them to charge higher prices to the Direct Purchaser Plaintiffs than they would have been able to charge absent the agreement to allocate territories, each class member having been charged an increased price with damages suffered in proportion to their share of purchases. "Typically, a class recovery in antitrust or securities suits will divide the common fund on a pro rata basis among all who timely file eligible claims, thus leaving no unclaimed funds." 3 Newberg on Class Actions, § 8:45 (4th ed. 2011).

The Direct Purchaser Plaintiffs direct the Court to several comparable antitrust cases where the *pro rata* distribution has been employed. In *In re Brand Name Prescription Drugs Antit. Litig.*, No. 94 C 897, 1999 WL 639173 (N.D. Ill. Aug. 17, 1999) the court approved a *pro rata* distribution in a case involving class member pharmacies of all sizes, ranging from small, independent pharmacies to large chain pharmacies, including CVS, Walgreens and Walmart:

> Of the distribution methods proposed, we think the pro rata or proportional method is the most appropriate here. The Class Plaintiffs alleged that they paid inflated prices for brand name prescription drugs. Assuming the truth of this allegation, for purposes

of distribution only, each class member's damages are in direct proportion to the amount of brand name prescription drugs each purchased. Each class member, therefore, is entitled to damages measured as follows: its purchases of brand name prescription drugs as a percentage of all class members' brand name prescription drug purchases for the relevant time period. We note that courts have utilized the pro rata distribution method in several prior price-fixing class actions. *See, e.g., In re Airline Ticket Commission Antitrust Litig.*, 953 F. Supp. 280, 284–85 (D. Minn.1997) (proposed pro rata distribution plan was "cost-effective, simple and fundamentally fair."); *In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1129 (S.D. Tex.1982) (approval of class action settlement that provided for pro rata distribution based upon valid claims of allowable purchases), *aff'd*, 687 F.2d 52 (5th Cir.1982). . . . We think this method will provide the most accurate measure of the damages suffered by each class member and, for this reason, we endorse the pro rata distribution method.

1999 WL 639173, at *4. *See also In re Plastic Additives Antit. Litig.*, No. 03-cv-2038, MDL No. 1684 (E.D. Pa. Feb. 10, 2009) (distributing $26,368,000 from a settlement fund *pro rata* among 175 approved claimants, to the extent of their allowed purchases).

The Court also notes that at the Final Fairness hearing, counsel for the Direct Purchaser Plaintiffs informed the Court that those filing claims will have a further opportunity to object to the final calculation of their share of the settlement proceeds at the conclusion of the claims administration process. Additionally, counsel for the Direct Purchaser Plaintiffs indicated to the Court that before any "checks are cut" from the Settlement Fund, Plaintiffs will file a supplemental submission to the Court indicating the final disposition. *See Lessard,* 422 F. Supp. 2d at 790 (proposed final distribution list submitted to court, *in camera* to protect the privacy of the claimants, for approval prior to distribution of settlement funds).

The Court concludes that the *pro rata* plan of distribution is fair, reasonable and adequate.

**D.    The Request for Attorneys' Fees and Reimbursement of Expenses is Largely Reasonable**

An award of attorneys' fees in common fund cases need only be "reasonable under the

26

circumstances." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). The

Court must consider and discuss the relevant factors that determine reasonableness, which include:

"'(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly

basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in

rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the

complexity of the litigation; and (6) the professional skill and standing of counsel involved on both

sides.'" *Moulton v. United States Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (holding that a

district court's award of attorneys' fees in a common fund case need only be reasonable under the

circumstances but remanding for an on-the-record discussion of these factors) (quoting *Bowling v.*

*Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

     The Sixth Circuit permits calculation of attorneys' fees under either the lodestar method

(multiplying the number of hours spent on the litigation by certain attorneys by their hourly rate) or

the percentage of the fund method (counsel receive a set percentage of the total settlement fund). In

weighing the benefits and shortcomings of each method, the Sixth Circuit in *Rawlings* concluded:

"For these reasons, it is necessary that district courts be permitted to select the more appropriate

method for calculating attorney's fees in light of the unique characteristics of class actions in general,

and of the unique circumstances of the actual cases before them." 9 F.3d at 516. The Sixth Circuit

has observed that "[t]he percentage of the fund method has a number of advantages; it is easy to

calculate; it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected

recovery; and it encourages early settlement, which avoids protracted litigation." *Rawlings*, 9 F.3d

at 516.

     The Direct Purchaser Plaintiffs employ the percentage of the fund method, but offer the

lodestar calculation as a check on the reasonableness of their request. They request an award of $6.9 million, which represents between 26.5% to 29% (depending on the resolution of the Home City MFN dispute - the maximum amount of the refund if due will be $2,000,000 and the fee award will remain a set $6.9 million regardless of the resolution of the dispute – thus the variance in the percentage of 26.5% to 29%) of the $26 million settlement fund. The fee percentage is applied to the settlement fund before the separate award of litigation costs and expenses are deducted from the fund. *See In re Cardizem*, 218 F.R.D. at 531-35 (attorneys' fees awarded based on the gross settlement); *In re Delphi Corp. Sec. Litig.*, 248 F.R.D. 483, 505 (E.D. Mich. 2008) (awarding attorneys' fees based on gross settlement fund).

Direct Purchaser Plaintiffs submit that this percentage, with or without the MFN refund, is less than the 30% figure set forth in the Notices to the Class and is also in the range of awards made in recent similar antitrust cases. *See In re Foundry Resins Antit. Litig.*, No. 04-mdl-1638 (S.D. Ohio March 31, 2008) (awarding 33⅓% of a $14.1 million settlement); *In re Automotive Refinishing Paint Antit. Litig.*, MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) (awarding 32% of a $39 million settlement). *See* Pls. Mot., Dkt. No. 396, pp. 11-13 (collecting multiple cases awarding fees in the range of 30%).

Of the factors recognized by the Sixth Circuit as relevant to a determination of the reasonableness of a fee request, all fully support the requested award in the instant case. The value of the benefit to the class members appears substantial. Direct Purchaser Plaintiffs point out that the Settlement Fund of $26 million amounts to 2.5% of Home City's and 2.2% of Arctic Glacier's sales in the United States, which class counsel considers an "excellent recovery." As the Court noted in its Order approving the HC Settlement, several cases support the claim that a percentage of total sales

28

in the neighborhood of 2.0% is generally accepted as an excellent result when measuring the total amount of the settlement. In this regard, clearly class counsel has obtained a good result for the settlement class. Additionally, it appears that nearly 50% of the total affected sales are represented by the claims that have been filed by class members, further indicating that the settlement funds will reach a significant portion of affected class members.

Regarding the value of the services on an hourly basis, the Direct Purchaser Plaintiffs assert that a lodestar cross-check confirms that the $6.9 million fee request is reasonable. Direct Purchaser Plaintiffs attach to their fee motion several affidavits from the numerous attorneys that have worked on the case. In total, counsel collectively have expended 10,083 hours since June 1, 2009. Applying the historical rates charged by counsel (lead counsel placed a cap of $375 per hour spent on document review and coding) to the hours expended yields a "lodestar" figure of $4.54 million. This does not include amounts that Lead Counsel expended before their appointment or since August 31, 2011. The $6.9 million fee request then represents a multiplier of 1.5% applied to the lodestar figure. *See In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767-68 (S.D. Ohio 2007) ("Most courts agree that the typical lodestar multiplier" in a large class action "ranges from 1.3 to 4.5."); *In re Cardizem*, 218 F.R.D. at 533 (approving a lodestar multiplier of approximately 1.2% as "both reasonable and well within the range of multipliers awarded by courts in complex cases such as this").

Although the Court agrees that the 1.5% multiplier applied to the lodestar figure is within the range of multipliers applied by other courts in similarly complex cases, the Court is troubled by one particular category of attorney's fees for which Lead Counsel seeks to recover. Although Lead Counsel state that they have excluded from the total request those hours that Lead Counsel expended prior to their appointment by the Court on June 1, 2009, the award request does include amounts for

time expended by other counsel prior to the appointment of Kohn, Swift as Lead Counsel. At the hearing on this matter, Mr. Kohn explained to the Court that included in the total proposed fee award are requests submitted by two firms, Boies, Schiller & Flexner, LLP and Spector Roseman Kodroff & Willis, P.C., both of whom competed with Kohn Swift to be appointed as Lead Counsel, for time spent by those firms before this Court appointed Kohn Swift lead counsel for the Direct Purchaser Plaintiffs. These amounts were not expended at Kohn Swift's request or direction on behalf of the Settlement Class. The Court feels that amounts included in the fee request for services provided by these firms, for hours spent and expenses incurred prior to the time that the Court appointed Kohn, Swift as lead counsel, are not appropriately included in the fee award. This would include the request for $260,363.50 in fees charged by Boies, Schiller (Dkt. No. 396, Ex. A-5) and the request for $160,905.00 in fees charged by Spector Roseman (Dkt. No. 396, Ex. A-19). Accordingly, the Court will reduce the overall fee request of $6.9 million by $421,268.50, which represents the total amount requested on behalf of these two firms, and will approve a total fee award of $6,478,731.50. This in no way reflects a diminished respect for the excellent work that the Court feels Lead Counsel have performed in this case and the good result that they have achieved for the class members.

As to the risk of non-payment, it appears from the Direct Purchaser Plaintiffs' brief that counsel has undertaken this case on a contingency fee basis. Attorneys who take on such a massive task with a significant risk of nonpayment (all the more so, Lead Counsel suggests, since the DOJ has decided not to seek further indictments in the matter) should be compensated "both for services rendered and for the risk of loss or nonpayment assumed by accepting and prosecuting the case." *In re Automotive Refinishing*, 2008 WL 63269, at *5 (finding that "the risk of nonpayment is even higher when a defendant's *prima facie* liability has not been established by the government in a criminal

30

action") (citing *In re Linerboard*, 2004 WL 1221350).

There were no objections to the fee request of 30% that was disclosed in the Notice to settlement class members and there is no question as to the skill and efficiency of class counsel - both the Kohn Swift and Gurewitz firms have handled matters with extreme professionalism, expediency and competency and the Court has no hesitation concluding that this factor weighs in favor of approving the fee request. This antitrust litigation, like all litigation of its species, promises to be extremely complex and time intensive and there is no question that if settlement fails, the Defendants will mount a strong defense. *See In re Cardizem*, 292 F. Supp. 2d at 639 ("An antitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome.") As to the amount of time expended on the case, it is significant. Counsel represent that collectively they have spent 10,083 hours on this litigation since the Court appointed Kohn Swift lead counsel on June 1, 2009.

Importantly, the requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions. *See In re Foundry Resins Antit. Litig.*, No. 04-MDL-1638 (S.D. Ohio March 31, 2008) (Order attached to Plaintiffs' Mot. for Award of Fees, Ex. B, awarding 33⅓% of $14.1 million settlement); *In re Automotive Refinishing*, 2008 WL 63269 (awarding 32% of a $39 million settlement); *Disposaable Contact Lens Litig.*, MDL No. 1030 (M.D. Fla. 2001) (approving fees of 31.5% of a $92 million settlement for a total of $29 million in attorneys' fees) (Order attached to Pls.' Fee Mot. Ex. E); *In re Polypropylene Carpet Antit. Litig.*, MDL No. 1075 (N.D. Ga. 2001) (approving award of fees of 33⅓% of a $37.7 million settlement) (Order attached to Pls.' Fee Mot. Ex. F); *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 528 (E.D. Ky. 2010) ("Using the percentage approach, courts in this jurisdiction and beyond have

31

regularly determined that 30% fee awards are reasonable."); Alba Conte & Herbert Newberg, *Newberg on Class Actions* (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.")

On October 26, 2011, as discussed above, counsel for the Direct Purchaser Plaintiffs and Arctic Glacier executed an amendment to paragraph 19 of the AG Settlement Agreement, giving Arctic Glacier an extension of time, until the later of April 2, 2012 or 30 days following this Court's final approval of the AG Settlement, to make its second installment payment of $10 million dollars into the Settlement Fund.  Also on October 26, 2011, consistent with this amendment, Direct Purchaser Plaintiffs submitted a revised proposed order on the fee request clarifying that, in the event the Court awards fees, any disbursement of fees would be limited to the proportionate amount of funds paid into the Settlement Fund – Lead Counsel would be permitted to disburse from the $16 million paid into the Settlement Fund ($13.5 from Home City and $2.5 from Arctic Glacier) 66.6% of the fees approved by the Court with the remainder to be disbursed only when Arctic Glacier makes its subsequent second installment payment under the AG Settlement Agreement on the later of April 2, 2012 or 30 days following this Court's entry of a final order approving the AG Settlement. Accordingly, the Court approves at this time the payment of 66.6% of the attorneys' fee award approved by the Court, i.e. as adjusted by the Court from $6.9 million to $6,478,731.50, from the $16 million that has been paid into the Settlement Fund, with the remainder to be disbursed upon the payment by Arctic Glacier under the Settlement Agreement as amended of the additional settlement amount.  The Court will aggregate the amount of fees, leaving the specific allocation among the various contributing counsel to Lead Counsel.

### E.   The Request for Reimbursement of Litigation Expenses

Finally, Direct Purchaser Plaintiffs request reimbursement of litigation expenses in the amount of $150,000 to cover amounts expended out-of-pocket in the prosecution of the case by the participating law firms and in the settlement process. This amount is separate from the funds in the amount of $750,000 that this Court approved for the purposes of covering future litigation expenses against the remaining Defendant(s). Direct Purchaser Plaintiffs have twice received reimbursement from that $750,000 fund, for a total expenditure thus far of $240,786.52. At the Final Fairness hearing, counsel for the Direct Purchaser Plaintiffs explained to the Court that the request for reimbursement of $150,000 in litigation expenses is for amounts incurred prior to the time that the Court authorized disbursements up to $750,000 from the HC Settlement Fund. The Court will approve reimbursement of $150,000 in expenses, minus the $32,091.00 in expenses submitted by the Boies Schiller firm for work performed prior to the date on which this Court appointed Kohn Swift lead counsel for the Direct Purchaser Plaintiffs.

## IV.   CONCLUSION

The Court:

(1) **GRANTS** the motion for final approval of the AG Settlement Agreement and enters Final Judgment as to Arctic Glacier as set forth below;

(2) **GRANTS** the motion for approval of the plan of distribution and authorizes Lead Counsel to distribute the proceeds of the settlements with Home City Ice Company and Arctic Glacier on a *pro rata* basis to those members of the Settlement Class who timely file a Claim Form, as described in the Notice of Settlement with Arctic Glacier that went to all members of the Settlement Class on August 3, 2011, subject to submission to the Court, *in camera*, of the final disbursement plan;

33

(3) **GRANTS IN PART** the motion for an award of fees and expenses, awarding attorneys'

fees in the amount of $6,478,731.50 from the Settlement Funds obtained in the settlements with

Home City and Arctic Glacier, plus accrued interest. The Court finds that the fee is fair and

reasonable under the percentage of the recovery method of analyzing attorneys' fees award in

common fund class actions, with the caveat that the lodestar check compels the Court to decrease the

award by amounts incurred by outside firms before the date on which the Court appointed Kohn Swift

lead counsel.

The attorneys' fees approved herein may be disbursed on a proportional basis from the

Settlement Funds that have been paid by Home City and Arctic Glacier. Accordingly, Lead Counsel

may disburse from the $16 million paid to the Settlement Fund from Home City ($13.5 million) and

Arctic Glacier ($2.5 million) a total of 66.6% of the attorneys' fees awarded herein, with the

remainder to be disbursed upon the payment by Arctic Glacier under the Amended Settlement

Agreement of the additional AG Settlement Amount. Lead counsel shall be responsible for allocating

the attorneys' fees awarded; and

(4) **GRANTS IN PART** the motion for reimbursement of litigation costs and expenses,

approving the payment of $117,909.00 from the Settlement Fund to Plaintiffs' counsel. Lead Counsel

shall be responsible for allocating the expense reimbursement.

**IT IS SO ORDERED**.

### Rule 54(b) Final Order and Judgment as to Arctic Glacier Income Fund, Arctic Glacier Inc. and Arctic Glacier International, Inc.

The Court, having considered Plaintiffs' Motion for Final Approval of Class Action

Settlement with Defendants Arctic Glacier Income Fund, Arctic Glacier Inc. and Arctic Glacier

International, Inc. ("Arctic Glacier") and having held a final Fairness Hearing on October 28, 2011, and for the reasons stated more fully in the preceding Opinion and Order, IT IS ORDERED THAT:

1.      The Court has jurisdiction over the subject matter of this action.

2.      Terms used in this Final Order and Judgment that are defined in the Settlement Agreement between the Plaintiffs and the Settlement Class on the one hand and Arctic Glacier on the other dated March 30, 2011, as amended on October 26, 2011, unless otherwise defined herein, have the same meanings in this Final Order and Judgment as in the Settlement Agreement.

3.      The Court finds, as more thoroughly discussed in the preceding Opinion, that the Settlement Agreement was attained following an extensive investigation of the facts and assessment of damages. It resulted from vigorous arm's-length negotiations which were undertaken in good faith by counsel with significant experience litigating antitrust class actions.

4.      The Court finds, as more thoroughly discussed in the preceding Opinion, that due and adequate notice was provided pursuant to Rule 23 of the Federal Rules of Civil Procedure to all members of the Settlement Class certified in this Final Order and Judgment. The Notice advised the proposed Settlement Class Members of the pendency of this action, the Settlement Agreement with Home City, the proposed Settlement Agreement with Arctic Glacier, the possibility of the triggering of the Most Favored Nation provision of the Home City Settlement Agreement and the claims filing process. The Notice provided was the best notice practicable under the circumstances and included individual notice by first class mail to all members of the Settlement Class who could be identified through reasonable effort as well as notice published in the national edition of the Wall Street Journal and on the Internet. The Notice fully complied in all respects with the requirements of Federal Rule of Civil Procedure 23.

5.      The Court finds that notice of the Settlement Agreement was properly provided to all persons entitled to receive such notice, including the federal and state attorneys general, in full compliance with the Class Action Fairness Act.

6.      The Court certifies the following Settlement Class (the "Settlement Class"):

> All purchasers of Packaged Ice who purchased Packaged Ice in the United States directly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at any time during the period from January 1, 2001 to March 6, 2008. Excluded from the Settlement Class are governmental entities and Defendants, including their parents, subsidiaries, predecessors or successors, and Defendants' co-conspirators.

7.      The Court finds, as discussed more thoroughly in the preceding Opinion, that certification of the Settlement Class is appropriate because:

> a.      The Settlement Class is so numerous that joinder of all members is impracticable, satisfying the requirement of Rule 23(a)(1);

> b.      There are questions of law or fact common to the Settlement Class, satisfying the requirement of Rule 23(a)(2);

> c.      Alvin's Enterprises, Inc. d/b/a Party King, Suzie's Investments, Inc. d/b/a Checker Drugs and Food, Arkansas Garden Center West, LLC, Arkansas Garden Center North, LLC, Chi-Mar Enterprises, Inc., Kingsway Enterprises, Polly's Food Service, Inc., Kenco, Inc. and Thomas Beverages Co., Inc. d/b/a Thomas Liquors ("Plaintiffs") are appointed Class Representatives for the Settlement Class. Plaintiffs' claims are typical of the claims of the Settlement Class, satisfying the requirement of Rule 23(a)(3);

> d.      The Plaintiffs will fairly and adequately protect the interests of the Settlement Class, satisfying the requirements of Rule 23(a)(4);

> e.      For purposes of settlement only, questions of law or fact common to the members of the Settlement Class predominate

36

over questions affecting only individual members and a class action is superior to other methods available for the fair and efficient adjudication of the controversy, satisfying the requirements of Rule 23(b)(3).

8.      The Court's certification of the Settlement Class as provided herein is without prejudice to, or waiver of, the rights of any Defendant other than Arctic Glacier to contest certification of any other class proposed by Plaintiffs.  The Court's findings in this Final Order and Judgment shall have no effect on the Court's ruling on any motion to certify any class in this litigation and no party may cite or refer to the Court's approval of the Settlement Class as persuasive or binding authority with respect to any motion to certify such class.

9.      The court finds that the persons and entities on the schedule attached hereto as Exhibit "A," and no others, have timely requested to be excluded from the Settlement Class and accordingly are not included in or bound by the Final Judgment being entered pursuant to this Order.

10.     The Court finds, as more thoroughly discussed in the preceding Opinion, that the Settlement Agreement is fair, reasonable and adequate and the Settlement Agreement with Arctic Glacier is hereby approved pursuant to Federal Rule of Civil Procedure 23(e).

11.     All Released Claims (as defined in the Settlement Agreement) of Plaintiffs and the Settlement Class that were asserted against Arctic Glacier and the other Releasees (as defined in the Settlement Agreement) in the Consolidated Amended Class Action Complaint are dismissed with prejudice, and, except as provided for in the Settlement Agreement, without costs.

12.     Upon the occurrence of the Effective Date of the Settlement Agreement, the Releasees shall be completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits, and causes of action, damages, liabilities of any nature, including costs, expenses,

penalties, and attorneys' fees, whether class, individual, or otherwise in nature, that Releasors, or any one of them, ever had, now has, or hereafter can, shall or may have directly, representatively, derivatively or in any other capacity against the Releasees or any of them, whether known or unknown, suspected or unsuspected, in law or equity, on account of or arising out of or resulting from the purchase of Packaged Ice in the United States during the Class Period or from conduct that occurred prior to the Effective Date of this Settlement Agreement concerning the sale of Packaged Ice in the United States, based in whole or in part on the facts, occurrences, transactions, or other matters alleged in the Consolidated Amended Class Action Complaint filed in this Action, and which arise under any federal or state antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, or civil conspiracy law, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* (the "Released Claims"); provided, however, that nothing herein shall release any claims made by indirect purchasers of Packaged Ice as to their indirect purchases, or any product defect or similar claim between the parties relating to Packaged Ice.

13.     Each member of the Settlement Class shall not, after the Effective Date of the Settlement Agreement, seek to institute, maintain, prosecute or continue or prosecute any suit or action, or collect from or proceed against the Releasees based on the Released Claims.

14.     Arctic Glacier shall have no obligation for attorneys' fees, costs or expenses, including, but not limited to, expenses of administering and distributing the Settlement Fund, which expenses are to be paid out of the Settlement Fund subject to further order of this Court.

15.     This Final Order and Judgment does not settle or compromise any claims by Plaintiffs or the Settlement Class against any other Defendant or person or entity other than the Releasees, and all rights against any other Defendant or other person or entity are specifically reserved.  The sales

38

of packaged ice to members of the Settlement Class by Arctic Glacier shall remain in this action and shall be part of any joint and several liability against any non-settling Defendant or other person or entity other than the Releasees.

16.     Nothing in this Final Order and Judgment or the Settlement Agreement and no aspect of the Settlement Agreement or negotiation thereof is or shall be deemed or construed to be an admission or concession of any violation of any statute or law or of any liability or wrongdoing by Arctic Glacier or of the truth of any of the claims or allegations in any of the complaints in the Action or any other pleading, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, whether in the Action or in any other action or proceeding, other than to enforce the terms of this Final Order and Judgment, or the Settlement Agreement.

17.     The Court further finds that the escrow account described in the Settlement Agreement is a qualified settlement fund ("QSF") pursuant to the Internal Revenue Code Section 468B and the Treasury Regulations promulgated thereunder.

18.     Without affecting the finality of this Final Order and Judgment, the Court retains jurisdiction for the purposes of, among other things, implementing and enforcing the Settlement Agreement, entering orders regarding the disbursement of the Settlement Fund and any other matters that may arise in connection with the effectuation of the Settlement Agreement.

19.     The court expressly finds, pursuant to Federal Rule of Civil Procedure 54(b) that there is no just reason for delay, and expressly directs entry of Final Judgment as to Arctic Glacier.

**IT IS SO ORDERED**.

Dated:  12-13-11

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

39

## EXHIBIT A

1.    B.J's Service

2.    Cedar-Knox Public Power District

3.    Dorothy Lugibihl

4.    Hi-Way Motel

5.    In-n-Out Food Inc.

6.    Koch Chemical Technology Group, LLC

7.    Koch Engineering

8.    Koch Glitsch, Inc.

9.    Mellinger's Beer Distributor, Inc.

10.   Middletown's Supermarket

11.   MMR Mobile Medical Response, Inc

12.   Port Cicero Liquors

13.   Rocky Point Resort

14.   Taing, Inc. d/b/a Mr. T's Market

15.   Vincentian Regency