UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE PACKAGED ICE ANTITRUST
LITIGATION

Case No. 08-MD-1952

INDIRECT PURCHASER ACTION

Paul D. Borman
United States District Judge

_____/

CORRECTED[1] OPINION AND ORDER
(1) GRANTING INDIRECT PURCHASER PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THEIR SETTLEMENT
WITH THE HOME CITY ICE COMPANY (ECF NO. 547);
(2) GRANTING FINAL CERTIFICATION OF THE SETTLEMENT CLASSES;
(3) OVERRULING OBJECTIONS
TO THE SETTLEMENT (ECF NOS. 539, 540, 548);
(4) DENYING OBJECTOR WILLARD'S
MOTION FOR ATTORNEYS' FEES (ECF NO. 551); AND
(5) GRANTING FINAL APPROVAL OF THE SETTLEMENT AGREEMENT
BETWEEN THE INDIRECT PURCHASER PLAINTIFFS AND HOME CITY

This matter is before the Court on the Indirect Purchaser Plaintiffs'

("Plaintiffs") Motion for Final Approval of their proposed Settlement Agreement with

Defendant the Home City Ice Company ("Home City"). (ECF No. 547, Indirect

Purchaser Plaintiffs' Motion for Final Approval of Their Settlement With the Home

City Ice Company.) The Court held a Final Fairness Hearing on July 11, 2017 and

heard from both Plaintiffs' and Home City's counsel, and also heard from two

---

[1] Correcting and striking ECF No. 555. The only correction to the Court's
8/23/2017 Opinion and Order appears on the last line of page 36, where the Court
has corrected the name of the speaking Objector to "Objector Andrews."

1

objectors (only three class members filed objections to the proposed Settlement Agreement) who asked to speak at the Final Fairness Hearing. The Court then required a post-hearing submission to be filed by Plaintiffs addressing the final number of valid claims filed and the final administrative costs that would be required to complete the claims payment process. Plaintiffs timely filed that submission on July 17, 2017. (ECF No. 553, Order; ECF No. 554, Indirect Purchaser Plaintiffs' Response.)

After careful consideration of the written submissions, as well as the comments of counsel and objectors at the Final Fairness Hearing, and based upon this Court's nine-year history with this multidistrict litigation that has resulted in the successful settlement of all disputes with the exception of the present proposed settlement agreement between the Plaintiffs and Home City, and for the reasons that follow, the Court GRANTS Plaintiffs' motion for final approval of the settlement with Home City.

I. **BACKGROUND**

This action is the lead case in the consolidated multidistrict litigation *In re Packaged Ice Antit. Litig.*, No. 08-MD-1952. The subject matter is packaged ice, sold in blocks or bags, manufactured by Defendants Reddy Ice Holdings, Inc. and its wholly owned subsidiary Reddy Ice Corporation ("Reddy Ice"), Arctic Glacier

Income Fund, its wholly owned subsidiary Arctic Glacier, Inc. and Arctic Glacier Inc.'s wholly owned subsidiary Arctic Glacier International, Inc. ("Arctic Glacier"), and Home City Ice Company ("Home City"), then sold directly to retailers for resale to their customers. This multidistrict litigation involves consolidated actions of both direct purchaser plaintiffs (retail stores and gas stations) and indirect purchaser plaintiffs (individuals who purchased from retail stores and gas stations). The direct and indirect purchaser plaintiffs allege that the Defendants conspired to allocate customers and markets throughout the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

The private civil suits that form the basis for the present multidistrict litigation were spawned in large measure by a 2008 criminal investigation by the Department of Justice ("DOJ") Antitrust Division into the packaged ice industry and the alleged anticompetitive conduct of its three largest producers – Reddy Ice, Arctic Glacier and Home City. On June 5, 2008, the Judicial Panel on Multidistrict Litigation ("JPML") transferred all then-pending related civil actions to this District and ordered that they be consolidated for pretrial purposes in this Court. Subsequent related tag-a-long actions, involving both direct and indirect purchaser claims, have been similarly transferred to this Court. This Court previously denied motions to dismiss both the Direct and Indirect Purchaser Complaints. *See In re Packaged Ice*, 723 F. Supp. 2d

3

987 (E.D. Mich. 2010) (Direct Purchasers); *In re Packaged Ice*, 779 F. Supp. 2d 642 (E.D. Mich. 2011) (Indirect Purchasers, Denying in Part and Granting in Part); *In re Packaged Ice*, No. 08-MD-1952, 2011 WL 6178891 (E.D. Mich. Dec. 12, 2011) (Indirect Purchasers, Denying in Part and Granting in Part).

Subsequent to those decisions, two of the Defendants, Arctic Glacier and Reddy Ice, filed for bankruptcy protection in other districts. All of the claims in the direct purchaser action have now been resolved through settlement. On February 22, 2011, this Court granted final approval of a proposed settlement agreement between Home City and the Direct Purchaser Plaintiffs. (ECF No. 329.) On December 13, 2011, this Court granted final approval of a proposed settlement agreement between Arctic Glacier and the Direct Purchaser Plaintiffs. (ECF No. 406.) On November 13, 2012, this Court granted final approval of a settlement agreement between Reddy Ice and the Direct Purchaser Plaintiffs. (ECF No. 476.)

On November 18, 2016, the Court received the Direct Purchaser Plaintiffs' Motion for Authorization to Make a Final Distribution of the Home City Settlement Funds. (ECF No. 532.) On December 19, 2016, this Court entered an Order authorizing the final distribution of the settlement funds in the Direct Purchaser case, which ended the Direct Purchaser portion of this MDL. (ECF No. 536, Order Authorizing Final Distribution of Settlement Funds.)

The Indirect Purchaser Plaintiffs' action has proceeded along a less direct path, as explained in several prior Orders of the Court. To summarize, on May 18, 2012, the United States Bankruptcy Court for the Northern District of Texas granted final approval of a settlement agreement between the Indirect Purchaser Plaintiffs and Reddy Ice in the amount of $700,000. Indirect Purchaser Plaintiffs' counsel, the Wild Law Group, has already received from that settlement fund $233,333.33 in attorneys' fees plus $80,000 for ongoing expenses. No distribution plan or allocation plan for the Reddy Ice settlement fund is currently in place in the Northern District of Texas. In 2014, the United States Bankruptcy Court for the District of Delaware granted final approval of a settlement agreement, reached between the Indirect Purchaser Plaintiffs and Arctic Glacier in Arctic Glacier's Canadian bankruptcy proceedings, in the amount of $3,950,000. (ECF Nos. 497, 498, 502, 503, 504.) Indirect Purchaser Plaintiffs' counsel, the Wild Law Group, received attorneys' fees from that settlement in the amount of $1.3 million plus $305,000 in costs, $1,000 for each class representative and a $200,000 "kicker" fee out of the assets of the Arctic Glacier bankruptcy estate – not out of that settlement fund. A plan of allocation and distribution was approved in the Arctic Glacier proceeding. (ECF No. 504-3, Proposed Long Form Notice, PgID 9986-9988.) The claims process for the Arctic Glacier Indirect Purchaser settlement has closed, with a less than robust claims

response, resulting in the filing of approximately 19,000 claims for a $6 payment. Any funds not ultimately distributed from the Arctic Glacier Indirect Purchaser settlement fund will inure to the benefit of the Arctic Glacier bankruptcy estate.

This Court was not invited to weigh in or be involved in any way in the approval process governing either the Reddy Ice or the Arctic Glacier Indirect Purchaser settlement agreements, both of which were finalized in their respective bankruptcy proceedings.

Thus, the only unresolved aspect of this MDL litigation that remains for determination by this Court is the proposed settlement agreement between Home City and the Indirect Purchaser Plaintiffs that is presently before the Court for final approval. The process of approval for the Home City settlement with the Indirect Purchasers has faced its own challenges in this Court, with the Court sending Indirect Purchaser Plaintiffs' counsel back to the drawing board on several occasions for a variety of issues that, in the opinion of this Court, were significant to the overall fairness and reasonableness of the Settlement Agreement. In summary, the Indirect Purchaser Plaintiffs filed their initial motion for preliminary approval of their settlement with Home City on April 10, 2012. (ECF No. 442, Motion to Approve Consent Judgment for Preliminary Approval and Permission to Disseminate Notice.) The Court identified several failings in the proposed notices that required revision

and following the hearing on the Indirect Purchaser Plaintiffs' initial motion for preliminary approval of the Home City Settlement Agreement, it was agreed that any final resolution of the preliminary approval motion should await the outcome of the Arctic Glacier Bankruptcy proceedings that were concurrently underway in Winnipeg, Canada. (ECF No. 472, Transcript of Oct. 19, 2012 at 41.)

As discussed *supra*, the Reddy Ice and Arctic Glacier settlements with the Indirect Purchaser Plaintiffs were approved in other districts in 2012 and 2014, and proceedings in this Court on the Home City Settlement with the Indirect Purchaser Plaintiffs were put on hold pending the outcome of the Arctic Glacier settlement. On July 31, 2014, following the Delaware bankruptcy court's final approval of the Arctic Glacier settlement, the Indirect Purchaser Plaintiffs supplemented in this Court their previously-filed motion for preliminary approval of their proposed Settlement Agreement with Home City. (ECF No. 504, Supplemental Brief.) On March 11, 2015, this Court ordered Indirect Purchaser Plaintiffs to appear for a status conference on April 6, 2015, to discuss what the Court determined were several remaining insufficiencies in the proposed Settlement Agreement and proposed Notice. (ECF No. 512, Transcript of April 6, 2015 Status Conference.) Following that Status Conference, the Court directed the Indirect Purchaser Plaintiffs to make several changes and resubmit the motion and proposed notices. On January 25, 2016, the

Court issued an Order requiring the Indirect Purchaser Plaintiffs to submit a written status report by February 16, 2016. The Court ordered the parties to appear for a status conference on February 23, 2016, to update the Court on their progress. On February 15, 2016, Class Counsel for the Indirect Purchaser Plaintiffs submitted a written response to the Court's January 25, 2016 Order, which presented not only the changes to the proposed notices that the Court had requested in April, 2015, but in addition presented an entirely new proposed settlement agreement with Home City that sought to combine the Home City fund with the Reddy Ice settlement fund for a common distribution. (ECF No. 517, Class Counsel for Indirect Purchaser Plaintiffs' Response to Court's Order Dated January 25, 2016.) In the end, because of significant legal problems caused by combining the funds, the Court rejected this proposed combination of the Home City and Reddy Ice settlement funds and ordered the Home City parties to revert to their original proposed Settlement Agreement. (ECF No. 526, August 9, 2016 Opinion and Order Denying Motion to Approve Consent Judgment.) On October 26, 2016, Indirect Purchaser Plaintiffs submitted their Motion for Order Granting Preliminary Approval of Indirect Purchasers' Settlement with Home City Ice Co. (ECF No. 529.) The Court held a hearing on the motion for preliminary approval on November 17, 2016 and requested Class Counsel to provide additional information regarding critical dates that were missing from the

8

information submitted in support of the motion for preliminary approval. (ECF No. 531, Transcript of 11/17/2016 Hearing.) Those supplemental materials were provided to the Court on November 27, 2016. (ECF No. 533, Supplemental Brief.) The Court issued its Order Granting Preliminary Approval and Authorization to Disseminate Notice on December 7, 2016, setting a date for the Final Fairness Hearing of July 11, 2017. (ECF No. 535.)

On June 6, 2017, the Indirect Purchaser Plaintiffs submitted the Motion for Order Granting Final Approval of the Home City Settlement that is presently before the Court. (ECF No. 547, Motion for Final Approval.) Having considered the extensive briefings and history of this case, and having considered the three objections to the Home City Settlement Agreement that have been filed with the Court, the Court is now persuaded that a fair, reasonable, and adequate settlement agreement has been reached by these parties, and that the best practicable notice of that agreement has been disseminated to the Class Members. The Court finds that the Settlement Classes satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b)(2) and (b)(3) and further finds that the settlement is fair, reasonable and adequate. Accordingly, the Court will CERTIFY the Settlement Classes I and II, and GRANT the motion for final approval of the Settlement Agreement between the Indirect Purchaser Plaintiffs and Home City.

## II.  JURISDICTION

This Court has personal jurisdiction over the Plaintiffs, the Classes, and Defendants and subject matter jurisdiction over the action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

## III.  THE TERMS OF THE SETTLEMENT AGREEMENT

The Settlement Agreement consists of: (1) the Original March 7, 2012 Settlement Agreement (ECF No. 529, Ex. 2); (2) a December 20, 2012 Modification Agreement (ECF No. 480, Notice, Ex. 2, Modification Agreement) ("the Original Modification Agreement); and (3) an October 24, 2016 Modification Agreement (ECF No. 529, Ex. 3) ("the 2016 Modification Agreement") (collectively "The Settlement Agreement.")

### A.  The Proposed Settlement Classes

The Proposed Settlement Agreement provides for two separate settlement classes:

> **Class I** – All purchasers of Packaged Ice who purchased Packaged Ice in the United States indirectly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at any time during the period from January 1, 2001 and March 6, 2008. Excluded from the Settlement Class are governmental entities and Defendants, including their parents, subsidiaries, predecessors or successors, Defendants' co-conspirators, and the Releasees.

> **Class II** - All purchasers of Packaged Ice who purchased Packaged Ice in Arizona, Arkansas, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin and Wyoming, indirectly from any of the Defendants or their subsidiaries or affiliates at any time between January 1, 2001 and March 6, 2008. Excluded from the Settlement Class are governmental entities and Defendants, including their parents, subsidiaries, predecessors or successors, Defendants' co-conspirators, and the Releasees.

(ECF No. 529, Mot. Ex. 2, Settlement Agreement ¶¶ 11, 13.)

The Proposed Settlement Agreement further provides that in the event that a new indirect purchaser class action brought under the law of a state other than those states covered in Settlement Class II, Home City has the right until final approval to add that state to the Class II states provided Home City first moves to dismiss those claims and is denied such relief. Home City also agrees to pay the increased notice costs associated with any states that are added to the Class II states in such a manner. (Settlement Agreement ¶ 32.)

Home City agreed to, and did, comply with all notice and filing requirements under the Class Action Fairness Act ("CAFA"). (Settlement Agreement ¶ 21; ECF No. 541, Certification of CAFA Compliance.)

11

### B. The Proposed Settlement Amount and Injunctive Relief

The Proposed Settlement Agreement provides for Injunctive Relief to Class I and Class II Members, and Monetary Relief to only Class II Members.

### 1. The Settlement Amount (available for distribution only to Class II members)

The Proposed Settlement Agreement provides that:

> Home City shall pay or cause to be paid the Settlement Amount of two million seven hundred thousand Dollars ($2,700,000) in settlement of the Action. The Settlement Amount shall be wire transferred by Home City within fifteen (15) business days after the Execution Date. The Settlement Payment shall be paid into the Settlement Fund, which shall be established as an escrow account designated by Class Counsel, and administered in accordance with the provisions of Section G of this Agreement. In the event that the Court denies preliminary approval, the Settlement Payment shall be returned to Home City.

(ECF No. 529, Ex. 2, Settlement Agreement ¶ 25.) This amount has been transferred into an escrow account of the Wild Law Group PLLC and is federally insured. The Modification Agreement gives Class Counsel certain rights, and places certain limitations on Class Counsel's handling of the Settlement Fund. (ECF No. 529, Ex. 3, 2016 Modification Agreement ¶ 5.) The 2016 Modification Agreement also authorized an increase in the amount of Settlement Funds permitted to be spent for purposes of providing notice, generating claims and/or administering the Settlement from $500,000 to $650,000. (2016 Modification Agreement ¶ 4.) This increase was

necessitated in part by the Court imposed changes to the proposed Notices, which the Court found to be insufficient when Plaintiffs first presented their motion for preliminary approval of the Home City Settlement Agreement. (ECF No. 459, Order Requiring Submission of Revised Notices; ECF No. 472, Transcript of Oct. 19, 2012 Hearing on Indirect Purchasers' Motion to Approve Consent Judgment for Preliminary Approval and Permission to Disseminate Notice 32.)

## 2.   Injunctive Relief (available to Class I and Class II)

The Proposed Settlement Agreement provides that Home City shall consent to entry of an injunction that provides:

> Home City is hereby enjoined from entering into any combination, conspiracy or agreement with Arctic Glacier International, Inc., Reddy Ice Corporation or other person or entity or organization to allocate Packaged Ice customers, territories or markets, or raise, fix, maintain, or stabilize the price of Packaged Ice that would be considered a per se unlawful restraint of trade under Section 1 of the Sherman Act.

(ECF No. 529, Ex. 2, Settlement Agreement ¶ 26.) The injunction lasts for a period of three (3) years from the "Effective Date" of the Settlement Agreement, as defined in ¶ 22 of the Settlement Agreement, and does not prohibit Home City from entering into lawful joint venture arrangements or acquisitions or from establishing or maintaining co-packing relationships in the course of its business. *Id.*

## C.     Notice

The October 24, 2016 Modification Agreement provides that: "Pursuant to an order granting preliminary approval, notice of the settlement and claims generation shall be done in a manner ordered by the Court." (ECF No. 529, Ex. 3, 2016 Modification Agreement ¶ 3.) The Revised Notices, which explain the nature of the action in general terms and also explain what class members are entitled to receive, along with their rights to object and exclude themselves, were attached to the Indirect Purchaser Plaintiff's motion for preliminary approval. Plaintiffs agreed to and did provide direct mail notice to all Arctic Glacier claimants. For the remaining million plus consumers, as to whom individual notice would be impractical, Plaintiffs agreed to and did advertise in both Parade and USA Today, which have an aggregate circulation of 22,000,000. Plaintiffs also agreed to and did employ an internet outreach program that directs consumers to a dedicated website. The Court concluded in its Preliminary Approval Order that the Revised Notices were "reasonably calculated under all the circumstances to apprise Class Members of the pendency of the action and to afford them an opportunity to object." *UAW v. General Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007). *See* discussion *infra* at Sections V and VI, regarding the Notice campaign and the Claims Procedure.

### D.    The Claims and Releases

The Claims are defined as any and all actions . . . that are related to the subject matter of this MDL Litigation. (ECF No. 529, Ex. 2, Settlement Agreement ¶ 1.) Releasors are defined by the Class to which they belong, i.e. Class I Releasors and Class II Releasors. Id. ¶¶ 7, 9. Releasees are defined as Home City and all of its officers, directors, and affiliates not including any of the Reddy Ice or Arctic Glacier entities. Id. ¶ 6.

### E.    Attorneys' Fees, Clear Sailing Clause, and Incentive Awards

The Settlement Agreement provided that Class Counsel may seek up to $900,000 in attorneys' fees, but Class Counsel has elected to seek <u>zero</u> attorneys' fees from the Home City Settlement Fund. (ECF No. 544, Notice of No Attorney Fee Application.) In addition, while the original Settlement Agreement did contain a Clear Sailing Clause, Settlement Agreement ¶ 31, it was deleted in the 2016 Modification Agreement, 2016 Modification Agreement ¶ 7. In any event, the issue of the Clear Sailing Clause is now moot, given that Class Counsel does not intend to seek any attorneys' fees from the Home City Settlement Fund. In addition to Class Counsel waiving any claim to attorneys' fees, the named Plaintiffs are not seeking any incentive awards.

## IV. CERTIFICATION OF THE SETTLEMENT CLASSES

For purposes of this proposed settlement only, two settlement classes have been defined:

Settlement Class I

All purchasers of Packaged Ice[2] who purchased Packaged Ice in the United States indirectly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at any time during the period from January 1, 2001 to March 6, 2008. Excluded from Settlement Class I are governmental entities, Defendants, including their parents, subsidiaries, predecessors or successors, and Defendants' co-conspirators, and the Releasees [i.e. The Home City Ice Company and its past and present officers, directors, individual shareholders, employees, and the successors, heirs, and executors of each of the foregoing and each of The Home City Ice Company's subsidiaries, and divisions and the predecessors and successors-in-interest of each].

And,

Settlement Class II

All purchasers of Packaged Ice who purchased Packaged Ice in Arizona, Arkansas, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin and/or Wyoming, indirectly from any of the Defendants or their subsidiaries or affiliates (including all predecessors thereof) at any time during the period from January 1, 2001 to March 6, 2008. Excluded from Settlement Class II are governmental entities, Defendants, including their parents, subsidiaries, predecessors or successors, Defendants' co-conspirators, and the Releasees [i.e. The

---

[2] "Packaged Ice" means ice packaged in bags as well as ice sold in blocks.

Home City Ice Company and its past and present officers, directors, individual shareholders, employees, and the successors, heirs, and executors of each of the foregoing and each of The Home City Ice Company's subsidiaries, and divisions and the predecessors and successors-in-interest of each].

"Before a court may certify a class, it must ensure that the class satisfies each of Rule 23(a)'s requirements and that it falls within one of three categories permitted by Rule 23(b)." *UAW*, 497 F.3d at 625 (citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)). The Court finds that both Settlement Classes satisfy the Rule 23 requirements.

### A.    Both Settlement Classes Satisfy the Requirements of Rule 23(a).

Federal Rule of Civil Procedure 23(a) provides that class members may represent a class if the following prerequisites are satisfied:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four prerequisites are met here with respect to both Settlement Class I and Settlement Class II:

1.     **Rule 23(a)(1):** Plaintiffs submit that there are over one million putative class members. A class of this size satisfies the numerosity requirement. *See UAW*, 497 F.3d at 625 (finding that where settlement class consisted of 476,676 members, the numerosity requirement "require[d] little discussion" and was "undoubtedly so numerous that joinder of all members is impracticable"). "Given the large number of potential class members, and the relatively small claim each one has for damages, individual lawsuits are clearly impracticable, and Rule 23(a)(1) is satisfied." *In re M3 Power Razor Sys. Marketing & Sales Practice Litig.*, 270 F.R.D. 45, 54 (D. Mass. 2010).

2.     **Rule 23(a)(2):** "The requirement of commonality requires only a common question of law or fact." *UAW v. Ford Motor Co.*, No. 06-cv-10311, 2006 WL 1984363, at *19 (E.D. Mich. July 13. 2006) (citing *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997)). Here Classes I and II share a single common question — "'whether Defendants conspired to allocate territories and customers and whether their unlawful conduct caused Packaged Ice prices to be higher than they would have been absent such illegal behavior.'" *In re Packaged Ice Antit. Litig.*, No. 08-cv-1952, 2011 WL 717519, at *6 (E.D. Mich. Feb. 22, 2011).

3.     **Rule 23(a)(3):** The claims of the Class Representatives are typical of the Settlement Class in satisfaction of Rule 23(a)(3). "'A plaintiff's claim is typical

[under Rule 23(a)(3) ] if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Ford Motor*, 2006 WL 1984363, at *19 (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996)) (alteration in original). The members of Settlement Class I each have claims that arise from the same course of conduct, i.e. a conspiracy to allocate markets in violation of the Sherman Act, and their claims are based on the same legal theory which entitles them to claim injunctive relief under § 16 of the Clayton Act. The members of Settlement Class II rely on the same course of conduct, i.e. a conspiracy to allocate markets, and their claims are cognizable under the various state antitrust laws in these states that have enacted *Illinois Brick*[3] repealer statutes entitling indirect purchasers to seek monetary relief premised on an alleged antitrust injury, i.e. the passed-on overcharge for packaged ice, an injury common to each Settlement II class member. The typicality requirement, which is "not onerous," is satisfied as to both Settlement Class I and II. *Ford Motor*, 2006 WL 1984363, at *19.

---

[3] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois Brick*, the Supreme Court held that only direct purchasers had standing under the federal Sherman Act to sue for monetary damages resulting from an alleged antitrust injury. Following *Illinois Brick*, numerous states, including those defined in Settlement Class II, enacted legislation which allowed indirect purchasers to sue for money damages for such antitrust injury. These statutes are colloquially referred to as *Illinois Brick* repealer statutes.

**4.      Rule 23(a)(4):** The named Plaintiffs will fairly and adequately represent the interests of the Settlement Class Members in satisfaction of Rule 23(a)(4). "The two criteria for determining whether class representatives are adequate are '(1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Ford Motor*, 2006 WL 1984363, at *19 (quoting *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). Plaintiff's interests are aligned with the Class Members because they all possess the same interests and have suffered the same alleged injury, i.e. they have each allegedly paid more for packaged ice than they would have paid absent the alleged conspiracy. There is no indication that the named Plaintiff's interests are unjustifiably advanced at the expense of unnamed Class Members or that the named Plaintiff's interests conflict in any way with those of the Class Members. *Lessard v. City of Allen Park*, 372 F. Supp. 2d 1007, 1009 (E.D. Mich. 2005) ("In determining fairness, a court should consider whether the interests of counsel and the named plaintiffs are 'unjustifiably advanced at the expense of unnamed class members.'") (quoting *Williams v. Vukovich*, 720 F.2d 909, 921-23 (6th Cir. 1983)). In regards to this settlement with Home City, there are no incentive awards being given to the named Plaintiffs and Indirect Purchaser Plaintiffs' counsel is seeking no attorneys' fees.

There can be no claim that the interests of the named Plaintiffs and class counsel are being advanced at the expense of the unnamed class members.

**B.      Both Settlement Classes Satisfy at Least One of the Requirements of Rule 23(b)**

**1.      Settlement Classes I and II satisfy Rule 23(b)(3)**

Rule 23(b)(3) will be met if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "'Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws, because proof of the conspiracy is a common question that is thought to predominate over the other issues of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (quoting *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591,625 (1997)) (finding that allegations of price fixing and market allocation will not vary among the class members).

"Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only

individual class members." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011). The Court's inquiry questions whether Home City's conduct, i.e. alleged anti-competitive market allocation, was common as to all class members and whether the resulting injuries, payment of passed-on supracompetitive prices for packaged ice, were common to all class members. *Sullivan*, 667 F.3d at 297-98. In answering this question, the Court is mindful that "variations in state law do not necessarily defeat predominance," and that "concerns regarding variations in state law largely dissipate when a court is considering certification of a settlement class." *Id.* Specifically in *Sullivan*, the court concluded that variations in state antitrust laws did not defeat the commonality and predominance requirements:

> [C]ommonality is satisfied where common questions generate common answers "apt to drive the resolution of the litigation." That is exactly what is presented here, for the answers to questions about [Home City's] alleged misconduct and the harm it caused would be common as to all of the class members, and would thus inform the resolution of the litigation if it were not being settled.

> Specifically, here, plaintiffs allege that [Home City] engaged in anticompetitive activity [that] resulted in a common injury as to all class members—inflated [packaged ice] prices—in violation of federal antitrust law, and the antitrust, consumer protection, or unjust enrichment laws of every state and the District of Columbia. In this respect, [Home City's anticompetitive] conduct lies at the core of plaintiffs' claims, as do the common injuries which all class members suffered as a result. Based upon our case law, we can distill that each class member shares a similar legal question arising from whether [Home City] engaged in a broad conspiracy that was aimed to and did

22

affect diamond prices in the United States. Evidence for this legal question would entail generalized common proof as to the implementation of [Home City's] conspiracy, the form of the conspiracy, and the duration and extent of the conspiracy.

The plaintiffs likewise share common factual questions as to whether [Home City] acted in concert to artificially fix, maintain, and stabilize prices and to monopolize trade and commerce in the market for [packaged ice] and whether said activity resulted in an inflation in the prices of [packaged ice] sold to consumers." These allegations are unaffected by the particularized conduct of individual class members, as proof of liability and liability itself would depend entirely upon [Home City's] allegedly anticompetitive activities. Indeed, the presence of these questions stemming solely from [Home City's] asserted behavior and the fact that all class members purchased [packaged ice] is an apt illustration of why the predominance test is readily met in certain cases alleging consumer [ ] fraud or violations of the antitrust laws. Considering this presentation of common issues, a finding that common inquiries predominated over individual questions particular to any putative class member appears reasonably within the discretion of the District Court.

667 F.3d at 299-300 (internal quotation marks and citations omitted) (alterations added).

So too here. The allegations of market and customer allocation will not vary among the class members and issues regarding the amount of damages do not destroy predominance. *In re Scrap Metal*, 527 F.3d at 535–36. "Nothing in [the] case law or the language of Rule 23 commands that everyone in a class must allege precisely identical or "uniform" causes of action and statutory variations do not defeat predominance in the presence of other exceedingly common issues." *Sullivan*, 667

F.3d at 302. These observations are particularly true in the context of a settlement-only class, where the Court need not be concerned with "intractable [case] management problems." *Id.* at 304 (internal quotation marks and citations omitted) (alteration added).

The superiority requirement is satisfied here because no class member has incentive to sue individually to recover $6 or $12. "The *realistic* alternative to a class action is not 17 million individual suits each seeking damages of $15 to $30 . . . but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original).

## 2. Class I satisfies Rule 23(b)(2)

Rule 23(b)(2) permits class certification only when the Rule 23(a) requirements are met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Court's discussion of predominance, *supra*, demonstrates, "the common elements of the complained of conduct [] are equally applicable to the class as a whole." *Sullivan*, 667 F.3d at 318. Thus, the injunctive relief sought is likely to "benefit the entire class" *Id.* Where, as here, the injunctive relief "seek[s] to define the relationship between the defendant and the 'world at large,'" the requirements of

Rule 23(b)(2) are generally satisfied:

> [T]he plaintiffs alleged that [Home City's] anticompetitive behavior caused the entire membership of all classes to pay artificially inflated prices, and that, in the absence of injunctive relief, all classes would continue to pay artificial [prices]. These claims demonstrate shared interests between the members of the putative class, and, these allegations, if proven, would support injunctive relief respecting the class as a whole. Likewise, the parties' mutual decision to settle claims "on grounds generally applicable to the class" complies with the text of Rule 23(b)(2) and should be respected.

*Sullivan*, 667 F.3d at 318.

The injunctive relief afforded to members of Settlement Class I is not "valueless and illusory." On the contrary, Class I members who are not also members of Class II do not waive monetary claims against Home City – in the event that a state previously remaining faithful to *Illinois Brick* opted to enact state antitrust legislation that afforded indirect purchasers a claim, Home City would be vulnerable to those claims. Furthermore, in addition to promising that it will refrain from violating the antitrust laws in the future, "Home City has agreed to be subject to the continued jurisdiction of the Court through the stipulated injunction, [giving] Plaintiffs a mechanism by which to hold Home City accountable for its future actions that would not otherwise be available without such an agreement." (ECF No. 542, Response of Home City to Willard Objection.) (Alteration added).

## V.   NOTICE TO THE CLASSES

Rust Consulting, Inc. ("Rust") handled the notice and claims processing for the Indirect Purchaser Plaintiffs' Settlement Agreement with Home City. (ECF No. 549, Declaration of Heidi A. Taylor ¶¶ 1-2.) Rust specializes in Class Action notification and claims administration, including telephone and web-based support, direct mail services, claims processing, and Settlement fund distribution. Rust has provided services in class actions ranging in size from 100 class members to 100 million class members and has provided notification and/or claims administration services in more than 3,500 class actions. (Taylor Decl. ¶ 2.)

As Settlement Administrator for the Home City Ice Settlement, Rust was engaged to and did perform the following services: (1) prepare and design the claim form for notice and mailing and design the notification notice mailing; (2) prepare, design, and place the media campaign; (3) prepare and host the settlement website (www.homecityicesettlement.com) which included a summary of the Settlement and Legal Rights of Class Members, a definition of the Settlement Classes, the Long Form Notice and claims documents, a list of Frequently Asked Questions, and downloadable PDF's of important Court documents including (a) the Consolidated Complaint, (b) the Settlement Agreement, (c) the 2016 Modification Agreement, and (d) the Preliminary Approval Order; (4) establish a toll-free number for class

members to call with questions; (5) receive claim forms and other correspondence at a dedicated PO Box; (6) process documents received, including sorting, date-stamping, and bar-coding into categories; (7) scanning claim forms and supporting documentation; (8) capture data included in each claim form; (9) communicate with counsel throughout and continuously update website and call center. (Taylor Decl. ¶¶ 3-9.)

Between January 24, 2017 and May 17, 2017, there were 375,309 unique visitors to the Home City Settlement website and in that period of time there were 141,924 online claims submitted. (Taylor Decl. ¶¶ 10-11.) Also, on or about January 27, 2017, Rust direct mailed Claim Forms with Notice to 18,921 prospective class members who previously participated in the Arctic Glacier claims process. (Taylor Decl. ¶ 12.) The Claim Form clearly explained how to access the Home City Settlement website for further information and clearly set forth the claims filing deadline and the three categories of purchases which qualify class members to participate in the settlement and the corresponding claim amounts for each category. The Claim Form included a copy of the Short Form Notice explaining who is included in the Settlement Classes, what the Settlement provides, what Class Members are eligible to receive, and how to get a payment. (*Id*. Ex. 2, Claim Form and Notice.) *See infra* discussion at section VI regarding the Plan of Allocation and

Claims Process.

In addition to the mailed notice and the information available on the Home City Settlement website, Rust placed a Short Form Notice in a 1/6 page advertisement that appeared in *USA Today* on January 31, 2017, with an estimated circulation of 975,139. Rust also placed a Short Form Notice in a half-page advertisement that appeared in *Parade Magazine* on January 29, 2017, with an estimated circulation of 22,000,000. (Taylor Decl. ¶¶ 13-15, Ex. 3, Short Form Notice.)

In addition to the advertising in *USA Today* and *Parade Magazine*, and the direct mail notice to Arctic Glacier claimants, online advertisements of the Settlement appeared across a variety of sites and networks, including: (1) online networks – banner ads appeared across a variety of networks delivering approximately 8,452,411 "impressions" or opportunities for the advertisements to be seen; (2) blogs – banner ads appeared on a variety of blogs that feature content on related topics; (3) Facebook – newsfeed ads were delivered on Facebook using targeted tactics to reach people who have expressed interest in related topics; (4) Twitter – sponsored/promoted Tweets were delivered using targeted tactics, reaching followers of handles about related topics. (Taylor Decl. ¶ 16.) In addition, a link about the Settlement was posted on a Facebook page and Twitter handle followed by consumers with interest in class action lawsuits. (Taylor Decl. ¶ 17.) Finally, on January 31, 2017, a press

release was distributed on PR Newswire's US1 National newsline, which is distributed to over 15,000 print and broadcast outlets and over 4,550 online media outlets. The press release was picked up by over 135 news outlets, with a potential audience of 89 million people. (Taylor Decl. ¶ 18, Ex. 4.) The Settlement received additional media coverage from organizations and entities that picked up and republished news of the Settlement. These media releases appeared with captions such as "Class Action Settlement Announced Involving Packaged Ice," and "Packaged Ice Settlement - No Proof of Purchase Needed." (Taylor Decl. ¶ 18, Ex. 5.)

## VI.    THE PLAN OF ALLOCATION AND THE CLAIMS PROCEDURE

The allocation plan reimburses consumers up to $12 without proof of purchase for up to the purchase of 12 bags/blocks of ice and an additional $2 for each additional bag/block purchased more than 12 with proof of purchase. The Long Form Notice, the Short Form Notice, and the Claim Form itself, each clearly explained that Class II Members who (1) purchased 1-6 bags/blocks of ice from any of the Defendants in the Class Period were eligible to receive $6 without proof of purchase/payment, (2) purchased 7-12 bags/blocks of ice from any of the Defendants in the Class Period were eligible to receive $12 without proof of purchase/payment, and (3) purchased more than 12 bags of ice (i.e. 13 or more) from the Defendants

during the Class Period were eligible to receive $12 for the first 12 bags/blocks and an additional $2 for each additional bag/block *with* proof of purchase. (Taylor Decl. Ex. 2; ECF No. 533, Supp. Br. With Revised Notices Exs. 2-5.)

Since June 29, 2017, Rust has received a total of 151,029 claims that were filed either online or mailed by prospective Class Members, 148,808 of which were deemed timely. (Taylor Decl. ¶¶ 20-21.) Timely claims were segregated by the number of bags or blocks claimed with the following results:

- 15,906 claims for more than 12 bags/blocks;

- 128,299 claims for 7-12 bags/blocks;

- 4,537 claims for 1-6 bags/blocks;

- 66 claims where claim form was not signed or no ice was claimed.

(Taylor Decl. ¶ 22.)

Upon review of the 15,906 claims for more than 12 bags/blocks, which required proof of purchase/payment, only 18 claims were received with relevant supporting documentation, and of those 18 only 12 provided sufficient documentation to determine the quantities of ice actually purchased so that a claim amount could be determined. The remaining 6 were identified for follow-up with the claimant. (Taylor Decl. ¶ 23.) As to the remaining 15,694 claims for more than 12 bags that had no documentation of proof of purchase, those claims were defaulted to the 7-12

bag category, increasing the number of claims in the 7-12 bag category to 144,187. (Taylor Decl. ¶ 23.)

As of the date of the filing of the initial Taylor Declaration, the validation process for these timely claims was incomplete and the Court requested that Class Counsel file an update with the Court, setting forth the final number of claims to be paid, with corresponding dollar amounts, and a final estimate of Rust's costs to complete the claims process. (ECF No. 553, July 11, 2017 Order Regarding Final Fairness Hearing.) On July 17, 2017, Indirect Purchaser Plaintiffs filed their Response to the Court's July 11, 2017 Order, attaching the Supplemental Declaration of Heidi Taylor. (ECF No. 554, Indirect Purchaser Plaintiffs' Response to the Court's Order Dated July 11, 2017, Ex. 1.)

Plaintiffs' Response explains that, due to Indirect Purchaser Plaintiffs' Counsel's decision to waive any award of attorneys' fees from the Settlement Fund, *see* ECF No. 544, Notice of No Attorney Fee Application, there is an amount of money in the Settlement Fund that exceeds the amount necessary to pay each valid claim per the $6, $12, and $12-plus amounts set forth in the Notices and Claim Forms. Consequently, Rust has estimated the dollar amounts per claimant to be higher than proposed in the Plan of Allocation. The possibility of such a proportional increase was explained in the Notices and the Claim Forms:

Any money that may be left after claims are paid and expenses and attorneys' fees are deducted may be distributed by increasing payment amounts proportionally or extending the claims filing deadline and advertising to attract more claims.

(*See, e.g.* ECF No. 549-2, Short Form Notice PgID 11275.)

In calculating the final claims payment numbers, Rust assumed that the Settlement Fund of $2.7 million would be reduced by $649,921.00, which Rust estimates will be its total charge for fees and expenses for this project. (ECF No. 554, Ex. 1, Supp. Taylor Decl. ¶ 5.) This figure falls just within the $650,000 allotment for these costs set forth in the 2016 Modification Agreement and leaves $2,050,079 in the Settlement Fund for claims payments.

Given the total funds remaining in the Settlement Fund, Rust estimates the payouts per claim will be higher than set forth in the Plan of Allocation and will be as follows:

- $7.92 for 1-6 bags/blocks for 4,024 households, totaling at least $31,870;

- $15.84 for 7 or more bags/blocks of ice without proof of purchase for 124,482 households, totaling at least $1,971,795;

- $15.84 plus $2.64 for each bag/block of ice over 12 with proof of purchase, totaling at least $7,690. There are 15 claims of

households falling into this category but 6 of them are still being

asked to provide additional documentation, so that this figure is

still subject to change. Rust used the average of the 9 households

with sufficient documentation, an average of $854 per household,

to estimate that the total payments in this category could reach

$12, 810.

(Supp. Taylor Decl. ¶ 6.)

Thus, as of July 17, 2017, Rust estimated that the total claims payments could

reach $2,016,475 out of the $2,050,079 remaining in the Settlement Fund after

payment of Rust's final administration costs. The estimated remaining $33,604 in

Settlement Funds will be used in calculating the final pro-rata distribution once the

claims process for the 6 remaining households in the 12 or more bag category has

been completed upon final submission of proof of purchase documentation. (Supp.

Taylor Decl. ¶ 7.)

The Court preliminarily approved the Notice program for the Home City

Settlement, concluding that it was "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and to afford

them an opportunity to present their objections." *UAW*, 497 F.3d at 629. Ms.

Taylor's Declarations confirm that the Notice outreach was successfully executed and

that the exposure that the Home City Settlement received through the online activities, the banner ads on blogs, the Facebook and Twitter ads, as well as the media coverage from the news outlets that picked up the press release on the PR Newswire and republished the information regarding the Home City Settlement and how to participate, all demonstrate the outreach was robust and was the best practicable under the circumstances of this case. The claims response rate of nearly 150,000 was almost ten times the response received in the Arctic Glacier settlement process that was approved by the Delaware Bankruptcy court and demonstrates the efficacy of Class Counsel's positive enhancements to the Notice outreach for the Home City Settlement. The fact that there were millions of consumers who *could have* participated but did not cannot be used as a measure of the adequacy of the Notice program under the circumstances of this case. *See In re Serzone Pdcts. Liab. Litig.*, 231 F.R.D. 221, 235-36 (S.D. W.Va. 2005) (concluding that a claims rate of 6,524 claimants out of a settlement class that could have potentially included millions did not demonstrate the inadequacy of the notice, noting that "many factors contribute to the claims response rate," and observing that "claims response levels will tend to vary with the circumstances, types of class notices employed, and size of individual claims involved in each case") (internal quotation marks and citations omitted). Where, as here, the Defendant "engaged in customary and court approved notice procedure, the

response rate [is] not determinative of the adequacy of the class notice." *Id.* There are a multitude of reasons that consumers would elect not to participate in a settlement process of this nature. That being said, it is an indication of the success of the Notice outreach that nonetheless nearly 150,000 claimants did respond to the Notice and did attempt to participate, and that of those claimants, nearly 130,000 households will receive money from the Settlement Fund.

Finally, Class Counsel has explained that the Settlement Funds have generated approximately $42,335.19 in interest. This amount was not included in the potential payout schedule because, pursuant to ¶ 2 of the December 20, 2012 Modification Agreement and ¶ 4 of the 2016 Modification Agreement, Class Counsel is permitted to use the interest earned on the Settlement Funds to satisfy payments and expenses associated with taxation matters incurred in relation to the Settlement Fund. Class Counsel anticipates and hopes that the tax preparation liabilities will be less than the interest earned, and represents that any amount of interest not needed for such tax preparation expenses will be added to the Settlement Fund for claims payment. However, because this exact amount is unknown, Rust based its calculation only on the $2,700,000 principal of the Fund. (ECF No. 554, Pls.' Resp. 4, PgID 11378.)

## VII. FAIRNESS, REASONABLENESS, AND ADEQUACY OF THE SETTLEMENT AGREEMENT

"Rule 23(e) governs class action settlements and mandates that the court may approve a settlement upon holding a fairness hearing and concluding that it is 'fair, reasonable, and adequate.'" *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 276 (6th Cir. 2016). The Sixth Circuit has set out the following factors to guide this inquiry:

> (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Gascho*, 822 F.3d at 276 (quoting *UAW*, 497 F.3d at 631.)

### A. The Risk of Fraud or Collusion

"Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Ford Motor*, 2006 WL 1984363 at * 26. There is no evidence or even an allegation in this case of any collusion between Class Counsel on the one hand and the Home City Graydon Head law firm or any of the parties to the negotiations and all are presumed to have acted in good faith. This factor weighs in favor of final approval. In fact, the baseless suggestion of Objector Andrews at the Final Fairness Hearing of

such a potential was an affront to both the Court and to counsel.

## B. The Complexity, Expense, and Likely Duration of a Trial and the Amount of Discovery Conducted to Date

"[T]he prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery." *In Re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003). "Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *Id.* "[A]n antitrust action is arguably the most complex action to prosecute . . . The legal and factual issues involved are always numerous and uncertain in outcome." *In re Linerboard Antit. Litig.*, 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004) (internal quotation marks and citations omitted). As this Court noted in approving the Direct Purchaser's settlement with Home City, "an antitrust litigation of this scope has great complexity and undeniable inherent risks, such as whether the class[es] will be certified and upheld on appeal, whether the conspiracy as alleged in the Complaint can be established, whether Plaintiffs will be able to demonstrate class wide antitrust impact and ultimately whether Plaintiffs will be able to prove damages." *In re Packaged Ice*, 2011 WL 717519, at *10. And in an indirect purchaser case, "the problem of proof [] is intrinsically more complex, because the damage model must account for the action of innocent intermediaries

who allegedly passed on the overcharge." *In re Graphics Processing Units Antit. Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008). This factor weighs in favor of settlement, as discussed more fully below in the evaluation of the likelihood of success on the merits weighed against the amount and form of the relief by settlement.

As noted above, this proposed settlement between the Indirect Purchaser Plaintiffs and Home City is the very last piece that will close this nine-year long MDL litigation. Although the original Settlement Agreement was reached years ago, and indeed was definitely an ice-breaker in the litigation given Home City's early agreement to cooperate, the Court's analysis of this Settlement now benefits from the knowledge gained in all that has transpired since the original Settlement Agreement was reached in 2012. The "stage of proceedings" factor asks the Court to consider whether "counsel had an adequate appreciation of the merits of the case before negotiating." *Sullivan*, 667 F.3d at 321. This was not the first settlement agreement reached in this 2008 MDL action and, as discussed *supra*, much had been learned by 2012 when this Settlement Agreement was reached. Class Counsel was well informed of the shortcomings (and any strengths) of this case when the Settlement Agreement was negotiated. This factor weighs in favor of approval of the Settlement Agreement.

### C. The Likelihood of Success on the Merits Weighed Against Relief Obtained in the Settlement Agreement

This Court "cannot judge the fairness of a proposed compromise without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *UAW*, 497 F.3d at 631 (internal quotation marks and citations omitted). Here, as a starting point and as a highly significant fact, the Indirect Purchaser Plaintiffs would face a very tough legal battle in establishing a nationwide conspiracy. Following their investigation into the packaged ice industry, the Department of Justice did not bring nationwide conspiracy charges but charged only a criminal antitrust conspiracy in Southeastern Michigan. The DOJ closed its investigation without pursuing nationwide conspiracy charges:

> Plaintiffs point out, and the Court notes, that the Department of Justice has closed its investigation of the Packaged Ice industry and, while certainly not dispositive of Plaintiffs' claims, this is a factor which favors settlement. See *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp.2 d 697, 702 (M.D. Pa.2008) ("Risks of establishing liability and damages are substantial .... [and] the criminal investigation that likely instigated this antitrust litigation was concluded without the issuance of any indictments."); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) (finding that district court did not abuse its discretion in considering that "there were no government coattails for the class to ride"). Plaintiffs also note that their case alleges a nationwide conspiracy, while certain Defendants have pled guilty only to antitrust violations in Southeastern Michigan. Plaintiffs also state that the November 15–17, 2010 deposition of Keith Corbin, a retired Arctic Glacier executive who features prominently in the allegations of the CAC, did not change their analysis of their chances of success.

*In re Packaged Ice*, 2011 WL 717519, at *9.[4] These same considerations apply here, even more, since any evidence in this case that might favor the Plaintiffs has become increasingly stale, and related litigation involving the former Arctic Glacier employee and whistleblower, Martin McNulty, resulted in dismissal by this Court and an abandoned appeal.

Another hurdle for these Indirect Purchasers to overcome would be the certification of a *litigation* settlement class. As the court noted in *Sullivan*, the complexities of certifying a nationwide indirect purchaser class are far less of a concern in the settlement context than they become in the litigation context, where courts will face "intractable case management" issues. *Sullivan*, 667 F.3d at 304. *See also In re Warfarin Sodium Antit. Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) ("Although Appellant's concerns about the manageability of a multistate class of consumers . . . did not pose a problem for the certification of a settlement class, there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified."). Particular issues of damages proofs plague class certification of nationwide antitrust actions. *Comcast*

---

[4] The criminal antitrust conspiracy indictment was brought in the Southern District of Ohio. Judge Herman Weber presided over the criminal antitrust proceeding. The indictment charged Defendants Arctic Glacier and Home City with crimes committed in the Southern District of Michigan.

*Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (concluding that plaintiffs' antitrust nationwide class action was improperly certified and holding that "damages must be capable of measurement on a classwide basis"); *In re Cathode Ray Tube (Crt) Antit. Litig.*, No. 07-cv-5944, 2016 WL 721680, a*37 (N.D. Cal. Jan. 28, 2016) (approving indirect purchaser class for purposes of settlement only and noting that indirect purchaser plaintiffs would have a "severe hurdle" to overcome demonstrating a valid method for proving pass through overcharges) (citing *Behrend*) (Quinn, MJ), *adopted in part at and final approval granted at* 2016 WL 3648478 (N.D. Cal. July 7, 2016).

Thus, Indirect Purchaser Plaintiffs would be required to establish that they could demonstrate antitrust injury, i.e. pass-through overcharges, through common proof. Given the individual markets involved in the alleged market allocation conspiracy, and possible variations in state antitrust laws, this would be a "severe hurdle" for Plaintiffs at the litigation stage. Indirect Purchaser Plaintiffs must establish that the direct purchasers passed on to them the effects of the supracompetitive pricing the direct purchasers claim to have paid as a result of the alleged conspiracy. In fact, it is this difficulty of proof that in part spurred the decision in *Illinois Brick* to limit monetary recovery for antitrust violations under the Sherman Act to direct purchasers. *See In re Graphics*, 253 F.R.D. at 499 ("the problem of proof in an indirect purchaser case is intrinsically more complex, because

41

the damage model must account for the actions of innocent intermediaries who allegedly passed on the overcharge," as recognized in *Illinois Brick*) (internal quotation marks and citations omitted). And, because in this case the allegations involved claims of market allocation, the Plaintiffs' proofs would necessarily have to account for the potential differences in competition in the various markets across the country in which the Defendants competed for the packaged ice market. The impact of the alleged collusion, particularly given the DOJ's election not to proceed on a nationwide conspiracy theory, would be difficult to establish.

Balanced against all of this significant risk to the Indirect Purchaser Plaintiffs in succeeding on their claims should this case proceed to trial is the $2.7 million settlement achieved on their behalf, which will amount to just over $2 million once notice and claims administration costs are deducted. First, it must be remembered that the Home City settlements, in both the Direct Purchaser and Indirect Purchaser actions, were among the first to occur and were important ice breakers, providing significant cooperation that no doubt played a substantial role in the eventual settlements reached with the other Defendants. As this Court noted in evaluating the Direct Purchaser's settlement with Home City, the value of such cooperation weighs in favor of approval of the Settlement Agreement. *In re Packaged Ice*, 2011 WL 717519, at *10. *See also In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F.

Supp. 2d 697, 702 (M.D. Pa.2008) ("the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to withstand a larger judgment.").

Finally, the Settlement Amount of $2.7 million is a substantial settlement for these Indirect Purchasers under the facts of this case. "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *In re Polyurethane Foam Antit. Litig.*, 168 F. Supp. 3d 985, 1001 (N.D. Ohio 2016) (internal quotation marks and citation omitted). "The propriety of a settlement must be assessed as a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery (or reduced recovery)." *Id.* (internal quotation marks and citation omitted). In this Indirect Purchaser nationwide antitrust action, there was a real risk of complete non-recovery.

Plaintiffs state that the $2.7 million represents approximately 2% of Home City's sales in the Class II states during the Class Period and Mr. Roberts, Counsel for Home City, confirmed at the Final Fairness Hearing that Home City's sales in the year this lawsuit was filed were around $90 million and that less than half of the states in which Home City sold were *Illinois Brick* repealer states, confirming that Plaintiffs' 2% figure was not far off. As discussed *infra* in response to the Objection

of Objector Andrews, even assuming that the $2.7 million Settlement figure may actually fall somewhere between 1.5% and 2.0% of Home City's sales in the Class II states, such a recovery has been recognized as fair and reasonable in many antitrust class action lawsuits. *See, e.g., In re Pressure Sensitive Labelstock*, 584 F. Supp. 2d at 702 (approving cash settlement that was 1.5% of defendants' sales during the class period and finding this percentage "within the range of settlements approved in other class actions" in that district); *Meijer, Inc. v. 3M*, No. 04-5871, 2006 WL 2382718 at *16 (E.D. Pa. Aug. 14, 2006) ($28.9 million settlement represented 2% of settling defendant's sales to class members); *In re Linerboard*, 321 F. Supp. 2d at 627 (approving settlement that represented 1.62% of settling defendants' sales); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (preliminarily approving settlement that represented 2% of sales).

But more important, the adequacy of any settlement amount is a function of both the possible best case recovery and the potential for complete non-recovery should the case proceed to trial. *In re Polyurethane*, 168 F. Supp. 3d at 1001. The settlement amount cannot be considered in a vacuum and, if argued to be "grossly inadequate" it can only be so "in light of the strength of the case presented by plaintiffs." *In re Serzone*, 231 F.R.D. at 244-45. In this Indirect Purchaser litigation,

in which the DOJ did not seek indictments on a nationwide basis but limited its criminal charges to Southeastern Michigan, these Indirect Purchaser Plaintiffs faced a very difficult uphill battle, both in certifying a litigation class and in proving both the existence of a nationwide conspiracy, and in proving that the supracompetitive pricing allegedly paid by the Direct Purchasers was passed through to the individual consumer.

Also, as discussed *supra*, the injunctive relief has significant value because all Class I members benefit from being able to hold Home City accountable in this Court for any antitrust violations for a period of three years following Final Approval of this Order without necessity of filing a new lawsuit. None of the hurdles that necessarily would face litigation of this Indirect Purchaser action, discussed *supra*, would have to be overcome if Home City violated the injunction – Class Members could simply proceed in this Court to enforce the terms of the Settlement Agreement.

### D.     The Opinions of Class Counsel and Class Representatives

Class Counsel has had their work cut out for them in taking on this Indirect Purchaser Litigation, and have remained actively involved in the case through its numerous bankruptcies, obtaining the assistance of bankruptcy counsel in the Reddy Ice Texas bankruptcy proceedings, and appearing regularly in the Arctic Glacier Canadian bankruptcy proceedings and in the Delaware bankruptcy proceedings,

representing the interests of the Indirect Purchaser class. In addition, as Class Counsel summarized in the motion for Final Approval, Class Counsel's investigation included:

> Reviewing publicly available information about the investigation and the Defendants (including statements from the Department of Justice concerning the outcome of the investigation); coordinating with the lawyer for the two government informants (Martin McNulty and Gary Mowery) in the criminal cases; consulting with a leading economist firm; analyzing the tapes and transcripts of intercepted telephone conversations between Home City, Arctic Glacier and Reddy employees; reviewing certain documents produced in connection with and the transcript of, Keith Corbin's deposition; interviewing executives from a national supermarket chain to understand how antitrust overcharges are passed on and how consumers who purchased packaged ice can be identified and tracked; and conducting their own independent factual investigation.

(ECF No. 547, Pls.' Mot. at 9.) These are among the factors that this Court found persuasive in determining that this factor weighed in favor of approval in the Direct Purchaser case. *In re Packaged Ice*, 2011 WL 717519, at *11. The same holds true even more here and this factor weighs in favor of approval of the Indirect Purchaser Plaintiffs' settlement with Home City.

### E. The Reaction of Absent Class Members

There were three Objections to the Settlement Agreement and one apparent Opt-Out that was "phoned in" to Mr. Roberts, counsel for Home City, the day before the Final Fairness Hearing. All three Objections focused primarily on the $900,000

attorneys' fee provision, which is no longer an issue given Class Counsel's decision not to seek any attorneys' fee from the Home City Settlement. The Objections are as follows:

1.    Christopher Andrews (ECF No. 539, Objection). Objector Andrews is a serial objector – that is to say he seeks out and regularly objects to class action settlements across the country.[5] Andrews filed a 42-page rambling Objection, largely lacking in evidentiary and/or legal support. Andrews requested and was granted permission to appear, and did appear and speak, at the Final Fairness Hearing. (ECF No. 545.) He filed a claim for 7-12 bags of ice. (ECF No. 539, PgID 10900). He states that he used ice to keep drinks cold for players when participating in numerous inline hockey tournaments. The Court will not address the litany of objections that Andrews, a practiced Objector, mounts, as many of them utterly lack both evidentiary and legal basis. The following Objections, however, merit mention:

---

[5] *See, e.g. In re Polyurethane Foam Antit. Litig.*, 168 F. Supp. 3d 985, 994, 998 (N.D. Ohio 2016) (addressing Andrews' objections to the class action settlement and noting that Andrews "repeatedly makes baseless accusations using inappropriate language," and raised "many unfounded, conclusory, and frivolous objections," and addressing only a few and specifically rejecting "completely the inflammatory and conclusory accusations of fraud by pro se objector Andrews"). This description of Mr. Andrews' conduct aptly depicts his participation in this Class Action Final Fairness hearing. This Court was similarly offended by Mr. Andrews' suggestions of fraudulent conduct between Class Counsel and counsel for Home City in this case. And this Court too will address only a few of Mr. Andrews' otherwise baseless, and frankly offensive, objections.

- *The "sky high, unverified, $650,000 for expenses associated with notice, claims generation and settlement administration.* This objection is not well taken because Rust has verified its expenses in great detail, and the Court has studied and validated Rust's expenses, and the need for its activities in this case.

- *The "unseen undocumented fees motion."* This objection is moot given Class Counsel's decision not to seek any attorneys' fees from the Home City Settlement.

- *The settlement amount of $2.7 million is inadequate.* This objection is based on Andrews' assumption that Home City's sales were $80 million/year for each of the 7 years in the class period. That would be a total of approximately $560,000,000 in total sales during the Class Period. Mr. Roberts explained at the Final Fairness hearing that fewer than half of the states in which Home City sold ice were *Illinois Brick* repealer states that would be home to Class II members. If less than half of Home City's sales were in Class II states, approximately $200,000,000 in sales, 2% of that would be $4 million and the Settlement Amount in this case is $2.7 million. Indirect Purchaser Plaintiffs represent that the $2.7 million represents approximately 2% of Home City's sales in the Class II states during the Class Period. Assuming the Objector's figures are accurate, the Settlement figure may actually fall somewhere between 1.5% and 2.0% of Home City's sales in the Class II states. As discussed *supra*, such a recovery has been recognized as fair and reasonable in many antitrust class action lawsuits. *See, e.g., In re Labelstock Antitrust Litig.*, 584 F. Supp. 2d at 702 ($8.25 million settlement equal to 1.5% of settling defendant's sales during the class period); *Meijer,* 2006 WL 2382718 at *16 ($28.9 million settlement represented 2% of settling defendant's sales to class members); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d at 627 (approving settlement that represented 1.62% of settling defendants' sales); *In re Automotive Refinishing Paint Antitrust Litig.*, 2004 WL 1068807, at *2 (approving settlement that represented 2% of sales); *In re Pressure Sensitive Labelstock Antit. Litig.*, 584 F. Supp. 2d at

702 (approving cash settlement that was 1.5% of defendants' sales during the class period and finding this percentage "within the range of settlements approved in other class actions" in that district). As discussed *supra*, the settlement amount cannot be considered in a vacuum and, if argued to be "grossly inadequate" it can only be so "in light of the strength of the case presented by plaintiffs." *In re Serzone*, 231 F.R.D. at 244-45. In this Indirect Purchaser litigation, in which the DOJ did not seek indictments on a nationwide basis but limited its criminal charges to Southeastern Michigan, these Plaintiffs faced a very difficult uphill battle, both in certifying a litigation class and in proving both the existence of the conspiracy and their overcharge pass-through damages. In light of all of these hurdles, which Objector Andrews fails to note, this Objection to the adequacy of the settlement is OVERRULED.

• *There was no disclosure regarding the release of claims.* This objection is not well taken because the Notice specifically informed Class Members that the right to sue that they were giving up was explained in detail in the Settlement Agreement which was available at all times on the website. If the Notice had contained this type of detail, it would have been too many words and much more expensive. It was adequate.

• *The claims rate of nearly 150,000 claimants out of millions of consumers represents a "clear failure" of the notice program.* This objection is not well taken. As explained *supra* in the Court's discussion of the Notice campaign, the response rate is not indicative of the adequacy of the Notice under the circumstances of this case. *See In re Serzone*, 231 F.R.D. at 236 (concluding that a claims rate of 6,524 claimants out of a settlement class that could have potentially included millions did not demonstrate the inadequacy of the notice, noting that "many factors contribute to the claims response rate," and observing that "claims response levels will tend to vary with the circumstances, types of class notices employed, and size of individual claims involved in each case). Where, as here, the Defendant "engaged

49

in customary and court approved notice procedure, the response rate [is] not determinative of the adequacy of the class notice." *Id.* It is an indication of the success of the Notice outreach here that nearly 150,000 claimants, nearly 10 times the response rate in the Arctic Glacier Indirect Purchaser settlement, did respond to the Notice and did attempt to participate, and that of those claimants, nearly 130,000 households will receive money from the Settlement Fund, fully exhausting the Settlement Fund after Notice and claims processing expenses are paid.

2.   The Willard Objection. (ECF No. 540.) Objector Willard requested and was granted the opportunity to appear through counsel, Mr. MacDonald, and be heard at the Final Fairness Hearing.

- •   Willard's principal objection is to Wild's $900,000 fee request. As Willard admits in his motion for attorneys fees, "Class Counsel's decision to waive their $900,000 fee would likely have outweighed Willard's remaining objections to the proposed settlement." (ECF No. 551, Willard Fee Motion 9, PgID 11340.) This objection is now moot.

- •   Willard also filed a Motion for Attorneys' Fees, claiming credit for persuading Class Counsel to drop the request for attorneys' fees from the Home City Settlement Fund. The Court DENIES this motion. Class Counsel opted not to file a motion seeking attorneys' fees from the Home City Settlement Fund long before Willard filed his Objection. There is no evidence, in fact Class Counsel expressly denies, that Willard's Objection, filed after Class Counsel had let the deadline for his fee motion come and go, had any influence on the decision not to seek attorneys' fees from the Home City Settlement Fund.

3.   Pamela Sweeney Objection. (ECF No. 548.) Sweeney did not request to appear and be heard.

- Sweeney, like Willard and Andrews, principally objects to the $900,000 fee award request. This objection is moot.
- *Concern over lack of oversight by the Court over the remaining claims process.* Sweeney suggests that Class Counsel be required to file a final summary and accounting. The Court had always intended to request a final report and accounting, which is provided for in this Opinion and Order and in the separate Fed. R. Civ. P. 54(b) Final Order and Judgment filed separately this day.

There were only 3 objections filed to the Settlement Agreement, and over 150,000 Class Members who have attempted to participate in the Settlement. Each of the Objections focused principally on Class Counsel's $900,000 fee request, which is no longer an issue. Andrews, who admits to quite a history as an objector in class actions, came up with a host of other "issues" in his written submissions and at the Final Fairness Hearing, but in fact conceded in an email to Class Counsel prior to the Final Fairness hearing that his primary objection was to the $900,000 fee request. Andrews claimed in his Email to Class Counsel that because his Objection had "caused Class counsel to drop the entire fee," Andrews was considering dropping his Objection and considering the fee withdrawl "a feather in his cap." (ECF No. 574-4, PgID 11206, May 26, 2017 Email from Andrews to Wild.) This Court disagrees with Andrews' statement that his Objection affected Class Counsel's intention not to seek a fee (as discussed *supra* with respect to the Willard Objection, Class Counsel did not file a motion for attorneys' fees, clearing communicating his intent not to seek a fee,

long before Andrews filed his Objections). Regardless, however, of what prompted Class Counsel's decision not to seek attorneys' fees from the Home City Settlement Fund, any objection to the fee request is now moot. The fee request was, by Objector Andrews' own admission, the driving force behind his Objection. That issue is now moot and none of Andrews' other "objections" lead the Court to question the fairness, reasonableness, or adequacy of this Settlement Agreement.

In summary, none of Objections has convinced the Court to disallow this arm's length, well-informed and fairly-bargained agreement, negotiated after years of diligent work by Class Counsel on behalf of this Class, to finally resolve these Indirect Purchasers' claims, claims that would be exceedingly difficult to prove should this case go to trial. This truly is a case in which the prospect of the Class Members actually receiving nothing were this Court to disapprove of the Settlement Agreement is more than a platitude – it is a real possibility.

### F.    The Public Interest

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem*, 219 F.R.D. at 530. There do not appear to the Court to be any countervailing public interests that would suggest that the Court should disapprove the Settlement

Agreement. This factor weighs in favor of final approval.

## VIII. CONCLUSION

Indirect Purchaser Plaintiffs have adequately established that the proposed Settlement Agreement with Home City is fair, reasonable, and adequate, and have established that Settlement Classes I and II should be certified as settlement classes under Fed. R. Civ. P. 23(a) and 23(b)(2) and (3).

Accordingly, it is ORDERED that:

(1) The Indirect Purchasers' Motion for Final Approval of Their Settlement with the Home City Ice Company (ECF No. 547) is GRANTED and the Settlement Agreement is APPROVED;

(2) The Andrews and Willard Objections to the Settlement Agreement are OVERRULED (ECF Nos. 539, 540) and the Sweeney Objection (ECF No. 548) is noted insofar as it asks the Court to require a final report and accounting following Rust's completion of the claims process, which the Court had required in the Direct Purchaser action, and intended to do here, and is otherwise OVERRULED;

(3) Settlement Classes I and II are certified for purposes of this settlement only under Fed. R. Civ. P. 23(a) and 23(b) (2) and (3);

(4) Objector Willard's Motion for Attorneys' Fees (ECF No. 551) is DENIED;

(5) A Fed. R. Civ. P. 54(b) Final Approval Order and Judgment is entered

separately this same day.

IT IS SO ORDERED.

Dated:     SEP 1 9 2017

Paul D. Borman
United States District Judge